David T. Biderman, Bar No. 101577
Judith B. Gitterman, Bar No. 115661
Farschad Farzan, Bar No. 215194
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, California  94111
Telephone: (415) 344-7000
Facsimile: (415) 344-7050

Floyd Abrams (admitted *pro hac vice*)
Adam Zurofsky (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

*Attorneys for Defendant*
*The McGraw-Hill Companies, Inc.*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION | Civil Action No. 09-01376 (SI) |
| | **CONSOLIDATED CLASS ACTION ECF** |
| | **THE RATING AGENCY DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date:     January 29, 2010<br>Time:     9:00 a.m.<br>Before:   Hon. Susan Illston |

1

**TABLE OF CONTENTS**

2   NOTICE OF MOTION AND MOTION TO DISMISS ................................................ 1

3   STATEMENT OF ISSUES TO BE DECIDED ....................................................... 1

4   MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

5   PRELIMINARY STATEMENT ............................................................................. 1

6   STATEMENT OF RELEVANT FACTS ............................................................... 3

7   ARGUMENT ........................................................................................................ 4

8   I.     PLAINTIFFS' SECTION 11 CLAIMS MUST BE DISMISSED ................... 4

9          A.     Plaintiffs' § 11 Claims Against The RAs Are Precluded By Express SEC
                  Rule ........................................................................................................ 4
10
           B.     Plaintiffs Have No Claim for "Underwriter" Liability Against The RAs ............... 7
11
                  1.     The Consent Requirements of Section 11(a)(4) Preclude Plaintiffs'
12                       Claims ............................................................................................ 7

13                2.     The RAs Are Not "Underwriters" of the Securities They Rated ............. 10

14  II.    THE ASSERTED RATINGS-RELATED "MISSTATEMENTS" AND
           "OMISSIONS" ARE NOT ACTIONABLE IN ANY EVENT ........................ 16
15
           A.     No Actionable "Misstatements" or "Omissions" Are Alleged ............................. 17
16
           B.     The Ratings-Related Statements In The Offering Documents Are Entitled To
17                Protection Under The "Bespeaks Caution" Doctrine ........................................... 20

18  III.   PLAINTIFFS' § 15 CLAIMS SHOULD BE DISMISSED ............................................. 21

19  CONCLUSION ..................................................................................................... 25

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                   **Page**

*Ackerberg* v. *Johnson*, 892 F.2d 1328 (8th Cir. 1989)...................................   10-11

*In re Adelphia Communications Corp. Sec. and Derivative Litig.*, 2007
   WL 2615928 (S.D.N.Y. Sept. 10, 2007)  ................................................   14

*Alderman* v. *SEC*, 104 F.3d 285 (9th Cir. 1997)..........................................   5n

*Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009) ...............................................   13

*In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857 (N.D. Cal. 2004)..   20

*Durham* v. *Kelly*, 810 F.2d 1500 (9th Cir. 1987)..........................................   22n

*In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F.
   Supp. 2d 742 (S.D. Tex. 2005)................................................................   5

*Falkowski* v. *Imation Corp.*, 309 F.3d 1123 (9th Cir. 2002).......................   22

*In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y.
   2003)........................................................................................................   8n

*In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217 (N.D. Cal. 1994) .............   22

*Hedden* v. *Marinelli*, 796 F. Supp. 432 (N.D. Cal. 1992)..........................   10-11

*Herman & MacLean* v. *Huddleston*, 459 U.S. 375 (1983) ...........................   4, 7, 8n

*In re Iasia Works, Inc. Sec. Litig.*, 2002 WL 1034041 (N.D. Cal. May 15,
   2002)........................................................................................................   21

*Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525 (S.D.N.Y. 1977) ....................   10-12

*Lopes* v. *Vieira*, 543 F. Supp. 2d 1149 (E.D. Cal. 2009) .............................   18n

*Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*, 2009 WL
   2590087 (E.D. Pa. Aug. 20, 2009) ........................................................   5n

*McCasland* v. *Formfactor, Inc.*, 2008 WL 2951275 (N.D. Cal. July 25,
   2008)........................................................................................................   22

*McFarland* v. *Memorex Corp.*, 493 F. Supp. 631 (N.D. Cal. 1980)............   7-11, 12n, 14,
   24

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal.
   2000)........................................................................................................   24

*In re Metricom Sec. Litig.*, 2004 WL 966291 (N.D. Cal. Apr. 29, 2004) .....   19

*Middlesex Retirement System* v. *Quest Software Inc.*, 527 F. Supp. 2d
   1164 (C.D. Cal. 2007) ............................................................................   24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund* v. *America
   West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003).................................   21-22, 22n

*Paracor Finance, Inc.* v. *General Electric Capital Corp.*, 96 F.3d 1151
   (9th Cir. 1996) ........................................................................................   22

*Pinter* v. *Dahl*, 486 U.S. 622 (1988) ............................................................. 15

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 2009 WL 3149775 (D. Mass. Sept. 30, 2009)............................. 17-18, 21

*In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)............................................................................................... 21

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007).............. 13-15

*In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) . 7-11, 14

*Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) ................... 18

*Rubke* v. *Capital Bancorp Ltd.*, 460 F. Supp. 2d 1124 (N.D. Cal. 2006), *aff'd*, 551 F.3d 1156 (9th Cir. 2009) ......................................................... 19, 22

*Safeway Portland Employees' Federal Credit Union* v. *C.H. Wagner & Co. Inc.*, 501 F.2d 1120 (9th Cir. 1974) ..................................................... 22

*SEC* v. *Allison*, 1982 WL 1322 (N.D. Cal. Aug. 11, 1982) ........................ 12

*In re Stac Electronics Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996)................... 20

*Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ............................................................................................... 16n

*In re Textainer Partnership Sec. Litig.*, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005)............................................................................................... 19

*Tirone* v. *Calderone-Curran Ranches, Inc.*, 1978 WL 1095 (W.D.N.Y. June 14, 1978) ....................................................................................... 8n

*TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438 (1976) ...................... 19

*Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083 (1991)..................... 17

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994)................................................................................................... 19-20

*Wright* v. *Schock*, 571 F. Supp. 642 (N.D. Cal. 1983), *aff'd* 742 F.2d 541 (9th Cir. 1984) ....................................................................................... 24

**Congressional Documents**

H.R. Rep. No. 73-85 (1933)................................................................... 11n

**Regulations**

SEC Regulations

17 C.F.R. § 229.1120 (2009)........................................................... 15n

17 C.F.R. § 230.405 (2009)............................................................. 22

17 C.F.R. § 230.436(g) (2009) ........................................................ 5-6, 6n, 7, 13, 17

THE RATING AGENCY DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. C-09-01376-SI

**Rules**

Fed R. Civ. P.

8 ............................................................................................... 1

12(b)(1) ..................................................................................... 1

12(b)(6) ..................................................................................... 1

**Statutes**

Securities Act of 1933

§ 2(a)(11), 15 U.S.C. § 77b(a)(11) (2006) ........................... 11

§ 7, 15 U.S.C. § 77g (2006) ................................................ 8n

§ 11, 15 U.S.C. § 77k (2006) ............................................... *passim*

§ 12, 15 U.S.C. § 77l (2006) ............................................... 4, 21

§ 15, 15 U.S.C. § 77o (2006) .............................................. 1-4, 21-24

Securities Exchange Act of 1934

§ 10(b), 15 U.S.C. § 78j(b) (2006) ...................................... 6, 16

§ 20(a), 15 U.S.C. § 78t(a) (2006) ...................................... 22n

**SEC Decisions**

*In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004) ............................................................................................... 10

*In re Reiter-Foster Oil Corp.*, 6 S.E.C. 1028, Release No. 33-2201, 1940 WL 36362 (Mar. 11, 1940) ................................................................... 12n

**SEC Releases**

SEC Rel. No. 33-6336, 46 F.R. 42024 (Aug. 18, 1981) ............................. 5-6

SEC Rel. No. 33-6383, *Adoption of Integrated Disclosure System*, 1992 WL 90370 (Mar. 3, 1982) .............................................................................. 5

SEC Rel. No. 33-7086, *Disclosure of Security Ratings*, 1994 WL 469347 (Aug. 31, 1994) ...................................................................................... 6n, 19

SEC Rel. No. 33-8400, 69 F.R. 15594 (Mar. 25, 2004) ............................. 6n

**Treatises**

1 Thomas Lee Hazen, *The Law of Securities Regulation* (4th ed. 2002) ...... 10

THE RATING AGENCY DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. C-09-01376-SI

1

2       **Other Authorities**

3       Daniel M. Covitz, *Testing Conflicts of Interest at Bond Ratings Agencies*        18n
            *with Market Anticipation:  Evidence that Reputation Incentives*
4           *Dominate* (2003) ......................................................................................

