1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   DAVID R. STICKNEY (Bar No. 188574)
    TIMOTHY A. DeLANGE (Bar No. 190768)
3   MATTHEW P. JUBENVILLE (Bar No. 228464)
    12481 High Bluff Drive, Suite 300
4   San Diego, CA 92130
    Tel:    (858) 793-0070
5   Fax:    (858) 793-0323
    davids@blbglaw.com
6   timothyd@blbglaw.com
    matthewj@blbglaw.com

7

8   *Attorneys for Lead Plaintiffs Alameda
    County Employees' Retirement Association,
    Government of Guam Retirement Fund,
9   New Orleans Employees' Retirement System
    and Louisiana Sheriffs' Pension and Relief
10  Fund*

11

12              UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

14  IN RE WELLS FARGO MORTGAGE-          Civil Action No. 09-cv-01376-SI
    BACKED CERTIFICATES
15  LITIGATION                           CONSOLIDATED CLASS ACTION
                                         ECF
16

17                                       LEAD PLAINTIFFS' OPPOSITION TO
                                         THE RATING AGENCY DEFENDANTS'
18                                       MOTION TO DISMISS THE
                                         CONSOLIDATED COMPLAINT
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

I.    INTRODUCTION ..................................................................................................1

II.   SUMMARY OF ALLEGATIONS .......................................................................3

    A.   The Rating Agencies' Role In The Certificate
        Offerings ....................................................................................................3

    B.   The Certificates' Ratings Were Unjustifiably High....................................5

III.  ARGUMENT ........................................................................................................6

    A.   Legal Standard ...........................................................................................6

    B.   The Rating Agencies Are Liable As Underwriters .....................................7

        1.   Underwriters Are Those Who Participate In
               Steps Necessary To A Security's
               Distribution ....................................................................................7

        2.   The Rating Agencies Acted As Underwriters.................................9

        3.   SEC Rule 436(g)(1) Does Not Preclude
               Lead Plaintiffs' Claims ................................................................11

    C.   The Rating Agencies Controlled The Depositor........................................13

    D.   The Complaint Adequately Alleges That The
        Offering Documents Contained Untrue Statements
        And Omissions ..........................................................................................15

        1.   The Certificates' Ratings Were False And
               Misleading....................................................................................16

        2.   The Rating Agencies Had A Duty To
               Disclose The Omitted Information ...............................................18

        3.   Lead Plaintiffs Are Not Required To Plead
               Subjective Belief...........................................................................18

        4.   The Bespeaks Caution Doctrine Is
               Inapplicable..................................................................................20

    E.   Lead Plaintiffs' Claims Against The Rating
        Agencies Are Timely .................................................................................21

    F.   Lead Plaintiffs Have Standing To Pursue Claims
        Against The Rating Agencies Related To All
        Offerings And Certificates.........................................................................21

IV.   CONCLUSION....................................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2  <u>Cases</u>                                                   <u>Page(s)</u>

3

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   2009 U.S. Dist. LEXIS 79607 (S.D.N.Y. Sept. 2, 2009).................................17, 21, 22

4

5

*Ackerberg v. Johnson*,
   892 F.2d 1328 (8th Cir. 1989) ......................................................................10

6

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)...........................................................20

7

8

*In re Apple Comp. Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ......................................................................21

9

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)....................................................................................7

10

11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................. passim

12

13

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ........................................................................23

14

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ("Cent. States II")...........................................23

15

16

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009)...............................................................6, 16

17

18

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................23

19

*In re DDi Corp. Sec. Litig.*,
   2005 WL 3090882 (C.D. Cal. July 21, 2005)...............................................21

20

21

*Durham v. Kelly*,
   810 F.2d 1500 (9th Cir. 1987) ......................................................................14

22

23

*Durning v. First Boston Corp.*,
   815 F.2d 1265 (9th Cir. 1987) ......................................................................17

24

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ......................................................................24

25

26

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   511 F. Supp. 2d 742 (S.D. Tex. 2005) ..........................................................13

27

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ..................................................................17, 22

28

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ...................................................................6

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994) ........................................................16

*Harden v. Raffensperger, Hughes & Co.*,
  65 F.3d 1392 (7th Cir. 1995) ...................................................2, 9, 10, 12

*Hedden v. Marinelli*,
  796 F. Supp. 432 (N.D. Cal. 1992) ..........................................................10

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) .................................................................................17

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) .................................................................13

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) ...............................................2, 13, 14, 16

*Ingenito v. Bermec Corp.*,
  441 F. Supp. 525 (S.D.N.Y. 1977)...........................................................10

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003).......................................................14

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) ...................................................................17

*Kensington Capital Mgmt. v. Oakley, Inc.*,
  1999 WL 816964 (C.D. Cal. Jan. 14, 1999) ............................................21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...................................................................21

*McCasland v. Formfactor Inc.*,
  2008 WL 2951275 (N.D. Cal. July 25, 2008)...........................................16

*McFarland v. Memorex Corp.*,
  493 F. Supp. 631 (N.D. Cal. 1980) .............................................10, 11, 15

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..............................................15, 20

*In re Metro. Sec. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) .................................................21

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................15

*Paracor Fin., Inc.* v. *GE Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ............................................................................15

*Pinter v. Dahl*,
   486 U.S. 622 (1988)........................................................................................7

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
   2009 WL 3149775 (D. Mass. Sept. 30, 2009) ...................................18, 19

*In re PMI Group, Inc. Sec. Litig.*,
   2009 WL 3681669 (N.D. Cal. Nov. 2, 2009) (Illston, J.) .............................22

*In re PMI Group, Inc. Sec. Litig.*,
   2009 WL 1916934 (N.D. Cal. July 1, 2009) (Illston, J.) ..............................23

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................11

*In re Refco, Inc. Sec. Litig.*,
   2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ...........................................11, 12

*Rubke* v. *Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ........................................................................20

*SEC v. Allison*,
   1982 WL 1322 (N.D. Cal. Aug. 11, 1982) ...........................................8, 9, 10

*SEC v. Holschuh*,
   694 F.2d 130 (7th Cir. 1982) ...........................................................................9

*SEC v. Kern*,
   425 F.3d 143 (2d Cir. 2005).....................................................................2, 8, 9

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ................................................................ passim

*Schneider v. Apple Comp.*,
   496 U.S. 943 (1990)........................................................................................21

*Special Situations Fund, III, L.P. v. Cocchiola*,
   2007 WL 2261557 (D.N.J. Aug. 3, 2007) ...................................................8, 9

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438 (1976)...................................................................................17, 18

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)......................................................................................20

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
   259 F.R.D. 490 (W.D. Wash. May 15, 2009) .................................................14

*In re Wash. Mut. Sec. Deriv. & ERISA Litig.*,
  2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) ...........................................................20

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994), *cert. denied*, 516 U.S. 868 (1995)....................................22

*Wright v. Schock*,
  571 F. Supp. 642 (N.D. Cal. 1983) .........................................................................15, 16

**STATUTES, RULES & REGULATIONS**

15 U.S.C.
  § 77b(a)(11) ..............................................................................................................7
  § 77k(a) ................................................................................................................7, 17
  § 77k(a)(4) ...............................................................................................................12
  § 77k(a)(5) .................................................................................................................7
  § 77o ........................................................................................................................13

17 C.F.R.
  § 230.405.................................................................................................2, 13, 14, 16
  § 230.408..................................................................................................................19
  § 230.436(g)(1) ........................................................................................................12

The Alameda County Employees' Retirement Association, the Government of Guam Retirement Fund, the Louisiana Sheriffs' Pension and Relief Fund, and the New Orleans Employees' Retirement System (collectively, "Lead Plaintiffs"), respectfully submit this memorandum of law in support of their opposition to The Rating Agency Defendants' Motion To Dismiss The Consolidated Class Action Complaint ("RA Mot."). Dkt. No. 157.