5       *Credit Rating Agencies and the Financial Crisis: Hearing Before the*            17n
            *House Committee on Oversight and Government Reform*, 110th Cong.
6           (2008) (statement of Frank L. Raiter), *available at*
            http://oversight.house.gov/documents/20081022102804.pdf  .................

7       SEC Report on the Role and Function of Credit Rating Agencies in the            19n
            Operation of the Securities Markets (Jan. 2003)  ....................................
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that, on January 29, 2010, at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Susan Illston, United States District Court Judge, of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California, defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill"),[1] Moody's Investors Service, Inc. ("Moody's") and Fitch Ratings, Inc. ("Fitch," and collectively, the "RAs") will move the Court pursuant to Fed. R. Civ. P. 8, 12(b)(1) and 12(b)(6) for an order dismissing all claims asserted against the RAs in the Consolidated Class Action Complaint ("Amended Complaint" or "AC") with prejudice.   The motion is made and based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, all pleadings and papers on file herein, and such additional evidence and argument as may hereinafter be presented to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

The following issues are to be decided on this motion:

1.      Whether Plaintiffs have failed to state a claim against the RAs in Count I of the Amended Complaint for violation of Section 11 of the Securities Act of 1933.

2.      Whether Plaintiffs have failed to state a claim against the RAs in Count III of the Amended Complaint for violation of Section 15 of the Securities Act of 1933.

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k, provides plaintiffs a potential strict liability cause of action if false or misleading information is contained in a registration statement.  But the categories of persons that may be sued under § 11 are carefully limited and defined to include only those persons that had a direct role in the registered offering. In the long history of the 1933 Act, that group has never included a nationally recognized

---

[1]  Because the allegations in the AC regarding McGraw-Hill concern its business unit, Standard & Poor's Rating Services, we refer to this defendant herein as "S&P."

statistical rating organization ("NRSRO"), *i.e.,* a rating agency recognized by the federal government. By bringing this case against the RAs, Plaintiffs seek an unprecedented expansion of the well-settled terms of the 1933 Act.

Specifically, Plaintiffs assert § 11 claims against S&P, Moody's and Fitch, three NRSROs that issued credit ratings on certain of the securities at issue. Plaintiffs do so notwithstanding that the ratings of NRSROs are expressly exempt as a matter of law from liability under § 11. Plaintiffs seek to elude this explicit bar on § 11 liability with a sleight of hand: They simply relabel the RAs' alleged conduct as "underwriting." That the RAs in fact underwrote nothing appears to be of no moment. Nor does the legal reality that, at the very most, the RAs' alleged conduct could provide a basis for "expert" liability under § 11 if, as required by the statute, the RAs had been named in the registration statement as having prepared or certified any portion of it. But the RAs, indisputably, are not so named and did not consent to be named.

Plaintiffs' "underwriter" claims against the RAs are all the more puzzling since there has never been any doubt as to the identity of the actual underwriters of the transactions at issue in this case. The AC itself, and the Offering Documents at issue, could hardly be clearer in identifying the "Bank Underwriters" – Goldman, Sachs & Co., Morgan Stanley & Co., Inc., Bear, Stearns & Co., Inc., Deutsche Bank Securities, Inc., UBS Securities, LLC, Credit Suisse Securities (USA), LLC, RBS Securities, Inc., Barclays Capital, Inc., Banc of America Securities, LLC, HSBC Securities (USA), Inc., Citigroup Global Markets, Inc., Countrywide Securities Corporation, and Merrill Lynch, Pierce, Fenner & Smith Incorporated – as the "underwriters" for the various offerings at issue. (AC ¶¶ 17-30, 43, 58, 150). Under the 1933 Act, the role of an "underwriter" has long been confined to those persons that have a direct role in the distribution process between the issuer and the investor. The RAs are not – and could not be – alleged to have played such a role. In short, there is no legal basis for a § 11 claim against the RAs here. *See* Section I, *infra.*

Further, as demonstrated below, additional – and entirely distinct – bases exist for the dismissal of the claims asserted against the RAs. For one thing, Plaintiffs' claims are time-barred. The RAs join in the brief filed by the Wells Fargo Defendants on this point. Moreover, the

alleged "misstatements" and "omissions" asserted by Plaintiffs relating to the RAs and their rating opinions cannot as a matter of law serve as the basis for a claim both because they are not material misstatements or actionable omissions and because these inherently forward-looking statements were accompanied by meaningful cautionary language.  *See* Section II, *infra*.  Finally, Plaintiffs abjectly fail to plead a viable claim for control person liability under § 15 against the RAs.  *See* Section III, *infra*.[2]

### STATEMENT OF RELEVANT FACTS

On March 27, 2009, the General Retirement System of the City of Detroit filed a purported class action on behalf of a putative class of investors who allegedly purchased certain mortgage pass-through certificates ("Certificates"), commonly referred to as residential mortgage-backed securities ("RMBS"), pursuant to allegedly false and misleading Registration Statements, Prospectuses and Prospectus Supplements (collectively, the "Offering Documents") filed by Wells Fargo Asset Securities Corporation ("WFASC").  A similar action was filed by the New Orleans Employees' Retirement System, Louisiana Sheriffs' Pension & Relief Fund, Government of Guam Retirement Fund, and Alameda County Employees' Retirement Association (the "New Orleans Plaintiffs") on April 13, 2009.  In an order dated July 16, 2009, this Court consolidated the two cases and appointed the New Orleans Plaintiffs as Lead Plaintiffs.  On August 31, 2009, Lead Plaintiffs filed the AC.

As did its predecessor complaints, the AC asserts that the Offering Documents "contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading."  (AC ¶ 5).  The AC names as Defendants:  the "Depositor" and "Issuer" of the Certificates, WFASC (*id.* ¶ 15); the "sponsor" of each of the Offerings, Wells Fargo Bank, N.A. (*id.* ¶ 16); the "Bank Underwriters" (*id.* ¶¶ 17-30); the individuals that signed the registration statements (*id.* ¶¶ 35-39); and the RAs (*id.* ¶¶ 31-34).

---

[2] The RAs also join in the brief filed by the Wells Fargo Defendants, which seeks dismissal of Plaintiffs' claims for the additional reasons that: 1) Plaintiffs lack standing to assert any claims with respect to the 37 offerings from which none of the named Plaintiffs purchased securities; and 2) Plaintiffs have failed to allege any actionable omission or misrepresentation.

3

Although Plaintiffs certify that they collectively purchased securities from senior classes of only 17 RMBS issuances, the AC purports to bring a class action on behalf of purchasers of 54 RMBS issuances, totaling approximately $67.5 billion, each sold by a separate allegedly misleading prospectus supplement and collateralized by a separate pool of residential mortgage loans.  (AC ¶¶ 3, 45, 128).   On behalf of these purchasers – many of whom own performing securities – the AC asserts claims under §§ 11, 12 and 15 of the 1933 Act.  (AC ¶¶ 132-161).  Plaintiffs assert §§ 11 and 15 claims against the RAs.  (AC ¶¶ 132-146, 156-161).