I.    INTRODUCTION

Between 2005 and 2007, Moody's Investors Service, Inc. ("Moody's"), McGraw-Hill Companies, Inc., through its division Standard & Poor's ("S&P") and Fitch Ratings, Inc. ("Fitch") (collectively, the "Rating Agencies") participated in the issuance of over $67 billion in mortgage-backed certificates ("Certificates").[1]   The registration statements, prospectuses and prospectus supplements (collectively, "Offering Documents") contained materially untrue statements and omissions for which the Rating Agencies are liable under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. § 77 *et seq*. ("Securities Act").

The Rating Agencies played a significant and necessary role in the distribution of the Certificates.  Rather than simply assigning credit ratings to the Certificates, the Rating Agencies actively participated in structuring the Certificates, including evaluating default and loss rates of the underlying mortgages.  ¶¶60, 110-11.  The Rating Agencies controlled the composition of the mortgage pools and were able to pre-determine the ratings that the Certificates eventually received. It was "a condition to the issuance of the Offered Certificates" that they be assigned a specific set of pre-determined ratings.  ¶¶59, 111.

The ratings were also integral to distributing the Certificates to investors, as many institutional investors including banks, mutual funds and public pension funds are prohibited from

---

[1]   ¶¶3, 31-33, 60-61.  References to "¶__" are to the Consolidated Class Action Complaint for Violations of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Complaint"). Dkt. No. 133. "Defendants" refers collectively to (1) Wells Fargo Asset Securities Corporation ("Depositor"), Wells Fargo Bank, N.A. ("Wells Fargo") (together, the "Wells Fargo Defendants"); (2) Goldman, Sachs & Co., Morgan Stanley & Co., Inc., Bear, Stearns & Co. Inc., Deutsche Bank Securities, Inc., UBS Securities, LLC, Credit Suisse Securities (USA), LLC, RBS Securities, Inc., Barclays Capital, Inc., Banc of America Securities, LLC, HSBC Securities (USA), Inc., Citigroup Global Markets, Inc., Countrywide Securities Corporation, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Bank Underwriters"); and (3) the Rating Agencies.

---

buying securities that are not rated investment-grade.  ¶52.  Ultimately, the Rating Agencies assigned AAA ratings to over 95% of the Certificates.

The ratings were unjustifiably high as they were based on insufficient information and faulty assumptions concerning the number of underlying mortgages that were likely to default.  ¶¶7, 115.  Former Rating Agency employees confirmed that credit rating modeling was not updated on a timely basis, despite the fact that **S&P had developed, but never implemented**, a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products…" and that the Rating Agencies "did not update their models or their thinking."  ¶¶122, 124.  Corroborating these statements, the SEC found numerous flaws in the Rating Agencies' methodologies and procedures.  ¶¶117-121.  The Rating Agencies have now downgraded nearly all the Certificates, many to below investment-grade.  ¶¶7, 128.

Having departed from the traditional scope of rating agency activities, and taken on a unique and indispensable role in the Certificate offerings, the Rating Agencies are liable as Section 11 underwriters, as their participation was necessary to the distribution of the Certificates.  *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400 (7th Cir. 1995); *SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005); *SEC v. Murphy*, 626 F.2d 633, 652 (9th Cir. 1980).

In addition, the Rating Agencies are liable as Section 15 control persons due to their control over the structure of the Certificates, and the role allowed them to control the Depositor – whose exclusive corporate purpose was to issue mortgage-backed securities.  The Rating Agencies clearly had the "power to direct or cause the direction of the management and policies of" the Depositor.  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000); 17 C.F.R. § 230.405.

The Rating Agencies, while acknowledging as they must that the Complaint is subject to Rule 8's notice pleading standard, contend that Lead Plaintiffs' allegations should nevertheless be dismissed.  A complaint, however, can only be dismissed if the plaintiff's allegations are insufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Here, the Complaint amply alleges that the Rating Agencies were at the center of billions of dollars in Certificate offerings which – despite their original AAA ratings – have now been downgraded below investment-grade.  ¶128.  The Complaint also alleges facts to show that the

Rating Agencies' role in the offerings was equally – if not more – important to the Certificates' distribution than the roles of the other Defendants. Lead Plaintiffs' claims for relief are far more than "plausible," and the Rating Agencies' motion to dismiss should be denied. *Twombly*, 550 U.S. at 570.

II.     SUMMARY OF ALLEGATIONS

  A.     The Rating Agencies' Role
    In The Certificate Offerings

   The Rating Agencies played a unique and vital role in over $67.5 billion in Certificate offerings during the relevant period.[2] The "securitization" process began with Wells Fargo originating and acquiring large volumes of residential mortgage loans.[3] Wells Fargo then transferred a pool of these loans to the Depositor who "deposited" them into an issuing trust and divided the cash flows from the pool into Certificates, or tranches. ¶¶15-16, 41-42. Senior tranches were purportedly more protected from loss, but offered lower returns, while junior tranches offered higher risk, but greater returns. ¶42. The Depositor's corporate purpose was limited solely to the securitization of mortgage loans:

> The limited purposes of the Depositor are, in general, to acquire, own and sell mortgage loans; to issue, acquire, own, ***hold and sell mortgage pass-through securities*** and home equity asset-backed pass-through securities which represent ownership interests in mortgage loans...

*See* Request For Judicial Notice In Support Of Wells Fargo Defendants' And Individual Defendants' Motion To Dismiss The Consolidated Complaint ("WF RJN"), Ex. 33 at S-23, 37.

---

[2] ¶¶3, 45. For further factual detail, Lead Plaintiffs respectfully refer the Court to the concurrently-filed (1) Lead Plaintiffs' Opposition To The Wells Fargo Defendants,' the Individual Defendants' and the Underwriter Defendants' Motions To Dismiss The Consolidated Complaint ("Wells Opp."); and (2) Lead Plaintiffs' Opposition To The Underwriter Defendants' Motion To Dismiss The Consolidated Class Action Complaint ("Underwriter Opp."). "Wells Mot." refers to the Wells Fargo Defendants' And Individual Defendants' Motions To Dismiss The Consolidated Complaint. Dkt. No. 162.