## ARGUMENT

### I.      PLAINTIFFS' SECTION 11 CLAIMS MUST BE DISMISSED

Section 11 "allows purchasers of a registered security to sue certain *enumerated* parties in a registered offering when false or misleading information is included in a registration statement.  [It] was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a *direct role* in a registered offering."  *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 381-82 (1983) (emphasis added).   The only parties that can be held liable are listed in the statute and are the following:

> (1) every person who signed the registration statement; (2) every person who was a director . . . or partner in the issuer at the time of [filing] . . .; (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner; (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; and (5) every underwriter with respect to such security. 15 U.S.C. §77k(a).

Plaintiffs' § 11 claims against the RAs must be dismissed both because they are barred by SEC rule and because the RAs do not fall within the categories of persons subject to § 11  liability.

### A.      Plaintiffs' § 11 Claims Against The RAs Are Precluded By Express SEC Rule

Plaintiffs' § 11 claims against the RAs are, at their core, a challenge to the appropriateness of the ratings the RAs issued on the Certificates.  *See, e.g.,* AC ¶ 115.  Indeed, the vast majority of the AC's allegations against the RAs focus on their credit ratings and their alleged interactions

4

with the Bank Underwriters and Depositor "to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating." *See, e.g.,* AC ¶¶ 4, 43. Yet, whatever legal rights Plaintiffs might have to challenge those ratings under other statutes or law, a claim under § 11 of the 1933 Act is not among them. Indeed, by SEC rule, credit ratings of an NRSRO are absolutely immune from liability under § 11 of the 1933 Act. Specifically, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1), provides that:

> the security rating assigned to a class of debt securities,[3] a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization . . . shall not be considered a part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the [Securities] Act.

The purpose of the rule is unambiguous. It is to "exclude any [NRSRO] whose security rating is disclosed in a registration statement from civil liability under Section 11."[4] SEC Release No. 33-6336, 46 F.R. 42024, 42024, 42026 (Aug. 18, 1981) (the "Proposal Release"). *See also* SEC Release No. 33-6383, *Adoption of Integrated Disclosure System*, 1982 WL 90370, at *23 (Mar. 3, 1982) ("The Commission continues to believe that ratings should be permitted to be disclosed in Commission filings . . . and that it is appropriate to exempt NRSROs from Section 11 liability if their ratings are included in Securities Act registration statements."). Rule 436(g) thus provides a "statutory exemption" under the 1933 Act "for Section 11 claims against credit rating agencies" designated as NRSROs. *In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F. Supp. 2d 742, 817 (S.D. Tex. 2005).[5]

---

[3] The Certificates here are "debt securities." *See, e.g., Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*, 2009 WL 2590087, at *1 (E.D. Pa. Aug. 20, 2009) ("[M]ortgage-backed securities are long-term debt instruments that represent the income stream from a pool of mortgages.").

[4] Courts defer to the SEC's interpretation of its own rules "except where the interpretation is 'unreasonable' or 'plainly erroneous.'" *Alderman* v. *SEC*, 104 F.3d 285, 288 (9th Cir. 1997).

[5] In 1994, in recognition of the "dramatic proliferation in the types of securities offered in the marketplace, with the development of a vast market for mortgage and asset backed securities," the SEC "determined to reconsider its policy of voluntary ratings disclosure" and solicited market comments on several proposed amendments to related SEC rules. SEC Release No. 33-7086, *Disclosure of Security Ratings*, 1994 WL 469347, at *3 (Aug. 31, 1994) (the "1994 SEC Release"). The 1994 SEC Release sought comment on, *inter alia*, "the continued appropriateness of . . . exempting NRSROs from providing consents." *Id.* at *8. While adopting some of the

---

5

This exemption was adopted in full recognition of the concerns raised by some commentators that NRSROs might not give "due attention" to their ratings unless they were subject to potential liability, and with full appreciation of the "significance" of ratings for, *inter alia*, institutions statutorily barred from investing in securities below a certain rating.  Proposal Release, 46 F.R. at 42026-27 & n.16.[6]   In other words, the exemption reflects a deliberate and important public policy determination:   because of their value to investors, the SEC has encouraged the inclusion of ratings in registration statements, but has also recognized that but for the exemption no NRSRO would allow such inclusion.

The exemption makes sense given the nature of credit ratings.  As set forth in the Offering Documents, ratings are opinions about "the likelihood of the receipt by certificateholders of timely payments of interest and the ultimate return of principal."   *See, e.g.*, Wells Fargo Mortgage Backed Securities Trust, Series 2006-AR1 Prospectus Supplement S-55 (Wells Fargo Defendants' And Individual Defendants' Request For Judicial Notice ("RJN"), Ex. 33).  That is, they speak to the likelihood of future events.  If, as often happens when dealing with the future, those events turn out differently than anticipated at the time the ratings are issued, that does not mean the ratings themselves were "false" or, more to the point, that NRSROs should face the specter of strict liability under § 11 every time they offer an opinion about what may happen in the future.

In proposing Rule 436(g), the SEC emphasized that NRSROs would remain subject to liability under the antifraud provisions of the securities laws, *e.g.,* § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  Proposal Release, 46 F.R. at 42028.  But, liability under § 11 on the basis of an NRSRO's ratings is barred.  Because Plaintiffs' claims here, at their

---

proposed   measures,   the   SEC   ultimately   determined   not   to   change   its   position regarding the disclosure of ratings.  SEC Release No. 33-8400, 69 F.R. 15594 (Mar. 25, 2004).

[6]   In proposing Rule 436(g), the SEC cited several consequences that could follow if NRSROs were not granted the exemption.  Among these concerns, the SEC noted that without the exemption, an NRSRO "might not be willing to furnish a consent until it had reviewed all information in the registration statement, in order to ensure that its rating was based on the same data."  Proposal Release, 46 F.R. at 42027 n.26.  Yet here, what the SEC sought to avoid – the RAs becoming so involved that, for the purpose of avoiding potential liability, they felt obliged to verify all information relied on by the issuer – is precisely the task that Plaintiffs assert the RAs should be held strictly liable for allegedly failing to perform.

6

core, seek to hold the RAs liable for their ratings, they must be dismissed.

## B.    Plaintiffs Have No Claim for "Underwriter" Liability Against The RAs

Plaintiffs' § 11 claims must also be dismissed for the independent reason that the RAs do not, as a matter of law, fall within the five enumerated categories of persons that can be subject to § 11 liability.  Plaintiffs seek to impose liability against the RAs under § 11(a)(5) on the basis that, through their actions, they each "acted as an underwriter in the sale of Certificates issued by the Issuing Trusts."  (AC ¶ 137).  As detailed below, this is nothing more than a naked and improper attempt to erase the consent requirements of § 11(a)(4), which as shown below, Plaintiffs cannot meet.  (Section I.B.1).  In any event, even if neither the exemption in Rule 436(g) nor the consent requirements of § 11 existed, the activities the RAs allegedly performed here simply do not as a matter of law constitute "underwriting."  (Section I.B.2).

### 1.    The Consent Requirements of Section 11(a)(4) Preclude Plaintiffs' Claims

Plaintiffs assert that the RAs may be held liable under § 11 because they "participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold," "analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates" and "provided pre-determined credit ratings for the Certificates." (AC ¶¶ 31-33).  It is well-established, however, that "certain individuals who play a part in preparing the registration statement generally cannot be reached by a Section 11 action." *Herman & MacLean*, 459 U.S. at 386 n.22.  In certain narrow circumstances, "experts" (such as an "accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him") may be held liable under § 11(a)(4), but only to the extent the expert has been named to investors – and has consented to being named – as someone who has certified or prepared a portion of the registration statement.  15 U.S.C. § 77k(a)(4).

The types of activities the RAs allegedly performed here, *i.e.*, providing opinions and drafting documents, are activities that courts evaluate under this "expert" provision.  *See, e.g., McFarland* v. *Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980) (evaluating § 11(a)(4) claim against defendant alleged to have participated in the "preparation and review" of the registration statement); *In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *3 n.5 (S.D.N.Y. Aug.