[3] ¶41. Wells Fargo also served as the custodian, master servicer, paying agent and servicer for the offerings. As the master servicer, Wells Fargo calculated the distributions and other information regarding the Certificates in accordance with the pooling and servicing agreement. In addition, as the master servicer, Wells Fargo filed monthly reports on Form 10-D with the SEC on behalf of the issuing trusts and is responsible for the preparation of tax returns on behalf of the issuing trusts.

---

The Rating Agencies analyzed the "structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider." ¶111. They purportedly considered factors such as expected default rates and amount of losses, pool characteristics, the structure of the tranches and guarantees from insurance companies against losses from default or prepayment. ¶60. The Rating Agencies assigned pre-determined credit ratings to each tranche and "participated in the drafting and dissemination of the Prospectus Supplements." ¶¶31-33, 137.

The Certificates' ratings were instrumental to their issuance. Each prospectus supplement stated that it was "a condition to the issuance of the Offered Certificates" that they receive the pre-determined ratings. ¶¶59, 111, 113, 158. Investment-grade ratings were essential to distributing the Certificates to banks, mutual funds and public pension funds because such investors are required by regulation to purchase and hold only investment-grade securities. ¶52. Here, the Rating Agencies assigned AAA – the highest rating – to 95% of the Certificates.[4]

The Rating Agencies also monitored the ratings throughout the life of the Certificates. For example, the Pooling and Servicing Agreement could be amended by the Depositor, the Master Servicer and the Trustee, but often required an opinion of counsel stating that Certificateholders' interests would not be adversely affected. ¶66. No opinion of counsel was required, however, "if each Rating Agency…states in writing that [amendment] would not result in the downgrading or withdrawal of the ratings then assigned to the Certificates." *Id.* The Master Servicer could not resign unless it received a letter from each Rating Agency stating that the resignation would not result in a downgrade of the Certificates. ¶62. The Master Servicer could replace the Servicer with another servicing institution only if that institution was "acceptable to the Trustee and each Rating Agency." ¶65. Additionally, the trust account established in the name of the Master Servicer on behalf of the Trustee had to either be (1) opened at a bank rated in at least one of the Rating

---

[4] ¶4. S&P's highest rating is "AAA." Fitch's highest rating is "AAA." Moody's highest rating is "Aaa." These ratings signify the highest investment-grade, are of the best quality, and carry the smallest risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are considered "investment-grade ratings." Any instrument rated lower than BBB is considered below investment-grade.

Agencies' two highest categories; or (2) otherwise approved by the Rating Agencies.   ¶63.   The Rating Agencies also dictated the amount of insurance coverage a Servicer was required to hold. ¶64.

**B.   The Certificates' Ratings Were Unjustifiably High**

The Certificates' ratings were based on outdated and insufficient data and assumptions about the delinquencies and defaults in the underlying mortgage pools.   ¶115.  Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, confirmed that credit rating modeling was not updated on a timely basis, despite the fact that by early 2004, S&P had developed a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products."  ¶122.  Mr. Raiter stated:

> had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market…

*Id.* at 123.  Further, Jerome Fons, a former Managing Director of Credit Policy at Moody's, testified that the Rating Agencies "did not update their models or their thinking" during the period of deterioration in credit standards.  ¶124.

On July 8, 2008, following its investigation into the Rating Agencies' role in rating mortgage-backed securities, the SEC issued *The Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* ("Summary Report").   The Summary Report found numerous flaws in the Rating Agencies' procedures, including:

- Relevant ratings criteria were not disclosed;
- None of the rating agencies examined had specific written procedures for rating RMBS and CDOs;
- The rating agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;
- Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;
- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records. As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and
- There was a lack of documentation of rating agency committee actions and decisions.

1    ¶117.

2         The outdated data, models and assumptions used to evaluate the mortgage pools resulted in

3    unjustifiably high ratings as compared to other investments with the same risk profiles.  ¶¶7, 115.

4    Certificates initially rated "A" or higher maintained an "A" rating or higher until, at the earliest, May

5    20, 2008.  Certificates initially rated "AAA" maintained investment-grade ratings until, at the

6    earliest, December 16, 2008.  ¶114.  Many of the Certificates have now been downgraded below

7    investment-grade.  ¶128.  The Certificates are currently marketable at near the prices paid by Lead

8    Plaintiffs.  ¶7.

9    III.   ARGUMENT

10            A.    Legal Standard

11         Violations of Sections 11 and 15 of the Securities Act must be pled in accordance with Rule

12   8(a) of the Federal Rules of Civil Procedure.  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D.

13   534, 546 (N.D. Cal. 2009) (citation omitted).  Rule 8(a)(2) requires only "a short and plain statement

14   of the claim showing that the pleader is entitled to relief" and does not require "detailed factual

15   allegations."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint can only be

16   dismissed if the plaintiff's factual allegations are insufficient "to state a claim to relief that is

17   plausible on its face."[5]  A claim is plausible on its face "when the plaintiff pleads factual content that

18   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

19   alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).  At

20   the pleading stage, a court must accept as true all factual allegations in the complaint and draw all

21   reasonable inferences in favor of the plaintiff.  *Id.* at 1943.

22         Here, the Complaint contains factual allegations regarding, *inter alia*, the Rating Agencies'

23   roles as underwriters and control persons and their resulting liability for the untrue statements and

24   omissions in the Offering Documents.  The Complaint clearly alleges facts sufficient to state a

25

26

27   _____

28   [5]  *Id.* at 570.  Although *Twombly* related to allegations of antitrust violations, the Ninth Circuit's
     holding in *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008) confirms that the
     Rule 8(a) pleading standards articulated in *Twombly* apply to securities cases.

1  plausible claim to this relief. *Twombly*, 550 U.S. at 570.  Accordingly, the Rating Agencies' motion

2  to dismiss should be denied.

3        B.    <u>The Rating Agencies Are Liable As Underwriters</u>

4            1.    Underwriters Are Those Who
                       <u>Participate In A Security's Distribution</u>

5

6        Section 11 provides a primary cause of action against the issuers, underwriters and other

7  participants in any public securities offering made under a registration statement containing "an

8  untrue statement of a material fact or omitted to state a material fact required to be stated therein or

9  necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 11(a)

10 extends liability for misstatements and omissions to, *inter alia*, "…(5) every underwriter with

11 respect to such security."  15 U.S.C. § 77k(a)(5).

12       The Securities Act defines "underwriter" to include "any person who has purchased from an

13 issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any

14 security, ***or participates or has a direct or indirect participation in any such undertaking***. . ." 15

15 U.S.C. § 77b(a)(11) (emphasis added).  The legislative history of the Securities Act confirms the

16 broad definition of "underwriter":

17         Persons…who participate in any underwriting transaction or who have a direct or indirect
           participation on such a transaction…***The test is one of participation in the underwriting***
18         ***undertaking*** rather than that of a mere interest in it.