7

14, 2008) ("*Refco II* ") (noting that § 11 claims against "attorneys who draft the documents on which the public rely" are generally brought, and evaluated, under § 11(a)(4)).[7]  Thus, to state a § 11 claim, Plaintiffs were required to allege that the RAs were named, and consented to be named, as endorsing the Registration Statements.  Yet, as the Offering Documents make abundantly clear, the RAs were not so named and did not consent to be named; Plaintiffs do not allege otherwise.[8]

Notwithstanding Plaintiffs' assertion that they are suing the RAs as "underwriter[s]" and not under § 11(a)(4) (AC ¶¶ 31-33), this absence of naming and consent is dispositive of Plaintiffs' § 11 claims against the RAs.  A party's alleged role in preparing the registered offering cannot provide a basis for § 11 liability if it has not been named to investors as having prepared or certified the registration statement.[9]  Indeed, whatever actions a plaintiff may assert the unnamed "expert" performed in preparing the registered offering are simply "irrelevant" to § 11 liability.  In *McFarland*, 493 F. Supp. at 643, the court dismissed § 11 claims against an accountant, where the accountant had not been named in the registration statement as having prepared the specific financial data that was alleged to be misleading.  *Id*.  The court explained:  "The language of [§ 11] plainly states that an accountant may be sued only with respect to that part of a registration statement 'which purports to have been prepared or certified by him.'  Thus, even if part of a registration statement is misleading, there is no accountant liability unless the misleading data can

---

[7]  *See also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208-11 (S.D.N.Y. 2003) (evaluating § 11(a)(4) claim against defendant alleged to have reviewed financial and other information and issued fairness opinions included in registration statement); *Tirone* v. *Calderone-Curran Ranches, Inc.*, 1978 WL 1095, at *8 (W.D.N.Y. June 14, 1978) (evaluating § 11(a)(4) claim brought against lawyer that "passed on all legal matters relative to the [offering documents]") (citation and internal quotation marks omitted).

[8]  In fact, § 7 of the 1933 Act requires that where an entity is named as an expert, its *consent* "shall be filed with the registration statement."  15 U.S.C. § 77g(a).  No consent by the RAs was ever filed and Plaintiffs do not claim it was.

[9]  To the extent an expert does not meet the requirements for § 11 liability, a plaintiff is not without remedy for that expert's alleged wrongdoing; it is merely without a strict liability claim. *See Herman & MacLean*, 459 U.S. at 382 ("While a Section 11 action . . . can only be brought against certain parties, a Section 10(b) action can be brought . . . against '*any* person'[.]") (emphasis in original).

8

be expressly attributed to the accountant." *Id*. at 643.  Plaintiffs in *McFarland* argued that even though the accountant had not been named as an expert in connection with the allegedly misleading materials, it had prepared and reviewed the unaudited financial statements and other reports and valuations that were used in connection with the registered offering and thus, should still be liable under § 11.  The court rejected plaintiffs' argument, stating:  "This argument is flawed because *section 11(a)(4) limits liability.  Because the accountants are not 'named as' having prepared the allegedly misleading portions of the registration statement, their participation in the preparation of the misleading figures is irrelevant to section 11*."  *Id*. (emphasis added).

Similarly, in *Refco II*, even though the defendants had not been named to investors as having prepared or certified the registration statement at issue, plaintiffs argued that the defendants had been involved in drafting and editing the registration statement and thus could still be held liable as an underwriter under § 11(a)(5).  In dismissing plaintiffs' § 11 claims, the court observed that "Plaintiffs do not cite any case in which a court has held that a party that participated in the drafting of a registration statement, but who was not identified to the public as endorsing the truth of representations contained therein, has been held liable under §11 as an underwriter."  2008 WL 3843343, at *3.  In fact, the court reasoned, "courts have generally refused to extend §11 liability to those professionals most directly involved in the drafting of registration statements: lawyers." *Id*.  The *Refco II* plaintiffs attempted to distinguish the myriad cases holding that lawyers are not subject to § 11 liability, arguing that these cases were decided under the § 11(a)(4) "expert" provision – not the § 11(a)(5) "underwriter" provision.  The court rejected this distinction, noting "it would seem even stranger to classify attorneys who draft the documents on which the public rely as 'underwriters' – a term generally understood to refer to those who undertake actively to sell the securities – than to consider them 'profession[als] . . . named as having prepared . . . any part of the registration statement.'"  *Id*. at *3 n.5.  These cases make clear that both "plaintiffs attempting to extend §11 liability to lawyers and courts rejecting those efforts have looked primarily to the subsection (4) category . . . rather than to the subsection (5) category" – this, the

9

court explained, "speaks volumes" against the plaintiffs' argument that applying the "underwriter" prong would be "a straightforward application of broad and literal language" of § 11(a)(5).  *Id.*

Here, where the RAs were not named, and did not consent to be named, as endorsing the representations in the Offering Documents, Plaintiffs cannot satisfy the elements for § 11 liability and their § 11 claims against the RAs should be dismissed.  By nonetheless urging the Court to hold the RAs liable as "underwriter[s]" under § 11(a)(5), Plaintiffs, in substance, seek to erase the consent requirements of § 11 and the limits on liability imposed by § 11(a)(4).  But, in the face of rulings such as *McFarland* and *Refco II*, Plaintiffs may not do so.[10]

## 2.    The RAs Are Not "Underwriters" of the Securities They Rated

In any event, the activities allegedly performed by the RAs here do not, as a matter of law, make them "underwriters" of the securities at issue.  We begin by focusing on the nature of the entity at issue.

An "underwriter" acts as a conduit between the issuer and the investor.  "He participates in the transmission process between the issuer and the public."  *Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977).  In the 1933 Act, Congress defined "underwriter" "to encompass 'all persons who might operate as conduits for securities being placed into the hands of the investing public.'"  *In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004) (quoting 1 Thomas Lee Hazen, *The Law of Securities Regulation* 431 (4th ed. 2002)); *Hedden* v. *Marinelli*, 796 F. Supp. 432, 436-37 (N.D. Cal. 1992) (same); *Ackerberg* v. *Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989) ("The congressional intent in defining 'underwriter' was to cover

---

[10]    Indeed, if successful, Plaintiffs' attempt to ignore the limitations on § 11 liability contained in § 11(a)(4) would lead to senseless results.  An NRSRO, whose ratings are exempted from § 11 liability, would: (a) nonetheless be subjected to potential liability for the work product of all *others* reflected in a registration statement; and (b) be therefore subjected to greater potential liability than that of lawyers, accountants, and other professionals who regularly play a significant role in securities offerings.  That is because an "expert" is subject to § 11 liability only with respect to misstatements, if any, made in the portion of the registration statement that it prepared or certified.  15 U.S.C. § 77k(a)(4).  The expert is not subject to blanket liability for all statements made in the offering documents as an "underwriter" would be.

---

THE RATING AGENCY DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. C-09-01376-SI

all persons who might operate as conduits for the transfer of securities to the public.").[11]

Specifically, the 1933 Act provides as follows:

The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking. . . .

15 U.S.C. § 77b(a)(11).  Plaintiffs do not allege (nor could they) that the RAs meet the first clause of the definition.  Rather, it appears, that Plaintiffs base their unprecedented "underwriter" claims against the RAs on a tortured reading of the second clause of the definition, *i.e.*, someone who "participates or has a participation in the direct or indirect underwriting of any such undertaking."

Like the rest of the definition, however, the "participation" necessary to qualify one as a statutory underwriter must relate to the actual *distribution* of the security.  *McFarland*, 493 F. Supp. at 644 ("It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security.   There is no allegation here, however, that [the alleged underwriters] purchased any . . . securities with a view to distribution or that they offered or sold any security[.]"); *Hedden*, 796 F. Supp. at 437 ("[I]n order to be an underwriter one must participate in a distribution of securities to the public."); *Refco II*, 2008 WL 3843343, at *4 ("[T]he breadth of the definition of 'underwriter' is intended to sweep up all — but only — those who play a role in the distribution of the securities.").  Thus, "participation" in the § 11 context equates to involvement in the "transmission process between the issuer and the public." *Ingenito*,

---

[11]  The 1933 Act's legislative history confirms this:  "The term ['underwriter'] is defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also . . . the person who purchases an issue outright with the idea of then selling that issue to the public.  The definition of underwriter is also broad enough to include two other groups of persons who perform functions, similar in character, in the distribution of a large issue. The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter.   The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein."  H.R. Rep. No. 73-85, at 13 (1933).