19 H.R. Conf. Rep. No. 73-152, at 24 (1933); *cf. Pinter v. Dahl*, 486 U.S. 622, 650 n.26 (1988)

20 (liabilities and obligations expressly grounded in participation are found in numerous places in the

21 Securities Act, including the provisions defining underwriter in Section 2(a)(11)).

22       In *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980), the defendant (Murphy) was the founder,

23 president and director of a company which offered unregistered securities to investors via a complex

24 sale/leaseback scheme involving cable television systems.  *Id.* at 637-38.  Murphy devised the

25 financing scheme, prepared, reviewed and edited the offering memoranda, and met personally with

26 investors and their representatives.  *Id.*  He never, however, actually offered or sold securities to

27 investors.  The Ninth Circuit found Murphy liable as a participant in the offerings because "[t]he

28

---

conclusion that Murphy engaged in steps necessary to the distribution is inescapable."[6]  Murphy filled an "extensive role" "without which" there would have been no offering.  *Id.*  In *Murphy*, the Ninth Circuit made clear that "participation" is not limited to those who purchase and sell securities.  Instead, participation includes those who fulfill ***steps necessary*** to the distribution and liability extends to those who play significant roles in devising and constructing the securities.  In *SEC v. Allison*, 1982 WL 1322, at \*3 (N.D. Cal. Aug. 11, 1982), the court applied *Murphy* in a Section 2(a)(11) context, stating, "[w]hen…a defendant's actions [a]re necessary to and a substantial factor in an illegal securities distribution, the defendant is a participant and thus an underwriter..."[7]

Courts elsewhere have similarly applied a broad definition of participation under Section 2(a)(11).  *See e.g., Kern*, 425 F.3d at 152 (underwriters are those who participate in "steps necessary to the distribution of security issues.") (citation omitted); *Special Situations Fund, III, L.P. v. Cocchiola*, 2007 WL 2261557, at \*5 (D.N.J. Aug. 3, 2007) ("To be an underwriter under the Securities Act, it is not necessary for a person to undertake the risk that they will be left holding unsold shares…. Nor must a party actually sell shares to the public to be an underwriter under the Securities Act, ***mere participation in an offering is enough.***"  (emphasis added)).

In *Harden*, 65 F.3d, at 1400, the defendant was retained as a "qualified independent underwriter" to perform due diligence on a registration statement and to recommend a minimum yield.  The defendant did not "purchase or sell securities, solicit orders, take part in the actual distribution, assume any risk of sale of the securities or do other things commonly associated with an underwriter's role."  *Id.* at 1396.  Nevertheless, the Seventh Circuit found that the defendant was an underwriter under Section 11 because "its role…was '***necessary*** to the distribution of [the Firstmark]

---

[6]  *Id.* at 652.  The court reviewed two tests of participant liability: the "necessary participant" test and the "substantial factor" test.  Both tests asked whether, "but for the defendant's participation," the sales would have taken place.  *Id.* at 648-51.  The court declined to choose a test, but noted that the standards "differ little…[and] no court using the 'necessary participant' test has found liable a defendant whose acts were not a substantial factor in the sales transaction." *Id.*

[7]  Although the Rating Agencies rely on *Allison*, the facts there are not comparable to this case.  There, officers of the issuer arranged for public trading through brokers and transfer agents, stimulated demand through advertisements and later sold stock.  *Id.*  The court found that they were underwriters. Nothing in *Allison* limits underwriter liability to only those who actually purchase and sell securities.

securities.'"   *Id.* at 1401 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 n. 13 (7th Cir. 1982) (emphasis added)).

               2.        The Rating Agencies Acted As Underwriters

        Here, it is undisputed that the Rating Agencies were involved in multiple steps necessary to the distribution of the Certificates.  The Rating Agencies analyzed the "structural [and] legal" aspects of the Certificates, including pool characteristics such as expected default rates and amount of losses.  ¶¶60, 111.  The Rating Agencies also "participated in the drafting and dissemination of the Prospectus Supplements."  ¶¶31-33, 137.  The Rating Agencies' assignment of pre-determined ratings was "a condition to the issuance of the Offered Certificates."  ¶¶43, 59, 110-11, 113, 118, 158.  These high ratings were crucial to marketing the Certificates, as many banks, mutual funds and public pension funds were restricted from purchasing anything but investment-grade securities.  ¶52.  Clearly, the Rating Agencies' participation constituted steps necessary to the distribution, and they are therefore liable as underwriters. *See Murphy*, 626 F.2d at 652 (finding defendant who devised the financing scheme and prepared, reviewed and edited the offering memoranda but did not buy or sell securities liable as a "participant" under Section 5 of the Securities Act); *Allison*, 1982 WL 1322, at *3 (finding that when a defendant's actions are necessary and substantial factors in a distribution, the defendant is a participant and thus an underwriter); *Kern*, 425 F. 3d at 152; *Special Situations*, 2007 WL 2261557, at *5.

        Recognizing their unique and necessary role in the distribution of the Certificates, the Rating Agencies attempt to avoid liability by arguing for a narrow construction of "participation." According to the Rating Agencies, underwriters are limited to only those entities that purchase securities from issuers and sell them to investors (*i.e.*, "conduits").[8]  The Rating Agencies cite no decision, and Lead Plaintiffs are unaware of any, holding that Rating Agencies can never be held

---

[8] RA Mot. at 10-12.  The Rating Agencies argue that if they are held accountable as underwriters, the term could be extended to "all lawyers, accountants and other third parties." RA Mot. at 15.  Not true.  Whether a party is an underwriter is a factual question which depends on the extent of a defendant's participation in steps necessary to the distribution of the securities.  *Murphy*, 626 F.2d at 652; *Allison*, 1982 WL 1322, at *3; *Harden*, 65 F.3d at 1400.  Lawyers, accountants and other third parties do not play the same active roles the Rating Agencies played here.

liable as underwriters.  Rather, the Rating Agencies cite a series of decisions – many from outside the Ninth Circuit – which either support a broad interpretation of "participation," or contain little relevant analysis.  For example, *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977), recognized a broad interpretation of "participation," finding that an underwriter *either* "buys securities directly or indirectly from the issuer and resells them to the public, *or* he performs some act (or acts) that *facilitates* the issuer's distribution" (emphasis added).  The Rating Agencies' remaining cases analyze whether defendants purchased securities with a "view to distribution," not, as alleged here, whether they indirectly or directly "participated" in the undertaking.[9]

*McFarland v. Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980) – a district court case decided prior to the Ninth Circuit's decision in *Murphy* – is inapposite.  There, plaintiffs alleged that warrant holders who sold warrants to investment banks (who in turn exercised the warrants and sold the stock through a public offering) were liable as underwriters.  *Id.* at 644.  The court found that the original warrant holders had "no interest, direct or indirect," and played an inactive role in the public offering.  *Id.* at 646.  Here, unlike the warrant holders' attenuated role in *McFarland*, the Rating Agencies actively and extensively participated in structuring the Certificates, drafting, editing and reviewing the Offering Documents, and assigning the necessary, pre-determined, investment-grade ratings.  ¶¶31-33, 60-61, 110-11, 137.