THE RATING AGENCY DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. C-09-01376-SI

441 F. Supp. at 536.[12]  *See also SEC* v. *Allison*, 1982 WL 1322, at *3 (N.D. Cal. Aug. 11, 1982) (defendants were "underwriters" within the meaning of the 1933 Act where they "directly participated in the offers and sales of the securities: they arranged for public trading to commerce through market makers, brokers, and transfer agents; they stimulated demand through advertisements, research reports, and television promotions; and, through these efforts, they were able to sell a substantial amount of stock . . . to the public").

Even if the RAs performed the actions alleged in the AC, Plaintiffs offer no factual basis whatsoever – and there is none – to support any assertion that the RAs had a role in the "distribution process."  Significantly, the AC does not (and could not) allege that the RAs acted as a conduit between the issuer and the investors.  The AC does not (and could not) allege that the RAs were named to investors as underwriters.  The AC does not (and could not) allege that the RAs purchased securities from anyone with a view to their distribution.  And the AC does not (and could not) allege that the RAs offered or sold any securities to the Plaintiffs or had any contact whatsoever with them.[13]  The RAs' only "contact" with the public (for lack of a better term) was through the publication of their ratings, but that, of course, cannot form the basis for § 11 liability.

---

[12]  This is consistent with the SEC's interpretation of the term "underwriter."  Shortly after the passage of the 1933 Act, the SEC in *In re Reiter-Foster Oil Corp.* evaluated the question of what constitutes an "underwriter." 6 S.E.C. 1028, Release No. 33-2201, 1940 WL 36362, at *4, *7-*9 (Mar. 11, 1940).  The SEC found that each of 5 individuals had in fact served as an "underwriter" for the transaction.  The Commission pointed to a series of activities by the individuals which evidenced that they had "actively participated in the distribution of the underwritten securities," including that some or all of the individuals had "touted [the] securities in an effort to induce purchases," "contacted security holders," "suggested" names of purchasers and "dealers who might participate in the distribution," attended conferences "relative to arranging the terms of the underwriting," "induced" and/or "was responsible" for the purchase of shares by specific individuals, and "urged" stock sales.  In each instance, the focus of the Commission was on the distribution process and specifically the defendants' roles vis-a-vis the investing public.

[13]  Similarly, the AC does not (and could not) allege that the RAs had a financial stake in the success of the offerings.  This factor also counsels against any "underwriter" characterization.  *See McFarland*, 493 F. Supp. at 645 ("If the underwriters had been unable to sell the stock to the public, they would have had no recourse against the selling warrantholders.  The Court must consider whether the warrantholders 'participated' in the underwriting from this risk-bearing perspective. . . .  Because the warrantholders took no similar risk and received no corresponding reward, it would be anomalous to include them within the definition of underwriter along with those who engaged in the selling effort.").

By contrast, the AC asserts unambiguously that the Bank Underwriters served as the "underwriter[s] for [the] Certificates" and performed the typical functions of an underwriter, including "offer[ing] the various certificates to investors" and selling the Certificates. (AC ¶¶ 17-29, 43, 58, 150). The Offering Documents themselves state the same. For example, each of the Prospectus Supplements at issue describe one or more of these Defendants as the "Underwriter" of the respective Certificates. *See, e.g.,* Wells Fargo Mortgage Backed Securities Trust, Series 2006-AR1 Prospectus Supplement S-54 (describing Goldman as the "Underwriter" of the Offered Certificates) (RJN Ex. 33); Wells Fargo Mortgage Backed Securities Trust, Series 2006-AR2 Prospectus Supplement S-58 (describing Lehman as the "Underwriter" of the Offered Certificates) (RJN Ex. 37). Unsurprisingly, the Offering Documents never name the RAs as "Underwriter[s]."

Putting aside the RAs' ratings, as one must per Rule 436(g),[14] Plaintiffs' "underwriter" allegations against the RAs consist of legal conclusions. *See, e.g.,* AC ¶ 137 (the RAs "each acted as an underwriter in the sale of the Certificates" and "directly and indirectly participated in the distribution of the Certificates."). As the Supreme Court reiterated just recently, such allegations are insufficient to state a claim. *See Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id. In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) ("*Refco I*") is also instructive on this point. In *Refco I*, plaintiffs had asserted that defendants who allegedly "participated" in a public offering could be liable as "underwriters" under § 11. The court, noting that the term "underwriter" is not "a term of unlimited applicability that includes anyone associated with a given transaction," dismissed the claims. *Id.* The court found that plaintiffs' "conclusory allegation" failed to include "specific allegations as to the extent of [the alleged] participation or what actual actions the defendants took." *Id.* The court continued: "[T]he single sentence alleging that [defendants] participated in the public offering presents a legal

---

[14] As set forth in Section I.A, *supra*, an NRSRO's ratings cannot be the basis for a Section 11 claim. A plaintiff asserting a Section 11 claim against an NRSRO must allege and prove that actions of the NRSRO, *other than actions it took as part of generating and issuing its ratings*, somehow fall into the five enumerated categories providing for Section 11 liability.

13

conclusion, not a factual allegation"; it is "simply a reproduction of the statutory requirement of 'direct or indirect participation.'"  *Id.* at 630-31 (citation omitted).  *See also In re Adelphia Communications Corp. Sec. and Derivative Litig.*, 2007 WL 2615928, at *8 (S.D.N.Y. Sept. 10, 2007) (a "bare pleading" that banks "extended loans," "'induced and structured numerous public offerings'" through affiliates and had "'direct or indirect participation in the distribution'" did not "turn lenders into underwriters").

Plaintiffs' remaining allegations that the RAs participated in the "drafting" of the Offering Documents and the "structuring" of the Certificates (AC ¶¶ 61, 137) fare no better.[15]  Such activities, even if performed by the RAs, do not relate to the *distribution* of the securities.  On this point, *Refco II* is again telling.  On an amended complaint, the *Refco* plaintiffs added allegations that the alleged underwriters "played a substantial role in drafting and editing the Bond Registration Statement on the basis of which the registered bonds were sold to the public."  *Refco*, 2008 WL 3843343, at *2.  In dismissing the § 11 claims yet again, the court rejected "Plaintiffs' effort to redeem their complaint by identifying actions taken by defendants *behind the scenes*. . . ."  *Id*. at *4 (emphasis added).  The court cautioned that the definition of the term "underwriter" "must be read in relation to the underwriting function that the definition is intended to capture" – a definition which "primarily references those who 'purchase[ ] from an issuer with a view to . . . the distribution of any security.'"  *Id*.  The alleged "participation" must relate to the specific undertaking of "purchasing securities from an issuer with a view to their resale – that is, the underwriting of a securities offering as commonly understood."  *Id*.; *see also McFarland*, 493 F. Supp. at 645-46 (where warrantholders "had no interest, direct or indirect" in underwriting, "this Court will not strain the definition of a statutory term in order to classify [them] as underwriters" even where they had "structured the transaction . . . to avoid the risks of an underwriter").[16]

---

[15]  While the RAs dispute the factual allegations of the AC, they assume as true, for this motion only, Plaintiffs' allegations regarding their role in the offerings here.  As shown above, however, such allegations do not – as a matter of law – trigger § 11 liability.