In fact, the court's reasoning in *McFarland* supports Lead Plaintiffs' claims here.  There, Judge Ingram noted that Section 11 applies to underwriters because they "hold themselves out as professionals" and that the public "reasonably expects that they have investigated the offering with which they are involved."  *Id.* at 646. The court ultimately concluded that the warrant holders had none of these "qualifying indicia of underwriters" as they were unknown to the public, and were not identified as having investigated the public offering.  *Id.*  Here, however, the Rating Agencies were prominently and repeatedly identified in each prospectus supplement, including descriptions of their

---

[9] *See In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250, at *7 (May 11, 2004), *Ackerberg v. Johnson*, 892 F.2d 1328, 1337 (8th Cir. 1989), and *Hedden v. Marinelli*, 796 F. Supp. 432, 436-37 (N.D. Cal. 1992).  In each of these cases, the defendants purchased and sold securities and the court analyzed whether such purchases were made with a "view to distribution."  None of these decisions analyzed whether defendants indirectly or directly "participated" in the distribution.

1  participation in structuring and rating the Certificates. Therefore, they had all the "qualifying indicia

2  of underwriters." ¶113.

3  The conduct of the alleged underwriters in *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611,

4  629 (S.D.N.Y. 2007) (*"Refco I"*), and *In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *4

5  (S.D.N.Y. Aug. 14, 2008) (*"Refco II"*), is similarly inapposite. RA Mot. at 7-11, 13-15. In *Refco I*,

6  defendants purchased unregistered bonds and "immediately resold the bonds" to the plaintiffs. 503

7  F. Supp. 2d at 620. Later, Refco permitted the holders of the unregistered bonds to exchange their

8  holdings for registered bonds. Plaintiffs alleged that the purchasers of the unregistered bonds were

9  "underwriters" of the registered bonds. *Id.* at 629. The court dismissed plaintiffs' complaint as there

10  was only a "single sentence" alleging that the defendants acted as underwriters. *Id.* at 629-30. In

11  their amended complaint, plaintiffs alleged that the purchasers of the unregistered bonds and their

12  lawyers were liable as underwriters because they commented on draft registration statements for the

13  registered offering. *Refco II*, 2008 WL 3843343, at *4. The Court concluded that the defendants

14  were not liable as underwriters, as "participation" under Section 2(a)(11) does not include those who

15  "merely comment[ed] on a draft of a registration statement...." *Id.* The court also explained that the

16  lawyers were "behind the scenes," never held "themselves out in any respect," and that their role

17  "was never publicly acknowledged." *Id.* at *4. Here, by contrast, the Rating Agencies held

18  themselves out as participants, were clearly identified in the Offering Documents, and the public was

19  unequivocally informed that the issuance of the Certificates was conditioned on their assignment of

20  investment-grade ratings.

21  The Rating Agencies' participation here was far more than "behind the scenes." Lead

22  Plaintiffs' allegations provide the Rating Agencies with notice, and state a plausible claim that they

23  acted as underwriters. Fed. R. Civ. P. 8(a), *Twombly*, 550 U.S. at 570; *Murphy*, 626 at 652; *Harden*,

24  65 F.3d at 1400. Nothing more is necessary, and their motion should be denied.

25          3.      SEC Rule 436(g)(1) Does
                    Not Preclude Lead Plaintiffs' Claims
26

27  The Rating Agencies argue that SEC Rule 436(g) expressly exempts them "as a matter of law

28  from liability under § 11." RA Mot. at 2, 4-7. Notably, the Rating Agencies' motion omits Rule

---

OPPOSITION TO THE RATING AGENCIES' MTD                                                      -11-
CASE NO. 09-CV-01376-SI

436's title – "Consents Required in Special Cases" – which makes clear that 436(g)'s application is limited to cases in which NRSROs would otherwise be liable as "experts" under § 11(4). The plain text of Rule 436(g) confirms its limitation to cases in where the rating agency acted as an expert:

> Notwithstanding the provisions of paragraphs (a) and (b) of this section, the security rating assigned to a class of debt securities, a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization [NRSRO] . . . shall not be considered ***a part of the registration statement prepared or certified by a person*** within the meaning of sections 7 and 11 of the Act.

SEC Regulation C, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1) (emphasis added).

The "prepared or certified" language refers to § 11(a)(4), which identifies experts among the strictly liable persons when a registration statement contains a materially false statement or omission.[10] Rule 436(g) does not apply to § 11(a)(5), which states that "every underwriter" can be strictly liable as well. Rule 436(g)'s legislative history further confirms that it only exempts "the rating organization from liability ***as an expert*** under Section 11 of the Securities Act for security ratings included in registration statements." *Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024 01, 42025 (Aug. 18, 1981) (emphasis added). Rule 436(g) does not provide broad insulation to all parties and all causes of action.[11]

The Rating Agencies rely on *dicta* from *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 511 F. Supp. 2d 742, 817 n.77 (S.D. Tex. 2005), to support their argument. RA Mot. at 11. There, however, plaintiffs did not allege violations of Section 11, nor did defendants invoke Rule 436(g).

---

[10]   Section 11(a)(4) states that the following persons can be sued for a materially false and misleading statement in a registration statement: "…(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having ***prepared or certified*** any part of the registration statement…" (emphasis added) 15 U.S.C. § 77k(a)(4).

[11]   Likewise, the Rating Agencies' argument that Lead Plaintiffs are attempting "to erase the consent requirements of § 11(a)(4)" should be ignored. RA Mot. at 7, 10. The requirement that experts consent to being named to investors as having prepared and certified a portion of the registration statement is a requirement unique to Section 11(a)(4). Section 11(a)(5) has no similar consent requirement.

---

1  *Id.* at 809.  In a footnote, the court cited Rule 436(g), but did not apply it to the facts or rely upon it

2  in reaching its conclusions.  *Id.* at 817 n.77.

3          C.       <u>The Rating Agencies Controlled The Depositor</u>

4          Section 15 of the Securities Act imposes joint and several liability on "[e]very person who ...

5  controls any person liable under [Section 11 or Section 12 of the Securities Act]…" 15 U.S.C. § 77o.

6  To state a claim for control person liability, Lead Plaintiffs must allege: (1) a primary violation of

7  the securities laws; and (2) that the defendant exercised "control" over the primary violator.[12]

8  *Howard*, 228 F.3d at 1065.  The SEC defines "control" as "[t]he possession, direct or indirect, of the

9  power to direct or cause the direction of the management and policies of a person, ***whether through***

10 ***ownership of voting securities, by contract, or otherwise.***" 17 C.F.R. § 230.405 (emphasis added).

11 Determining control is "an intensely factual question, involving scrutiny of the defendant's

12 participation in the day-to-day affairs of the corporation and the defendant's power to control

13 corporate actions."  *Howard*, 228 F.3d at 1065.