[16]  Plaintiffs also assert that "[a]s a condition to the issuance of the Certificates, the Rating Agencies provided pre-determined investment-grade ratings, as represented in the Prospectus Supplements."  *See, e.g.,* AC ¶ 59.  Plaintiffs are referring to the fact that WFASC stated in the

Here, even taking Plaintiffs' allegations as true, they involve nothing more than alleged "behind the scenes" (to use the *Refco* court's phrase) actions unrelated to the distribution of securities. Accordingly, Plaintiffs' theory appears to be that the Rating Agencies may be liable as underwriters because their alleged actions here were somehow necessary steps in the creation and therefore the eventual distribution of the securities. If accepted, such a theory would – contrary to the holding in *Refco I* – render the term "underwriter" one of "unlimited applicability" extending it to all lawyers, accountants and other third parties who often play important roles in registered offerings and yet generally do not play a role in the distribution and thus, are not considered "underwriters." But, the 1933 Act has never been interpreted in this manner.

With no basis in current law for their claim, it is evident that what Plaintiffs are really asking the Court to do here is not to apply the well-settled terms of the 1933 Act to the facts of this case, but rather to amend retroactively the 1933 Act to broaden the categories of persons subject to § 11. But, as the Supreme Court held in *Pinter*, interpreting another provision of the 1933 Act:

> 'The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law.' . . . The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision 'more broadly than its language and the statutory scheme reasonably permit.' *Pinter* v. *Dahl*, 486 U.S. 622, 653 (1988).[17]

---

Offering Documents that the Certificates' achieving an investment grade rating would be a condition for their issuance. *See, e.g.,* Wells Fargo Mortgage Backed Securities Trust, Series 2006-AR1 Prospectus Supplement, dated February 22, 2006 (RJN Ex. 33). To the extent that an issuer opts to structure an offering of asset-backed securities in this manner, it is required to state this in the registration statement. The Standard Instructions for Filing Forms Under Securities Act of 1933 with respect to "Asset-Backed Securities" requires a filer to "[d]isclose whether the issuance or sale of any class of offered securities is conditioned on the assignment of a rating by one or more rating agencies, whether or not NRSROs. If so, identify each rating agency and the minimum rating that must be assigned." 17 C.F.R. § 229.1120. The fact that the transaction was structured to operate in this manner does not confer underwriter liability on the RAs. As discussed in Section I.A, *supra*, the RAs' ratings are exempt from Section 11 liability. That WFASC represented that it would not issue the Certificates without achieving a certain rating level does not void the protection afforded the RAs under the exemption.

[17] Not only would a request to rewrite the 1933 Act be inappropriate as a jurisprudential matter, but it could also lead to the imposition of billions of dollars in strict liability on entities that had no meaningful way to anticipate such potential exposure – and thus no meaningful opportunity to protect themselves and minimize that exposure. Leaving aside the fundamental injustice of such a result, the resulting uncertainty would lead to dramatic inefficiencies and costs (both in time and

15

Throughout the long history of the 1933 Act, the key in determining whether a defendant is an "underwriter" is whether the defendant had a role in *distributing* the securities.  Plaintiffs do not provide the Court with any basis, factual or legal, to conclude that the RAs had a role in the distribution of the Certificates.  Plaintiffs' § 11 claims must be dismissed on this ground as well.

## II.  THE ASSERTED RATINGS-RELATED "MISSTATEMENTS" AND "OMISSIONS" ARE NOT ACTIONABLE IN ANY EVENT

Even if the RAs were proper defendants here (and they are not), Plaintiffs' claims based on alleged misstatements relating to the RAs' ratings of certain of the Certificates must also be dismissed because such statements are not actionable.  While the vast majority of the allegedly "misleading" statements that serve the basis for Plaintiffs' claims relate to mortgage underwriting guidelines and property appraisal standards,[18] – areas with which the RAs had nothing to do – Plaintiffs also allege that the "ratings" set forth in the Prospectus Supplements "misstated the quality of the certificates."  (AC, p. 33).  Specifically, Plaintiffs assert that the RAs' ratings "were unjustifiably high and did not represent the true risk of the Certificates" because they allegedly were "based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default."  (AC ¶ 115).  Plaintiffs also characterize this as an omission, asserting that the Offering Documents omitted the "true fact[]" that the ratings "were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information."   (AC ¶ 6).  Plaintiffs' claims based on these statements must be dismissed both because the alleged misstatements and omissions are not actionable (§ II.A) and because no reasonable investor could have been misled by the Offering Documents when read in context and in their entirety (§ II.B).

money) in the offering process.  Indeed, courts have rejected attempts to expand a cause of action where it would also necessarily expand the well-recognized limits on liability that are relied upon by market participants.  *See, e.g., Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 772 (2008) (refusing to extend §10(b) to "aiders and abettors" and holding that "[t]he practical consequences of [such] an expansion . . . . provide[d] a further reason to reject [plaintiff's liability theory]" as it "would expose a new class of defendants" to the risks of "extensive discovery" and the potential "extort[ion] of settlements" which may force these new defendants to contract to "protect against these threats, raising the costs of doing business").

[18]  As noted *supra*, the RAs join in the brief filed by the Wells Fargo Defendants with respect to the arguments made regarding these alleged misstatements.

16

## A.   No Actionable "Misstatements" or "Omissions" Are Alleged

Plaintiffs' claims against the RAs concerning the ratings-related disclosures in the Offering Documents – whether phrased as "misstatements" or "omissions" – at their core amount to hindsight attacks on the RAs' ratings and, as such, are barred by Rule 436(g).  *See* Section I, *supra*.  Moreover, Plaintiffs' hindsight attacks do not come close to pleading that the RAs did not subjectively believe their ratings opinions.  It is well-established that a defendant cannot be held liable for the expression of its opinion unless it is adequately plead – and Plaintiffs do not even attempt to do so here – that the speaker did not subjectively hold the opinion expressed.  *See Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1095 (1991) (statements of opinion are actionable "solely as a misstatement of the psychological fact of the speaker's belief in what he says").  Indeed, the AC pleads the opposite, stating that it "does not allege fraud on the part of any Defendant."  (AC ¶ 2).

Moreover, Plaintiffs' allegations of "outdated" or "faulty" ratings models and assumptions rely exclusively on after-the-fact events occurring in 2008 involving hindsight criticisms of the RAs.[19]  Virtually identical allegations were just recently held insufficient by another federal court in dismissing similar 1933 Act claims with prejudice.  In that case, which also concerned post-hoc statements about the RAs' ratings processes, the court recognized that "Plaintiffs' allegations rest[ed] on uncited and undated after-the-fact admissions and laments by purported insiders."  *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 2009 WL 3149775, at *8 (D. Mass.  Sept. 30, 2009).  In finding that no actionable misstatement or omission had been pled, the court reasoned that "[n]one of the purported comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime mortgage market (in 2007)

---

[19]  In fact, Plaintiffs' allegations rest, in large part, on a single former S&P employee that testified that his opinion in 2008 was that a rating model available in 2004 "would have had an earlier warning about the performance of many of the new products."  (AC ¶ 123).  Plaintiffs omit that the testimony also makes clear that this employee left S&P in April 2005 and thus cannot speak to S&P's ratings models and methodologies used in rating the securities at issue here in 2006 and 2007.  *See Credit Rating Agencies and the Financial Crisis:  Hearing Before the House Committee on Oversight and Government Reform*, 110th Cong. (2008) (statement of Frank L. Raiter), *available at* http://oversight.house.gov/documents/20081022102804.pdf.

'support the inference' that the ratings were compromised as of the dates (in 2005 and 2006) when the registration statements and prospectus supplements became effective." *Id*.   The same is true here.   Even at the pleading stage, a cognizable claim under the 1933 Act requires plaintiffs to plead facts demonstrating that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.  *See Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009) (affirming district court's dismissal of plaintiff's § 11 claim, in part, because plaintiff failed to plead facts demonstrating that the allegedly omitted information existed, or that defendants knew of the allegedly omitted information, at the time the registration statement became effective).[20]

In addition, the asserted "omissions" alleged by Plaintiffs can impose no liability on the Defendants because several of the underlying facts on which Plaintiffs base their claims were publicly known to the market.   For example, the fact that the RAs were engaged and paid by the issuers of the securities they rate is well-known and is disclosed by the RAs in their public announcements of their ratings, including the ratings at issue here.[21]   Further, the potential conflicts of interest inherent in the RAs' "issuer-pays" business model has long been the subject of

[20]   Moreover, while the RAs dispute Plaintiffs' characterization of their ratings models and assumptions, to the extent that Plaintiffs are asserting that the Offering Documents should have expressly characterized the RAs' models or assumptions as "outdated" or "faulty," they have also failed to state a claim because such a characterization is not an actionable omission.   "The federal securities laws do not require a company to accuse itself of wrongdoing."   *Lopes* v. *Vieira*, 543 F. Supp. 2d 1149, 1186 (E.D. Cal. 2008) (citation and internal quotation marks omitted).