14         As detailed in Lead Plaintiffs' Opp. to the Wells Mot., the Depositor committed primary

15 violations of both Sections 11 and 12(a)(2).  The Rating Agencies had the power to – and did –

16 "cause the direction of the management and policies" of the Depositor "by contract or otherwise."

17 17 C.F.R. § 230.405; *see also Howard*, 228 F.3d at 1065; *Durham v. Kelly*, 810 F.2d 1500, 1503-04

18 (9th Cir. 1987).  Specifically, the Depositor was created for a singular purpose: "to acquire, own and

19 sell mortgage loans; ***to issue, acquire, own, hold and sell mortgage pass-through securities***..."  WF

20 RJN, Ex. 33 at S-23, 37.  The Rating Agencies controlled every stage of the Certificates' existence

21 from structuring through servicing, and decided whether the necessary and pre-determined ratings

22 would be assigned.  Ultimately, if the Rating Agencies did not assign the high credit ratings in

23 accordance with the representations in the Offering Documents, the Depositor could not legally

24 issue, market or sell the Certificates.  In other words, the Rating Agencies controlled the Depositor's

25 sole corporate purpose – the sale of mortgage pass-through securities.

26       —————————————

27 [12]  Although *Howard* addressed control-person liability under Section 20(a) of the Exchange Act, the
    Ninth Circuit's decision in *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990),

28 confirms that the control person analysis under Section 15 and Section 20(a) are identical.

The Rating Agencies contend that Lead Plaintiffs' allegations "lack any of the hallmarks generally considered adequate to plead 'control.'" RA Mot. at 22-24. The purported "hallmarks" of control – such as stock ownership in the controlled entity – are not, however, the exclusive means to plead control. *See* 17 C.F.R. § 230.405 (control can be shown "through ownership of voting securities, by contract, *or otherwise*" (emphasis added)). In fact, as detailed above, Lead Plaintiffs allege that the Ratings Agencies controlled the Depositor through the Depositor's extensive dependence on the Rating Agencies and the issuance of the ratings. *See In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. May 15, 2009) (noting that Rule 8's notice pleading standard applies to claims under Section 15). *See also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) ("Naked allegations of control…will typically suffice to put a defendant on notice…").

The Rating Agencies' authority is either easily distinguished or supports Lead Plaintiffs' position. For example, *Paracor Fin., Inc.* v. *GE Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996), stands for the proposition that the control person inquiry "'revolve[s] around the "management and policies" of the corporation, not around discrete transactions.'" RA Mot. at 22. Here, the Rating Agencies controlled the Depositor's management, policies and corporate purpose throughout the relevant period. In *Middlesex Ret. Sys.* v. *Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007), the court dismissed control allegations against one vice president because all the primary violators held positions of vice president or higher. The court could not determine how the defendant could "exercise control over either his peer Vice Presidents or his supervisors." *Id.* Likewise, the court dismissed control allegations against the corporate defendant because "it would be difficult to fathom how Quest could control any of the Individual Defendants."[13] These

---

[13] *Id.* The Rating Agencies also try to liken this case to cases where the control person allegations were facially weak or non-existent. In *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000), control person claims were dismissed because plaintiffs pled no facts related to "how the Section 20(a) defendants controlled specific Section 10(b) defendants." *Id.* The court granted plaintiffs leave to amend as remedying the deficient claims "may be a simple pleading matter…" *Id.* Similarly, in *McFarland*, 493 F. Supp. at 649, plaintiffs' control person allegations were based on "no specific allegations" and the misconception that "any person important enough to be named in the registration statement is presumptively" a control person. *Id.*

---

1    implausible allegations are simply not comparable to the well-pled control allegations against the

2    Rating Agencies.

3           The Rating Agencies also cite *Wright v. Schock*, 571 F. Supp. 642, 664 (N.D. Cal. 1983).  In

4    *Wright*, the primary violator, GSHL, brokered loans on real property and plaintiffs alleged that two

5    banks and nine title companies were control persons.  *Id.* at 664.   The court rejected plaintiffs'

6    theory.  Notably, both banks "carried on no more than an ordinary banking relationship" with GSHL,

7    including providing checking accounts, lock boxes, loans and escrow depository services.  *Id.* at 655.

8    The title company defendants simply prepared preliminary title reports, issuance of lenders' title

9    policies and occasional partial escrow services.  Neither the banks nor the title companies in *Wright*

10   controlled the structure of the promissory notes or the issuance of the notes.[14]

11          Finally, the Rating Agencies contend that "conclusory allegations of control are insufficient

12   as a matter of law."  RA Mot. at 22 (citing *McCasland* v. *Formfactor Inc.*, 2008 WL 2951275, at *11

13   n.27 (N.D. Cal. July 25, 2008); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1242-43 (N.D. Cal.

14   1994)).   As detailed above, however, Lead Plaintiffs' allegations are far beyond conclusory.   At

15   most, the Rating Agencies have raised "a factual rebuttal inappropriate for a motion to dismiss" and

16   their motion to dismiss the Complaint's control person allegations should be denied.   *Charles*

17   *Schwab*, 257 F.R.D. at 550.

18          D.    The Complaint Adequately Alleges That The Offering
                 <u>Documents Contained Untrue Statements And Omissions</u>

19

20          The Offering Documents contained materially false and misleading statements regarding: (1)

21   the underwriting standards purportedly used in connection with the origination of the underlying

22   mortgages; (2) the maximum loan-to-value ratios used to qualify borrowers; (3) the appraisals of the

23

24   _____

25   [14] The Rating Agencies again contend that if they are held liable as control persons, "all lawyers,
     accountants and other third parties that advise issuers and underwriters" will be converted to control

26   persons.  Whether "control" exists is a factual inquiry related to the magnitude of power one entity
     wields over another.  17 C.F.R. § 230.405; *Howard*, 228 F.3d at 1065.  Most lawyers, accountants

27   and other third parties who serve in "advisory" capacities simply do not have the same control over
     the other parties to an offering as the Rating Agencies had over the Depositor here.  *Howard*, 228

28   F.3d at 1065.

1   properties underlying the mortgages; and (4) the ratings of the Certificates.[15]  ¶5.  In their motion to

2   dismiss, the Rating Agencies focus on the unjustifiably high ratings.  As underwriters and control

3   persons, however, the Rating Agencies are strictly liable for all untrue statements and material

4   omissions in the Offering Documents, even those that concern subjects other than the ratings.  Lead

5   Plaintiffs respectfully refer the Court to § III.A of their Opposition to the Wells Mot. for facts and

6   law establishing the untrue statements and omissions in the Offering Documents.

7                    1.      The Certificates' Ratings Were False And Misleading

8           In the Ninth Circuit, plaintiffs in Section 11 cases must demonstrate "…(1) that the

9   registration statement contained an omission or misrepresentation, and (2) that the omission or

10  misrepresentation was material, that is, it would have misled a reasonable investor about the nature

11  of his or her investment."  *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994); 15 U.S.C. § 77k(a).