[21]   *See, e.g.*, *New Issue: Wells Fargo Mortgage Backed Securities 2006-AR1 Trust*, RatingsDirect (Apr. 18, 2006) (disclosing that S&P may receive compensation for its ratings, which is normally paid either by the issuers of the securities or third parties participating in the marketing the securities), Abrams Decl. Ex. 1; *Moody's Global Research: Rating Action*, dated May 4, 2006 (Wells Fargo 2006-AR7) (disclosing that "most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's have agreed to pay" fees for "appraisal and rating services"), Declaration of David McCarthy, Ex. A; Fitch, Inc. Terms of Use (in effect Mar. 30, 2006) ("Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities."), Declaration of Tobias J. Stern Ex. B; *see also* Fitch Rates Wells Fargo $952MM P-T Ctfs Series 2006-4 (referring investors to the Terms of Use), Stern Decl. Ex. A.

18

public comment, including detailed comment by regulators.[22]  Plaintiffs' claims require a showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available."  *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976).  By definition, public information is part of the "total mix" of information available, and thus "the securities laws do not require disclosure of information that is readily available in the public domain.").  *In re Textainer Partnership Sec. Litig.*, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005) (citation omitted).

Finally, it is well established that there can be no liability for an alleged omission in the absence of a duty to disclose, even if the information would have been material.  *See Rubke* v. *Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1137 (N.D. Cal. 2006) (dismissing § 11 claim, in part, because plaintiffs failed to identify "any SEC regulation or other legal authority" that imposed on defendants a duty to disclose the information allegedly omitted), *aff'd*, 551 F.3d 1156 (9th Cir. 2009); *In re Metricom Sec. Litig.*, 2004 WL 966291, at *22 (N.D. Cal. Apr. 29, 2004) (dismissing plaintiffs' § 11 claim where defendants "were under no obligation at the time of the public offering to disclose" the information at issue); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (affirming district court's grant of summary judgment to certain defendants in connection with § 11 claim, in part, because they were under no "duty to disclose" the allegedly undisclosed information).  Here, Plaintiffs fail to show that any of the Defendants had a duty to disclose the allegedly omitted information regarding the RAs' ratings assumptions or their compensation.  Plaintiffs do not and cannot point to any rule or regulation that required the disclosure of this information.  In fact, in the 1994 SEC Release, discussed in Section I *supra*, the SEC considered – and ultimately rejected – proposals "to require disclosure in the prospectus on the method of compensating the rating organization" and "the extent of the rating organization

---

22   SEC Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, at 40 (Jan. 2003) ("Potential conflicts of interest have existed in the credit rating business for many years. . ."); Daniel M. Covitz et al, *Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate*, at 1 (Dec. 2003) (referring to "well-known conflicts of interest").

19

involvement in the structuring of the security." SEC Release No. 33-7086, 1994 WL 469347, at *9.  The alleged omission of this type of information thus cannot be actionable.

### B.   The Ratings-Related Statements In The Offering Documents Are Entitled To Protection Under The "Bespeaks Caution" Doctrine

Plaintiffs' claims of alleged misstatements relating to the RAs and their forward-looking rating opinions also fail for another reason: the RAs' ratings were disclosed to investors in the Offering Documents along with cautionary language warning investors about the purpose and limitation of ratings and the risk that the amount of financial "cushion" in the offerings (otherwise known as "credit enhancement" or "credit support") could be insufficient to insulate investors from losses in the event of stress.  The Offering Documents thus "bespoke caution."

Materiality is an essential element of a Section 11 claim.  *See* 15 U.S.C. § 77k(a).  A misrepresentation or omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996) (citation and internal quotation marks omitted).  The bespeaks caution doctrine "merely represents the pragmatic application of two fundamental concepts in [securities actions]: materiality and reliance."  *In re Worlds of Wonder*, 35 F.3d at 1414.  "To put it another way, the 'bespeaks caution' doctrine reflects the unremarkable proposition that statements must be analyzed in context."  *Id.* (citation and internal quotation marks omitted).  Under this doctrine, courts may find as a matter of law that defendants are not liable for forward-looking statements where those statements "contained enough cautionary language or risk disclosure to protect against liability."  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 866 (N.D. Cal. 2004).

Here, the Offering Documents contained meaningful cautionary language regarding the nature and limitations of ratings.  For example, the Offering Documents stated that:

> A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.  No person is obligated to maintain the rating on any certificate, and accordingly, there can be no assurance to you that the ratings assigned to any certificate on the date on which the certificate is originally issued will not be lowered or withdrawn by a rating agency at any time

1
2
3
4
5

> thereafter.   The rating(s) of any series of certificates by any applicable rating agency may be lowered following the initial issuance of the certificates as a result of the downgrading of the obligations of any applicable credit support provider, or as a result of losses on the related mortgage loans in excess of the levels contemplated by the rating agency at the time of its initial rating analysis. . . . If any rating is revised or withdrawn, the liquidity or the market value of your certificate may be adversely affected.  *See, e.g.*, Wells Fargo Mortgage Backed Securities Trust Series 2006-AR1 Prospectus, at 12-13 (RJN Ex. 33).

6   These statements, as well as similar ones in each of the Offering Documents, specifically warned

7   investors about the nature and limitations of ratings and that investors could suffer losses

8   notwithstanding protections built into securities.[23]  This cautionary language is "sufficiently

9   specific and meaningful to warn investors of the risks that actually materialized."  *In re Portal*

10  *Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *14 (N.D. Cal. Aug. 10, 2005).  *See also Nomura*,

11  2009 WL 3149775, at *8 (in dismissing similar 1933 Act claims with prejudice, holding that

12  "plaintiffs were duly cautioned that '[t]he security ratings assigned to the Offering Certificates

13  should be evaluated independently from similar ratings on other types of securities.   A security

14  rating is not a recommendation to buy, sell or hold securities'"); *In re Iasia Works, Inc. Sec. Litig.*,

15  2002 WL 1034041, at *9 (N.D. Cal. May 15, 2002) ("[T]he Court finds that these statements . . .

16  would not have misled a reasonable investor.   The statements relied upon by plaintiffs are self-

17  evidently cost estimates, and are accompanied by disclaimers to the effect that the costs cannot be

18  predicted and could vary significantly from the estimated amounts.").   For this reason as well,

19  Plaintiffs' Section 11 claims against the RAs should be dismissed.

20  **III.     PLAINTIFFS' § 15 CLAIMS SHOULD BE DISMISSED**

21          Plaintiffs also allege claims against the RAs under § 15 of the 1933 Act.  (AC ¶¶ 156-61).

22  Thus, Plaintiffs were required to allege "(1) 'a primary violation of federal securities law' and (2)

23  'that the defendant exercised actual power or control over the primary violator.'" *No. 84*

24  *Employer-Teamster Joint Council Pension Trust Fund* v. *America West Holding Corp.*, 320 F.3d

25
26

---

[23] Additional relevant portions of the Offering Documents are attached as Exhibits 2-5 to the Declaration of Floyd Abrams submitted herewith.

27
28

21

920, 945 (9th Cir. 2003) (citation omitted).[24]   Plaintiffs have failed to plead either.