12  This represents a "stringent standard of liability" and "places a relatively minimal burden on a

13  plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  A misstated or omitted

14  fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have

15  been viewed by the reasonable investor as having significantly altered the 'total mix' of information

16  made available."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Materiality is a mixed

17  question of law and fact which is typically left for the jury to decide.  *Id.* at 449.  Falsity or

18  materiality can only be appropriately resolved prior to trial when "the adequacy of the disclosure or

19  the materiality of the statement is 'so obvious that reasonable minds [could] not differ…'"  *Fecht v.

20  Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995) (quoting *Durning v. First Boston Corp.*, 815 F.2d

21  1265, 1268 (9th Cir. 1987)).

22          Here, the credit ratings in the Offering Documents constitute an affirmative

23  misrepresentation of the character and investment risk of the Certificates.  The Certificates' ratings

24  were based on "outdated assumptions, relaxed ratings criteria, and inaccurate loan information" and

25  updated models were developed, but not implemented.  ¶¶6, 117, 122.  In fact, the SEC found that

26  _____

27  [15] The Rating Agencies join the Wells Fargo Defendants' argument that Lead Plaintiffs fail to allege
    any actionable misrepresentations or omissions related to the allegedly false underwriting standards,
28  loan-to-value ratios and appraisals.  RA Mot. at 3 n.2.

---

the Rating Agencies updated their models "infrequently," and a former Managing Director of Credit Policy at Moody's admitted that the Rating Agencies "did not update their models or their thinking" during the period.  ¶¶120, 124.  Accordingly, the credit ratings of the Certificates were, in truth, "far riskier than represented," and were not equivalent to other investments with the same credit ratings. In similar context, credit ratings have been held to be actionable misstatements.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2009 U.S. Dist. LEXIS 79607, at *35-36 (S.D.N.Y. Sept. 2, 2009) (finding high ratings and the information they conveyed to be actionable misstatements).

In addition, the Offering Documents omitted facts necessary to make statements regarding the ratings not misleading.  For example, Defendants failed to disclose that the Rating Agencies' compensation created conflicts of interest that were exacerbated when the Rating Agencies rated structured products such as the Certificates.[16]  Accordingly, investors were unaware of the Ratings Agencies' significant conflict of interest, and that those conflicts could interfere with "providing ratings of integrity."  *Id.*  Undoubtedly, this would have significantly altered the total mix of available information.  *TSC*, 426 U.S. at 449.

The Rating Agencies rely on *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 2009 WL 3149775, at *8 (D. Mass. Sept. 30, 2009) – an out-of-circuit district court decision which is currently on appeal – to support their argument that there were no false statements or omissions related to the Certificates' ratings.  RA Mot. at 17.  In *Nomura*, plaintiffs alleged that Moody's and S&P's use of outdated models and inaccurate loan information rendered their ratings "meaningless."  *Nomura*, 2009 WL 3149775, at *8.  The court noted that while it "may be true" that the ratings were meaningless, "plaintiffs do not allege that defendants inaccurately reported the actual ratings awarded by Moody's and S&P."  *Id.* at *28.

Here, Lead Plaintiffs' allegations are not centered on the accurate reporting of the ratings. Rather, the ratings misrepresented the character and risk of the underlying mortgage pools.  As

---

[16]  ¶118-119.  The fact that investors were unaware of these facts defeats the Rating Agencies' claim that the issuer-pay compensation model was "publicly known."  As detailed in the Complaint, the degree to which the MBS compensation model "exacerbated" the conflicts of interest inherent in the issuer-pay model was unknown until the SEC published the Summary Report in July 2008.  ¶117.

*Nomura* recognized, the deterioration in the lending standards and the outdated models at the time the credit ratings rendered the ratings meaningless.  ¶115 (the ratings affirmatively misstated the Certificates' risk profile at the time the ratings were issued and that they were "far riskier than other investments with the same ratings").

2.    The Rating Agencies Had A Duty
<u>To Disclose The Omitted Information</u>

The Rating Agencies contend they had no duty to disclose the truth about the assumptions used for rating the Certificates or about the conflicts of interest created by their compensation arrangement.  RA Mot. at 19.  Defendants are wrong.  The Offering Documents included select information regarding the structure and ratings of the Certificates.  Defendants therefore had a duty to disclose all information likely to materially affect those structures and ratings.[17]  Despite this duty, Defendants failed to disclose the existence of, but failure to implement, the most current and reliable data and models.[18]  Had these facts been disclosed, they would have materially affected the total mix of information regarding the risk and value of the Certificates.

3.    Lead Plaintiffs Are Not
<u>Required To Plead Subjective Belief</u>

The Rating Agencies contend that their ratings are opinions and, therefore, Lead Plaintiffs must plead subjective falsity.  RA Mot. at 17-18.  In support, Defendants cite *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991), and *Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009), both of which analyzed "fairness opinions," and concluded that in certain circumstances, plaintiffs must plead subjective falsity.[19]  Credit ratings are fundamentally different

---

[17]  *See* 17 C.F.R. § 230.408 (stating that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.").

[18]  *See* ¶¶117, 122.  The Rating Agencies had a "duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading."  ¶138.

[19]  In *Rubke*, plaintiffs were subject to Rule 9(b)'s heightened pleading standard, as their complaint employed "the exact same factual allegations of Section 11 as it uses to allege fraudulent conduct

than the fairness opinions in *Rubke* and *Virginia Bankshares*. Fairness opinions are "opinions" that a particular transaction is within a range of fairness from a financial point of view. By contrast, the credit ratings here made factual assertions regarding the Certificates' value and risk based on the underlying loan pools.

The "subjective falsity standard" does not apply to factual statements accompanying opinions. *See McKesson*, 126 F. Supp. 2d at 1266 ("purely factual assertions in the fairness opinion, such as Bear Stearns' statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard"). *See also In re Wash. Mut. Sec. Deriv. & ERISA Litig.*, 2009 WL 3517630, at *21-22 (W.D. Wash. Oct. 27, 2009) (finding that opinion stating that financial statements were presented "in conformity with accounting principles generally accepted in the United States of America" was an actionable statement of fact); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 241 (S.D.N.Y. 2004) (finding subjective falsity standard did not apply to certification of financial statements accompanying fairness opinion). Here, the ratings were ***factual assertions*** regarding the underlying loan pools addressing: (1) "the likelihood of the receipt by certificateholders of all distributions of principal and interest;" and (2) "...the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any." ¶¶31-33, 110-11. Accordingly, Lead Plaintiffs are not required to plead the Rating Agencies' subjective belief.

Even if the ratings are opinions, statements of opinion are still actionable if (1) the speaker does not genuinely believe the statement; (2) there is no reasonable basis for that belief; or (3) the speaker is aware of undisclosed facts tending to seriously undermine the accuracy of the statement. *In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1112 (9th Cir. 1989), *cert. denied sub nom. Schneider v. Apple Comp.*, 496 U.S. 943 (1990). Here, the Rating Agencies were aware of updated data and models, but did not implement them. Clearly, the Rating Agencies could not have genuinely believed – nor was there any reasonable basis to believe – that the Certificates' ratings were accurate given the use of outdated data and models. In *Abu Dhabi*, 2009 U.S. Dist. LEXIS 79607, at *35-37,

under section 10(b)." *Id.* at 1161. Here, as the Rating Agencies concede, Lead Plaintiffs' allegations are analyzed pursuant to Rule 8's notice pleading standard.