First, for all of the reasons set forth above and in the motions to dismiss filed by the other Defendants, Plaintiffs' § 11 and § 12 claims must fail and, with them, Plaintiffs' claims for control liability under § 15.  *See, e.g. Falkowski* v. *Imation Corp.,* 309 F.3d 1123, 1132 n.2 (9th Cir. 2002) (§ 15 does not set forth "separate grounds for liability"); *Rubke,* 460 F. Supp. 2d at 1151.

Second, Plaintiffs' § 15 claims against the RAs fail because Plaintiffs have not adequately pled "control."   Control is "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."   17 C.F.R. § 230.405 (standard adopted in *Safeway Portland Employees' Federal Credit Union* v. *C.H. Wagner & Co.*, 501 F.2d 1120, 1124 n.17 (9th Cir. 1974)).   In order to state a claim for control person liability, a plaintiff must set forth facts that raise an inference that the defendant actually controlled the primary violator's day-to-day affairs.   "[T]he defendant's involvement in an isolated corporate action" cannot be the basis for a control person claim; the control person inquiry "revolve[s] around the 'management and policies' of the corporation, not around discrete transactions."  *Paracor Finance, Inc.* v. *General Electric Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996).   Moreover, conclusory allegations of control are insufficient as a matter of law.  *See, e.g., McCasland* v. *Formfactor Inc.*, 2008 WL 2951275, at *11 n.27 (N.D. Cal. July 25, 2008) (allegations that defendants had the "power and authority to control information released to the public by virtue of their position" were insufficient to "plead specific facts upon which a fact finder could reasonably conclude that the individual defendants violated the federal securities laws"); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1242-43 (N.D. Cal. 1994) (dismissing claim based on conclusory allegations that entity controlled the contents of financial reports and press releases, had the ability to prevent the issuance of false statements, had an agent on the board, and owned 8.7% of the company's stock).

Here, Plaintiffs summarily assert that the RAs somehow controlled WFASC, the

---

[24]   While *No. 84 Employer-Teamsters* involved a claim under § 20(a) of the Securities Exchange Act of 1934, the analysis is equally applicable here.  *See Durham* v. *Kelly*, 810 F.2d 1500, 1503 (9th Cir. 1987).

"Depositor" for the offerings.  Plaintiffs' allegations in support of their claims, however, largely consist of insufficient and wholly conclusory statements that merely recite the elements of "control."  *See, e.g.,* AC ¶ 158 (alleging that the RAs "had the power and influence, and exercised that power and influence, to cause the Depositor to engage in violations of the Securities Act").  As stated above, such allegations are insufficient to state a claim under § 15.

Plaintiffs also attempt to plead "control" by pointing to a few provisions of the Offering Documents that describe certain actions that the Master Servicer and/or Trustee – *i.e., not the Depositor (WFASC)* – could take during the life of the transaction upon confirmation by the Rating Agency Defendants that such actions would not affect the rating of the transaction.  For example, Plaintiffs cite to the Offering Documents' statement that the *Master Servicer* (again, not the alleged primary violator) could not resign from its obligations after the securities had been offered without, *inter alia*, "a letter from each relevant Rating Agency stating that the resignation would not result in a downgrade." (AC ¶ 62).[25]  Plaintiffs provide no explanation whatsoever as to how these provisions of the Offering Documents – to the extent they were even exercised – allegedly conferred the RAs § 15 "control" over anyone, let alone the *Depositor.*  Similarly, while Plaintiffs summarily assert that the RAs "exercised" their alleged "power and influence, to cause the Depositor to engage in violations of the Securities Act" (AC ¶ 158), they provide no explanation as to how these provisions allowing for the approval of the Rating Agencies for certain events in the future in any way caused – or could cause – the Depositor to violate the Securities Act in selling the Certificates in the first instance.

Plaintiffs' conclusory allegations simply lack any of the hallmarks generally considered

---

[25] Plaintiffs' allegations on this point also misstate the Offering Documents.  Plaintiffs allege that "the Prospectuses explicitly stated that the Master Servicer was not allowed to resign from its duties *unless* it received a letter from each relevant Rating Agency stating that the resignation would not result in a downgrade of the Certificates."  (AC ¶ 62; *see also* AC ¶ 160) (emphasis added).   In fact, the Offering Documents state that the Master Servicer can resign wholly independently from any rating agency action, including "(ii) upon its determination that its duties thereunder are no longer permissible under applicable law *or* (iii) in the case of an assignment of its rights and delegation of its duties described below."  *See, e.g.*, Wells Fargo Mortgage Backed Securities Trust, Series 2006-AR1 Prospectus at 63 (RJN Ex. 33).

adequate to plead "control."   For example, the RAs are not alleged to have been involved in the day-to-day affairs of the Depositor or to have controlled the Depositor through stock ownership. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) (dismissing control person allegations where plaintiffs did not "plead and prove[] that defendants exercised a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations") (citation and internal quotation marks omitted); *McFarland* v. *Memorex Corp.*, 493 F. Supp. 631, 649 (N.D. Cal. 1980) (granting motion to dismiss where there were "no specific allegations detailing how the officers, the directors, or the warrantholders possessed the power to direct or cause the direction of the management of [the primary violator]").   *See also Middlesex Retirement System* v. *Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007) (dismissing claim where plaintiff did not plead how the defendant exercised control over high-level management of the corporation or how the defendant "caused [the primary violator] to file any misstated financial statements"); *Wright* v. *Schock,* 571 F. Supp. 642, 664 (N.D. Cal. 1983) (granting summary judgment and dismissing plaintiff's "novel" claim that defendant banks and title companies "collectively controlled [a mortgage broker] because their services were indispensable" and rejecting argument that the defendants could have "through a group boycott or threatened group boycott . . . forced [the primary violator] to mend its ways").

Indeed, Plaintiffs' § 15 claim appears to rely exclusively on the strained theory that because the RAs allegedly "controlled" what mortgage pools and/or credit enhancement would be sufficient for a given rating, they therefore "controlled" the entire transaction and somehow the alleged primary violator.   Again, Plaintiffs are attempting to expand the 1933 Act beyond recognition.   Their theory necessarily would convert all lawyers, accountants and other third-parties that advise issuers and underwriters into "controlling persons" of the entities that follow that advice.   Plaintiffs provide no legal authority for such an expansion of the 1933 Act. Moreover, such allegations that the RAs "controlled" the Depositor are contradicted by every other allegation contained in the AC that make clear that it was Wells Fargo Bank that was "*at all times the controlling entity of the Depositor*."  (AC ¶ 16) (emphasis added).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

For each of these reasons, Plaintiffs' § 15 claims against the RAs should be dismissed.

## **CONCLUSION**

The claims asserted against the RAs in the AC should be dismissed with prejudice.

Dated:   October 30, 2009

By:   /s/ David T. Biderman

Floyd Abrams (admitted *pro hac vice*)
Adam Zurofsky (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

David T. Biderman, SBN 101577
Judith B. Gitterman, SBN 115661
Farschad Farzan, Bar No. 215194
PERKINS COIE LLP
1620 26th Street, Sixth Floor, South Tower
Santa Monica, California 90404
Telephone:  (310) 788-9900
Facsimile:  (310) 788-3399

*Attorneys for Defendant McGraw-Hill*

By:   /s/ Keith E. Eggleton

James J. Coster
Joshua M. Rubins
(*pro hac vice* applications to be submitted)
SATTERLEE STEPHENS BURKE & BURKE
LLP
230 Park Avenue
New York, New York  10169
Telephone:  (212) 818-9200
Facsimile:  (212) 818-9606

Keith E. Eggleton, SBN 159842
KEggleton@wgsr.com
David A. McCarthy, SBN 226415
DMcCarthy@wgsr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100

*Attorneys for Defendant Moody's*

By:   /s/ Stephen E. Taylor

Martin Flumenbaum (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Tobias J. Stern (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Stephen E. Taylor, SBN 58452
Jayesh Hines-Shah, SBN 214256
Jonathan A. Patchen, Bar No. 237346
TAYLOR & COMPANY LAW OFFICES,
LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208

*Attorneys for Defendant Fitch*

THE RATING AGENCY DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. C-09-01376-SI