1    the court held credit ratings were actionable false statements.  There, Moody's and S&P argued, as

2    they do here, that their ratings were merely non-actionable opinions.  *Id.* at *37.  The court

3    disagreed, finding that the credit ratings were actionable misstatements because "plaintiffs have

4    sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings

5    they assigned…were accurate and had a basis in fact."  *Id.* at *37.

6                    4.    The Bespeaks Caution Doctrine Is Inapplicable

7            To qualify for protection under the "bespeaks caution doctrine," a statement must be

8    (1) forward-looking; and (2) accompanied by meaningful cautionary language identifying important

9    factors that could cause actual results to differ materially from those projected in the forward-

10   looking statement.[20]  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th

11   Cir. 2005).  "Dismissal on the pleadings under the bespeaks caution doctrine ... requires a stringent

12   showing: There must be "sufficient 'cautionary language or risk disclosure [such] that reasonable

13   minds could not disagree that the challenged statements were not misleading.'"  *Id.*; *In re Metro.*

14   *Sec. Litig.*, 532 F. Supp. 2d 1260, 1291 (E.D. Wash. 2007).

15           Here, the untrue statements and omissions are misrepresentations of ***present or historical***

16   ***fact***.  Specifically, the ratings purported to represent the present risk of the Certificates.  Likewise,

17   the omission regarding the Rating Agencies' compensation arrangement exacerbating existing

18   conflicts of interest is a present fact not disclosed.  ¶118.  The risk profiles and resulting ratings were

19   then-existing assessments of the Certificates' risk.  *In re PMI Group, Inc. Sec. Litig.*, 2009 WL

20   3681669, at *4 (N.D. Cal. Nov. 2, 2009) (Illston, J.) (statements regarding the quality of company's

21   mortgage underwriting and risk management practices are unprotected statements of then-existing

22   fact).

23           Even if the misstatements and omissions regarding the ratings were forward-looking – and

24   they are not – the voluminous boilerplate disclosures accompanying them are not "meaningful"

25   cautionary language.  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994), *cert.*

26   ─────────────────

27   [20]  *See also Kensington Capital Mgmt. v. Oakley, Inc.*, 1999 WL 816964, at *2-3 (C.D. Cal. Jan. 14,

28   1999) (same); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *15-16 (C.D. Cal. July 21, 2005)
     (same).

─────────────────

OPPOSITION TO THE RATING AGENCIES' MTD                                                    -20-
CASE NO. 09-CV-01376-SI

*denied*, 516 U.S. 868 (1995) ("'[T]he bespeaks caution doctrine applies only to **precise** cautionary language…'") (emphasis added).  Showing sufficient meaningful "cautionary language as a matter of law is a high standard."  *Fecht*, 70 F.3d at 1082.  The boilerplate disclosures in the Offering Documents, which generally asserted that (1) the ratings are not recommendations to buy, sell or hold the Certificates; and (2) the ratings do not guarantee payment, are not precise enough to absolve the Rating Agencies of liability.

The Ratings Agencies do not – and cannot – cite any disclosures which speak specifically to the fact that the risk profile of the Certificates is far greater than the ratings represented.  Further, the Rating Agencies cannot point to any statements disclosing that they were using outdated models and data or that they had access to, but failed to implement, models which used updated assumptions.  Indeed, the court in *Abu Dhabi*, found that the exact disclosures at issue here were "insufficient to protect the Rating Agencies from liability for promulgating misleading ratings."  2009 U.S. Dist. LEXIS 79607, at *39 (disclaimer that "a credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities" was insufficient).  In sum, the ratings "creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *In re PMI Group, Inc. Sec. Litig.*, 2009 WL 1916934, at *7 (N.D. Cal. July 1, 2009) (Illston, J.) (citing *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002)).

      **E.**      **Lead Plaintiffs' Claims Against**
                    **The Rating Agencies Are Timely**

The Rating Agencies join the Wells Fargo Defendants' fact-intensive argument that Lead Plaintiffs' claims are time-barred.  RA Mot. at 2.  Accordingly, Lead Plaintiffs incorporate herein their arguments in § III.C of their Opposition to the Wells Mot., which establishes that Lead Plaintiffs' claims are timely.

      **F.**      **Lead Plaintiffs Have Standing To Pursue Claims Against**
                    **The Rating Agencies Related To All Offerings And Certificates**

The Rating Agencies join the Underwriter Defendants' argument that Lead Plaintiffs lack standing to assert claims for certain Certificates.  RA Mot. at 3 n.2.  Lead Plaintiffs respectfully refer

1   the Court to their arguments in their concurrently filed Opposition to the Underwriter Mot. Lead

2   Plaintiffs purchased Certificates in Offerings in which each Rating Agency acted both as an

3   underwriter and controlled the Depositor, and suffered damage as a result. ¶¶1, 7, 11-14, 143, 152-

4   53. Accordingly, Lead Plaintiffs have Article III standing. *See Cent. States Se. & Sw. Areas Health*

5   *& Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("Cent.

6   States II"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1157-58 (C.D. Cal.

7   2008).

8   IV.   <u>CONCLUSION</u>

9        For the foregoing reasons, Lead Plaintiffs respectfully request that the Court deny the Rating

10   Agency Defendants' Motion To Dismiss The Consolidated Complaint. In the event the Court

11   decides to dismiss all or part of Lead Plaintiffs' allegations, Lead Plaintiffs respectfully request leave

12   to replead. Fed. R. Civ. P. 15(a) sets forth a policy in favor of granting leave to amend, stating that

13   leave shall be freely given when justice so requires. *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316

14   F.3d 1048, 1052 (9th Cir. 2003) (*per curiam*) (dismissal with prejudice and without leave to amend

15   is not appropriate unless it is clear "that the complaint could not be saved by amendment."). Here,

16   as none of these factors are present, leave to amend would be appropriate.

17   Dated: December 15, 2009       BERNSTEIN LITOWITZ BERGER
                        & GROSSMANN LLP

19                             */s/ David R. Stickney*
                            DAVID R. STICKNEY

21                         DAVID R. STICKNEY
                        TIMOTHY A. DeLANGE

22                         MATTHEW P. JUBENVILLE
                        12481 High Bluff Drive, Suite 300

23                         San Diego, CA 92130
                        Tel:   (858) 793-0070

24                         Fax:   (858) 793-0323
                        davids@blbglaw.com

25                         timothyd@blbglaw.com

26                         *Attorneys for Lead Plaintiffs Alameda
                        County Employees' Retirement Association,*

27                         *Government of Guam Retirement Fund,
                        New Orleans Employees' Retirement System*

28                         *and Louisiana Sheriffs' Pension and Relief
                        Fund*