David T. Biderman, Bar No. 101577
Judith B. Gitterman, Bar No. 115661
Farschad Farzan, Bar No. 215194
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, California  94111
Telephone: (415) 344-7000
Facsimile: (415) 344-7050

Floyd Abrams (admitted *pro hac vice*)
Adam Zurofsky (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

*Attorneys for Defendant*
*The McGraw-Hill Companies, Inc.*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION | Civil Action No. 09-01376 (SI)<br><br>**CONSOLIDATED CLASS ACTION**<br>**ECF**<br><br>**THE RATING AGENCY DEFENDANTS'**<br>**REPLY MEMORANDUM OF LAW IN**<br>**FURTHER SUPPORT OF THEIR MOTION**<br>**TO DISMISS THE CONSOLIDATED CLASS**<br>**ACTION COMPLAINT** |

1

**TABLE OF CONTENTS**

2    PRELIMINARY STATEMENT ................................................................................ 1

3    ARGUMENT ........................................................................................................... 2

4    I.    PLAINTIFFS' § 11 CLAIMS AGAINST THE RAs SHOULD BE DISMISSED ............ 2

5          A.    No § 11 Liability Can Be Imposed Based on the RAs' Ratings .............................. 2

6          B.    The Consent Requirements of § 11(a)(4) Preclude Plaintiffs' Claims.................... 3

7          C.    The RAs Were Not "Underwriters" Of The Securities They Rated........................ 4

8    II.   NO ACTIONABLE "MISSTATEMENTS" ARE ALLEGED REGARDING THE
           RAs' RATINGS ............................................................................................................. 9
9
     III.  PLAINTIFFS IDENTIFY NO BASIS FOR § 15 LIABILITY......................................... 11
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d

4
    155 (S.D.N.Y. 2009) .................................................................................... 11n

5

*In re Adelphia Communications Corp. Sec. Litig.*, 2007 WL 2615928
    (S.D.N.Y. Sept. 10, 2007) ...................................................................... 6n, 9n

6

*Ashcroft* v . *Iqbal*, 129 S. Ct. 1937 (2009) ................................................ 11, 12

7

*Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520 (6th

8
    Cir. 2007) ............................................................................................... 10

9

*In re Downey Sec. Litig.*, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ................ 12

10

*Durham* v. *Kelly*, 810 F.2d 1500 (9th Cir. 1987) ...................................... 12

11

*Gossett* v. *Czech*, 581 F.3d 891 (9th Cir. 2009) ...................................... 3

12

*Harden* v. *Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir. 1995)................ 6-9, 7n, 9n

13

*Hedden* v. *Marinelli*, 796 F. Supp. 432 (N.D. Cal. 1992)...................................... 5

14

*Howard* v. *Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000)........................... 12

15

*Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525 (S.D.N.Y. 1977) ............................... 5, 6n

16

*In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y.

17
    2003)....................................................................................................... 12

18

*Jefferson County School District No. R-1* v. *Moody's Investor's Services,*

19
    *Inc.*, 175 F.3d 848 (10th Cir. 1999)...................................................... 10

20

*McCasland* v. *Formfactor Inc.*, 2008 WL 2951275 (N.D. Cal. July 25,

21
    2008)....................................................................................................... 11

22

*McFarland* v. *Memorex Corp.*, 493 F. Supp. 631 (N.D. Cal. 1980)...................... 3-4, 5, 5n, 7n,
    8n

23

*Owens* v. *Gaffken & Barriger Fund, LLC*, 2009 WL 3073338 (S.D.N.Y.

24
    Sept. 21, 2009) ...................................................................................... 12

25

*Paracor Finance, Inc.* v. *General Electric Capital Corp.*, 96 F.3d 1151
    (9th Cir. 1996) ....................................................................................... 12-13, 14

26

*In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS

27
    97927 (S.D. Cal. Aug. 1, 2006)........................................................... 12

28

1

**Cases**

Plumbers' Union Local No. 12 Pension Fund v. Normura Asset
    Acceptance Corp., 2009 WL 3149775 (D. Mass. Sept. 30, 2009) .................... 10

In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ....................... 5n-7n, 9

In re Refco, Inc. Sec. Litig., 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ........... 4-5, 5n-7n, 9n

Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156 (9th Cir. 2009) ............................ 9

SEC v. Allison, 1982 WL 1322 (N.D. Cal. Aug. 11, 1982) ................................... 6n

SEC v. Holschuh, 694 F.2d 130 (7th Cir. 1982) ..................................... 6n

SEC v. Kern, 425 F.3d 143 (2d Cir. 2005) ......................................... 6n

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980) ......................................... 8, 8n, 9n

Special Situations Fund, III, L.P. v. Cocchiola, 2007 WL 2261557
    (D.N.J. Aug. 3, 2007) ...................................................... 6n

In re Splash Technology Holdings, Inc. Sec. Litig., 2000 WL 1727405
    (N.D. Cal. Sept. 29, 2000) ................................................ 12

In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096 (D. Nev. 1998) .............. 13-14

Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991) ............................ 10

In re Washington Mutual Inc. Sec., Deriv. & ERISA Litig., 259 F.R.D.
    490 (W.D. Wash. 2009) ................................................... 12

**Regulations**

SEC Regulations
    Rule 436(g), 17 C.F.R. § 230.436(g) (2009) ................................... 2-4, 9

**Rules**

Fed. R. Civ. P.
    9(b) ........................................................................ 11n

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

Securities Act of 1933
    § 5, 15 U.S.C. § 77e (2006)........................................................... 8, 8n
    § 7, 15 U.S.C. § 77g (2006) ........................................................... 4
    § 11, 15 U.S.C. § 77k (2006) .......................................................... *passim*
    § 12, 15 U.S.C. § 77(l) (2006) ....................................................... 9n
    § 15, 15 U.S.C. § 77o (2006) ......................................................... 11-14

**Other Authorities**

H.R. Conf. Rep. No. 73-152 (1933) .......................................................... 4

NASD Manual (CCH) (1994) ............................................................... 6-7, 7n

Preliminary Note to SEC Rule 144, 17 C.F.R. § 230.144..................................... 5n

SEC Release No. 33-6336, 46 F.R. 42024 (Aug. 18, 1981) .................................... 2

SEC Release No. 33-6383, 1982 WL 90370 (Mar. 3, 1982) ................................... 3

Defendants The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc. and Fitch Ratings, Inc. (collectively, the "RAs") respectfully submit this reply brief in support of their motion to dismiss the claims asserted against them in the Consolidated Class Action Complaint ("Amended Complaint" or "AC").

## PRELIMINARY STATEMENT

The unprecedented nature of Plaintiffs' effort to treat credit rating agencies as "underwriters" under the Securities Act of 1933 (the "1933 Act") is made abundantly clear by Plaintiffs' Opposition Brief ("Pls. Opp."). Plaintiffs fail to cite even *one* case in which an entity that performed the activities the RAs are alleged to have performed here was determined to be an "underwriter" under the 1933 Act. In fact, for all of Plaintiffs' repeated references in its opposition papers to the alleged "structuring" of the securities at issue by the RAs, Plaintiffs cite no case – in the more than 75 years since the enactment of the 1933 Act – that has ever deemed "structuring," or anything like it, sufficient to trigger potential liability under the 1933 Act. Nor do Plaintiffs cite any case in which "underwriter" liability has been imposed on an entity, such as the RAs, that neither purchased, sold or distributed securities, nor was named to investors as endorsing the truth of the statements made in the registration statement. Without legal precedent to support their claims, it is clear that what Plaintiffs actually seek with this lawsuit is a retroactive amendment of the 1933 Act to broaden the categories of persons subject to liability.

Specifically, in defense of their § 11 claims against the RAs, Plaintiffs latch onto out-of-context language, which has never been applied by a court in the manner Plaintiffs suggest here, to urge the expansion of the term "underwriter" to cover essentially all persons involved in a registered offering. To do so, Plaintiffs must first hurdle the requirement, repeatedly set forth in case law, that an "underwriter" must participate in the *distribution* of securities. Plaintiffs seek to side-step this requirement with a sweepingly overbroad "but for" theory that contorts the statute beyond recognition. According to Plaintiffs, if an entity performed some activity in connection with the creation of the securities at issue, it was therefore involved in the securities' eventual "distribution" and thus qualifies as a § 11 "underwriter." Such a theory, if accepted,

1

would not only inappropriately convert the RAs into underwriters, but it would expand potential underwriter liability to lawyers, accountants and other third parties who play significant roles in registered offerings but generally have no role in the distribution process and thus have never been understood to be § 11 "underwriters." By transforming the term "underwriter" into one of unlimited applicability, Plaintiffs' theory would uproot well-established and, until now, uncontroversial law. It should be rejected, as should Plaintiffs' equally tortured effort to mischaracterize the RAs as § 15 "control persons."[1]

## ARGUMENT

### I.   PLAINTIFFS' § 11 CLAIMS AGAINST THE RAs SHOULD BE DISMISSED

In their Opposition Brief, Plaintiffs confirm that their claims are, at their core, a challenge to the RAs' ratings. (Pls. Opp. at 16-17). Yet, Plaintiffs concede, as they must, that pursuant to Rule 436(g), the RAs' ratings are immune from liability under § 11(a)(4) of the 1933 Act. (Pls. Opp. at 11-13). Plaintiffs nevertheless argue that they can sue the RAs, including in connection with their ratings, under § 11(a)(5). Plaintiffs' argument fails for three independent reasons: 1) Rule 436(g) precludes *all* § 11 claims based on the credit ratings of an NRSRO; 2) Plaintiffs' § 11 claims are precluded by the consent requirements of § 11(a)(4); and 3) the activities the RAs allegedly performed here do not as a matter of law constitute "underwriting."

### A.   No § 11 Liability Can Be Imposed Based on the RAs' Ratings

Pursuant to Rule 436(g), 17 C.F.R. § 230.436(g)(1), the credit ratings of NRSROs, such as the RAs, are absolutely immune from liability under § 11 of the 1933 Act. Plaintiffs argue that Rule 436(g) has no bearing on this case because it does not apply to claims under § 11(a)(5). (Pls. Opp. at 12). There is no such limitation on Rule 436(g) and moreover, if Plaintiffs' argument was accepted, it would render Rule 436(g) meaningless.

As explained in the RAs' opening brief ("RAs Br."), the explicit and unambiguous purpose of Rule 436(g) is to "exclude any [NRSRO] whose security rating is disclosed in a

---

[1]   The RAs also join in the arguments made in the reply briefs filed by the Wells Fargo and Underwriter Defendants.

THE RATING AGENCY DEFENDANTS' REPLY MEMORANDUM OF LAW
CASE NO. C-09-01376-SI

registration statement from civil liability under Section 11." SEC Release No. 33-6336, 46 F.R. 42024, 42026 (Aug. 18, 1981). *See also* SEC Release 33-6383, 1982 WL 90370, at *23 (Mar. 3, 1982) ("The Commission continues to believe that ratings should be permitted to be disclosed in Commission filings . . . and that it is appropriate to exempt NRSROs from Section 11 liability if their ratings are included in Securities Act registration statements."). If, as Plaintiffs appear to urge, a rating agency could be held liable under § 11(a)(5) by virtue of its ratings – but, as Plaintiffs concede, not under § 11(a)(4) – Rule 436(g) would serve no purpose. Indeed, a plaintiff could end-run both the consent requirements of § 11(a)(4) (discussed further below) and Rule 436(g) by styling their claim, as Plaintiffs do here, as one under § 11(a)(5). Such a construction of § 11, and the SEC regulations promulgated thereunder, must not be countenanced. *See Gossett* v. *Czech*, 581 F.3d 891, 898 (9th Cir. 2009) (rejecting proposed interpretation that "would run afoul of the basic tenet of statutory and regulatory interpretation which counsels that a statute should not be read to render its implementing regulations meaningless").

Accordingly, a plaintiff asserting a § 11 claim against an NRSRO must allege and prove that actions of the NRSRO, *other than actions it took as part of generating and issuing its ratings*, somehow fall into the five enumerated categories providing for § 11 liability. Any liability under § 11 on the basis of the RAs' ratings, however, is barred by Rule 436(g).

**B.     The Consent Requirements of § 11(a)(4) Preclude Plaintiffs' Claims**

Based on the activities Plaintiffs allege the RAs performed here, it is a prerequisite to § 11 liability that the RAs have been named to investors as having prepared or certified the registration statement and consented to being so named. *See* RAs Br. at 7-10. Plaintiffs ask this Court to "ignore[]" this requirement as well by again asserting that they are not suing the RAs under § 11(a)(4), but as "underwriters" under § 11(a)(5). (Pls. Opp. at 12 n.11). Plaintiffs miss the point; they cannot simply bypass the consent requirement of § 11 by characterizing the RAs' conduct as "underwriting" and their claims as ones under § 11(a)(5). This is because, as this Court has concluded, § 11(a)(4) not only provides for liability, but also provides clear limitations on that liability for certain defendants, *i.e.,* "experts." *See McFarland* v. *Memorex Corp.*, 493 F.

1    Supp. 631, 643 (N.D. Cal. 1980) ("[S]ection 11(a)(4) limits liability."). The activities Plaintiffs

2    claim the RAs performed here, *i.e.,* providing opinions, drafting documents and advising on

3    aspects of the transaction, are activities that courts evaluate under the "expert" provision of

4    § 11(a)(4). *See* RAs Br. at 7-8. Thus, to state a viable § 11 claim, Plaintiffs were required to

5    allege that the RAs were named as having prepared some allegedly misleading portion of the

6    registration statement and consented to being so named. Plaintiffs do not — and cannot — make

7    such an allegation. In fact, to protect against the "unauthorized use of the expert's name," § 7 of

8    the 1933 Act requires that where an entity is named as an expert, its *written consent* "shall be

9    filed with the registration statement." 15 U.S.C. § 77g(a); H.R. Conf. Rep. No. 73-152, at 26

10   (1933). As Plaintiffs concede, no consent by any RA was ever filed. *See* Plaintiffs' Opposition

11   to the Wells Fargo Defendants' Motion to Dismiss, at 19 n. 15 ("[T]he Rating Agencies did not

12   provide the required consent referenced in Section 11(a)(4)."). Plaintiffs' § 11 claims against the

13   RAs therefore must fail for this reason as well.

14   **C.      The RAs Were Not "Underwriters" Of The Securities They Rated**

15          Beyond Rule 436(g) and Plaintiffs' failure to meet the consent requirements of § 11, their

16   attempted "end run" around those provisions of law independently fails because, as a matter of

17   law, Plaintiffs do not — because they cannot — adequately allege that the RAs were

18   "underwriters" of the securities they rated. Plaintiffs attempt to justify their characterization of

19   the RAs as "underwriters" by asserting that their allegations are "plausible." (Pls. Opp. at 9-11).

20   By so arguing, Plaintiffs ignore that even taking all of their allegations as true, the activities that

21   the RAs allegedly engaged in here simply do not fit, as a matter of law, within the long-standing

22   definition of an "underwriter" under the 1933 Act. Plaintiffs assert that the RAs' alleged actions

23   "had all the 'qualifying indicia of underwriters'" (Pls. Opp. at 10-11), but that assertion is

24   entirely baseless and, in fact, runs counter to established law. Not only are the RAs' alleged

25   activities far removed from the "qualifying indicia" of underwriting, it would require a radical

26   and unwarranted expansion of the settled terms of § 11 to force the RAs into the definition of an

27   "underwriter."

28          An underwriter is "a term generally understood to refer to those who undertake actively

                                                    4

to sell . . . securities." *In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *3 n.5 (S.D.N.Y. Aug. 14, 2008) ("*Refco II*"). *See also Refco II*, 2008 WL 3843343, at *4 ("[T]he definition of 'underwriter' is intended to sweep up all — but only — those who play a role in the distribution of the securities.").[2] To meet the definition, an entity must participate in the distribution of a security, *i.e.,* the "transmission process between the issuer and the public." *Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977). *See also McFarland*, 493 F. Supp. at 644 ("It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security. There is no allegation here, however, that [the alleged underwriters] purchased any . . . securities with a view to distribution or that they offered or sold any security[.]");[3] *Hedden* v. *Marinelli*, 796 F. Supp. 432, 437 (N.D. Cal. 1992) ("[I]n order to be an underwriter one must participate in a distribution of securities to the public."); RAs Br. at 11-12.

Plaintiffs provide no factual basis whatsoever to support a conclusion that the RAs played any role at all in the distribution of the securities, relying instead on 1) the RAs' exempted ratings (which, as discussed above, are at most § 11(a)(4) expert activities – not underwriting); and 2) allegations that the RAs advised on aspects of the transaction and played a role in creating the securities. Such alleged activities do not constitute underwriting. Significantly, not one of the cases cited by Plaintiffs in support of their "underwriter" theory has held that an entity that allegedly "structured" the transaction, or played any similar role in the *creation* of the securities – as opposed to their *distribution* – was an "underwriter" of the offering or subject to liability under § 11. In fact, in all but one of the cases cited by Plaintiffs in which an entity was determined to be an "underwriter," the entity had in fact purchased, sold or distributed the

---

[2]  This requirement is also reflected in § 11(e), which limits an underwriter's liability to "the total price at which the securities underwritten by him and distributed to the public were offered to the public." 15 U.S.C. § 77k(e). *See also* Preliminary Note to SEC Rule 144, "Persons Deemed Not to be Engaged in a Distribution and Therefore Not Underwriters," 17 C.F.R. § 230.144.

[3]  Despite Plaintiffs' attempts to distinguish *McFarland, In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ("*Refco I*") and *Refco II* (*see* Pls. Opp. at 10-11), Plaintiff has alleged here nothing more than what these courts found insufficient to state a § 11 claim, *i.e.,* that S&P performed alleged "behind the scenes" activities in the offering, but "took no part in the distribution of the bonds." *Refco II*, 2008 WL 383343, at *4 (dismissing § 11 claim on motion to dismiss); *McFarland*, 493 F. Supp. at 631, 644 (same).

THE RATING AGENCY DEFENDANTS' REPLY MEMORANDUM OF LAW
CASE NO. C-09-01376-SI

securities at issue.[4]  The remaining case, *i.e.,* the case on which Plaintiffs' entire theory must rest, is *Harden* v. *Raffensperger, Hughes & Co.,* 65 F.3d 1392 (7th Cir. 1995).  (Pls. Opp. at 8-9). Yet, the entity at issue in *Harden* was not alleged to have had merely a role in the creation of the securities at issue; rather *Harden* "dealt with an entirely different animal,"[5] *i.e.* the "Qualified Independent Underwriter" ("QIU").  To understand *Harden*, it is important to understand the role of a QIU.

A QIU is an entity that, *inter alia*, is legally required (as an "underwriter" would be) to conduct the due diligence on a transaction in situations where the actual underwriter is an affiliate of the issuer, a situation which the NASD and SEC have determined presents a potential conflict of interest.  *NASD Manual* (CCH) ¶ 1883, Sch. E, § 3(c)(1) (1994).  The QIU "thus

---

[4]   In several of the opinions cited by Plaintiffs, the court either did not reach the issue or determined that the entities at issue were not "underwriters," as none had played a role in the distribution of the securities.  *See SEC* v. *Holschuh*, 694 F.2d 130, 139 n.13 (7th Cir. 1982) (affirming a finding of "participant liability" against an individual deemed to be an "issuer" of securities, and declining to address the further argument that the individual was also a "'controlling person' and an 'underwriter'"); *Refco II*, 2008 WL 3843343, at *2-*4 (granting motion to dismiss § 11 claim; facts discussed at RAs Br. at 9); *Refco I*, 503 F. Supp. 2d at 629-30 (granting motion to dismiss § 11 claim; facts discussed at RAs Br. at 13-14); *Ingenito*, 441 F. Supp. at 535-36 (describing underwriter claim as "a fanciful machination, advanced with frightening nonchalance" where the alleged underwriter merely loaned funds to the issuer and plaintiffs failed to allege that the defendant ever sold or purchased securities "with an eye to public redistribution").  In the remaining cases, the court determined that the persons or entities at issue were "underwriters" under circumstances where, unlike here, they had purchased, sold or distributed the securities to the public.  *See, e.g., SEC* v. *Allison*, 1982 WL 1322, at *3 (N.D. Cal. Aug. 11, 1982) (defendants were "underwriters" where they "directly participated in the offers and sales of the securities: they arranged for public trading to commence through market makers, brokers, and transfer agents; they stimulated demand through advertisements, research reports, and television promotions; and, through these efforts, they were able to sell a substantial amount of stock . . . to the public"); *SEC* v. *Kern*, 425 F.3d 143, 152 (2d Cir. 2005) (entities were "underwriters" where they had "acquired securities . . . with a view to distribution"); *Special Situations Fund, III, L.P.* v. *Cocchiola*, 2007 WL 2261557, at *6, *8-*9 (D.N.J. Aug. 3, 2007) (deciding on summary judgment that certain defendants that had purchased and sold shares were "underwriters" in case where all defendants had been listed in prospectus "as underwriters who each agreed to purchase" shares).

[5]  *In re Adelphia Communications Corp. Sec. Litig.*, 2007 WL 2615928, at *8-*9 (S.D.N.Y. Sept. 10, 2007) (granting motion to dismiss § 11 claims and holding that a "bare pleading" that banks had "extended loans" to the issuer, "induced and structured numerous public offerings" through their affiliates and had "'direct or indirect participation in the distribution of'" securities was insufficient "to turn lenders into underwriters").

performs the same protective function envisioned by the 1933 Congress when it defined [the term underwriter]." *Harden*, 65 F.3d at 1403.  To qualify as a QIU, the NASD requires that the entity agree "to undertake the legal responsibilities and liabilities of an underwriter under the [1933 Act], specifically including those inhere in Section 11 thereof." *NASD Manual* (CCH) ¶ 1882, Sch. E, § 2(o)(7).[6]  Moreover, where a QIU is used, this fact must be disclosed to investors in the "underwriting section of the registration statement," along with "the name of the member acting as [QIU], if any, and that such member is assuming the responsibilities of acting as a [QIU] in pricing the offering and conducting due diligence." *NASD Manual* (CCH) ¶ 1884, Sch. E, § 4(b).  Thus, nothing in *Harden* changes the fact, discussed in the RAs' Opening Brief (pp. 7-10), that it is those entities "identified to the public as endorsing the truth of representations contained [in the registration statement]" that are the subject of § 11.[7]

The Seventh Circuit ultimately concluded that the QIU at issue "would qualify as an underwriter in this case" because "[i]ts role as [a QIU] was 'necessary to the distribution of [the] securities.'" *Harden*, 65 F.3d at 1401 (citation omitted).  Specifically, the Seventh Circuit held:

> The [QIU] . . . performs the same protective function envisioned by the 1933 Congress when it defined [the term underwriter] . . . .  Indeed, the [QIU] 'participates' in the issues through its voluntary and explicit assumption of the liability usually assumed by the underwriter.  That assumption of liability is an important factor in maintaining investor confidence.  Accordingly, we hold that

---

[6]  As stated in the NASD Manual in effect when *Harden* was decided, both the NASD and SEC agree that "the full responsibilities and liabilities of an underwriter under the [1933 Act] attach to a '[QIU]." *Harden*, 65 F.3d at 1399 (citing *NASD Manual* (CCH) ¶ 1882, Sch. E, § 2(o)).  Nonetheless, the SEC directed the NASD "to specifically require, should there be any doubt as to the legal attachment of [§ 11] responsibilities and liabilities, that [QIUs] specifically undertake those responsibilities and liabilities." *Id.* at 1399 (citation omitted).

[7]  Plaintiffs assert that, unlike in *McFarland* and *Refco*, the RAs here had the "qualifying indicia" of underwriters because they "were prominently and repeatedly identified in each prospectus supplement." (Pls. Opp. at 10-11).  Plaintiffs omit, however, that, as the Offering Documents make clear (*see, e.g.,* Defendants Request for Judicial Notice, Ex. 33 at S-55), the RAs were identified solely as rating agencies that would provide opinions on one topic: "the likelihood of the receipt by certificateholders of timely payments of interest and the ultimate return of principal."  Identifying to the public that a particular rating agency provided a rating opinion is a very different thing than identifying an entity as endorsing the truth of each of the representations in the Registration Statements.  There is *no* allegation that the RAs were identified to the public in this manner, nor could there be.

[the QIU] was subject to [§] 11 liability. *Id.* at 1403. Plaintiffs' exclusive focus on the phrase "necessary to the distribution" in the *Harden* opinion ignores the unique role of the QIU, which was hired as an underwriter, paid as an underwriter, voluntarily and explicitly assumed the liability of an underwriter, performed due diligence as an underwriter would and was publicly presented as an underwriter. *See Harden*, 65 F.3d at 1397-1403. The RAs did not do any of those things and Plaintiffs do not allege otherwise.

Plaintiffs also rely heavily on *SEC* v. *Murphy*, 626 F.2d 633 (9th Cir. 1980) – a decision that did *not* address the issue of whether the individual (Murphy) was an "underwriter" but rather whether he could be held liable as a "participant" in the offer and sale of unregistered securities under § 5 of the 1933 Act.[8] *Id.* at 648 (noting that the defendant "need not be an issuer, underwriter or dealer to be held liable for a § 5 violation"). Indeed, on appeal, the SEC had "abandon[ed] the argument that Murphy was an underwriter," arguing instead that he "participated in sales for the issuer" and was thus, subject to liability under § 5. *Id.* at 649. In examining what constitutes "participation" in the sale of a security under § 5, the court found that where Murphy had, *inter alia*, directly interfaced with potential investors – meeting with "salesmen and with potential investors and their representatives, if any, to give them information about [the company]" and "present[ing] the [company's] investment plan at sales seminars with broker-dealers" – he had indeed "engaged in steps necessary to the distribution" of the securities. *Id.* at 638, 652. Here, there is no allegation that the RAs had any similar contact with investors or were in any way involved in actively selling the Certificates.

Moreover, neither the *Harden* or *Murphy* opinion, nor any of the other cases that Plaintiffs cite, stand for the proposition Plaintiffs seem to urge here that all entities that performed activities allegedly "necessary" to the creation of the securities are somehow

---

[8] Plaintiffs attempt to distinguish the *McFarland* opinion by, *inter alia*, pointing out that it was decided prior to *Murphy*. Yet, *Murphy* in no way called *McFarland* into doubt. Indeed, the cases involve entirely different provisions of the 1933 Act: the *McFarland* court examined, *inter alia*, the requirements for liability under § 11(a)(4) and § 11(a)(5); in *Murphy*, in contrast, the Ninth Circuit was concerned with whether the defendant could be held liable as a "participant" in the offer and sale of unregistered securities under § 5, and did not reach the question of the definition of a statutory "underwriter."

transformed into underwriters. Plaintiffs' elemental "but for" interpretation of § 11(a)(5) would extend the term "underwriter" to every third-party professional that could be said to have contributed in some way to the creation (and thus, ultimately the distribution) of the securities.[9] Plaintiffs essentially seek to transform the term "underwriter" — contrary to Judge Lynch's opinion in *Refco I*, 503 F. Supp. 2d at 629 — into one of "unlimited applicability." There is simply no basis to use the *Harden* case — nor any of the other cases cited by Plaintiffs — to expand the reach of the 1933 Act and no court has ever applied *Harden* in the manner Plaintiffs urge here.[10]

In short, beyond an expansive and unsupported "but for" theory that the RAs were allegedly involved in the *creation* of the Certificates, Plaintiffs do not provide any basis to conclude that the RAs had a role in the distribution of securities. Plaintiffs' § 11 claims must accordingly fail.

## II.   NO ACTIONABLE "MISSTATEMENTS" ARE ALLEGED REGARDING THE RAs' RATINGS

As noted above, Plaintiffs continue to base their claims in large part on the RAs' ratings, asserting that the ratings "constitute an affirmative misrepresentation of the character and investment risk of the Certificates." (Pls. Opp. at 16). Rule 436(g) flatly precludes any such claim. (RAs Br. at 4-7.) An NRSROs ratings are simply not part of the registration statement for purposes of § 11 liability. Each of Plaintiffs' remaining arguments about the RAs ratings is without merit.

First, Plaintiffs assert that the Defendants can be held liable for allegedly omitting certain

---

[9]  As part of their discussion of the *Murphy* case — which, as noted above, did not concern the definition of "underwriter" — Plaintiffs state that the Ninth Circuit reviewed two tests of participant liability, "both [of which] asked whether, 'but for the defendants participation,' the sales would have taken place." (Pls. Opp. at 8 n.6). In fact, the Ninth Circuit observed that in practice, "but for" causation was *not* sufficient to establish participant liability under either § 5 or § 12 of the 1933 Act. *Murphy*, 626 F.2d at 650-52. The same is true with respect to "underwriter" liability under § 11(a)(5).

[10]  In fact, courts in other districts have recognized that the holding in *Harden* must be limited to the narrow situation presented there. *See Refco II*, 2008 WL 3843343, at *4 n.6; *Adelphia*, 2007 WL 2615928, at *9.

1   information about the RAs' rating models and assumptions. (Pls. Opp. at 17). Yet, Plaintiffs'

2   allegations of outdated rating models and assumptions rely exclusively on after-the-fact events

3   occurring in 2008 involving hindsight criticisms of the RAs. Such hindsight allegations are

4   plainly insufficient to state a cognizable claim under the 1933 Act. *See Rubke* v. *Capitol*

5   *Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009). Indeed, as noted in the RAs opening brief,

6   similar allegations were recently held insufficient by another federal court in dismissing 1933

7   Act claims with prejudice. *See Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset*

8   *Acceptance Corp.*, 2009 WL 3149775, at *8 (D. Mass. Sept. 30, 2009). Plaintiffs make a

9   tortured attempt to distinguish *Nomura*, noting that here "Lead Plaintiffs' allegations are not

10  centered on the accurate reporting of the ratings." (Pls. Opp. at 17). Yet, the same was true in

11  *Nomura. See Nomura*, 2009 WL 3149775, at *8 ("[P]laintiffs do not allege that defendants

12  inaccurately reported the actual ratings awarded[.]"). In fact, plaintiffs' claims in *Nomura*

13  regarding alleged ratings misstatements and omissions were virtually identical to Plaintiffs'

14  claims here. *See*, *e.g.*, *id* ("According to plaintiffs, the ratings listed in the prospectus

15  supplements were based on: (1) outdated models applicable only to years prior to 2000; (2)

16  lowered ratings criteria; and (3) inaccurate loan information."). The reasoning and holding of

17  *Nomura* are thus particularly instructive here.

18      Second, Plaintiffs' contention that the RAs' ratings are not opinions, but "factual

19  assertions," is plainly incorrect. (Pls. Opp. at 18-19). It is well-established that a credit rating,

20  which, at its core, is an assessment of the likelihood that a particular security may default in the

21  future, "is a predictive opinion, dependent on a subjective and discretionary weighing of

22  complex factors." *Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th

23  Cir. 2007) (holding that there was no basis to "conclude that the credit rating itself communicates

24  any provably false factual connotation" that could render it actionable); *see also Jefferson*

25  *County School District No. R-1* v. *Moody's Investors Services, Inc.*, 175 F.3d 848, 856 (10th Cir.

26  1999) (recognizing that credit ratings are "expression[s] of opinion"). Accordingly, as noted in

27  the RAs' opening brief, to trigger liability for the expression of an opinion, Plaintiffs were

28  required to plead that the RAs did not subjectively believe their rating opinions at the time they

10

1    were issued. *See Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1095 (1991). Yet, the

2    AC affirmatively pleads the opposite, disclaiming that it alleges any "fraud on the part of any

3    Defendant."[11] (AC ¶ 2). Plaintiffs thus have not and cannot meet their burden.

4         Finally, even if Plaintiffs had adequately alleged any material undisclosed facts, they

5    have not adequately pled, as they must, that the RAs had any duty to disclose this allegedly

6    omitted information. Plaintiffs' attempt to create a "duty" falls short. Plaintiffs assert that once

7    Defendants spoke on the topic of ratings, a duty arose to provide "all information likely to

8    materially affect those structures and ratings." (Pls. Opp. at 18). Plaintiffs' argument, however,

9    ignores the fact that the RAs did *not* speak; not one statement in the registration statement

10   (beyond its exempted ratings) is attributable to the RAs. Plaintiffs therefore are attempting

11   inappropriately to impose liability here on the RAs for statements they simply did not make.

12   **III.    PLAINTIFFS IDENTIFY NO BASIS FOR § 15 LIABILITY**

13        Even assuming, *arguendo*, that Plaintiffs have adequately pleaded a primary violation,

14   they offer no support for their profoundly implausible attempt to stretch the definition of a § 15

15   "control person" beyond recognition to include the RAs.

16        Evidently aware that they do not, and cannot, offer relevant substantive allegations,

17   Plaintiffs desperately contend that "naked allegations" of "control" are sufficient to survive a

18   motion to dismiss. (Pls. Opp. at 14). This assertion not only ignores *Ashcroft* v. *Iqbal*, 129 S.Ct.

19   1937 (2009), which makes clear that a complaint fails if it tenders "naked assertion[s] devoid of

20   _____

21   [11]  Plaintiffs cite *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155
     (S.D.N.Y. 2009) for the proposition that credit ratings can be actionable misstatements. (Pls.

22   Opp. at 17; *see also* Pls. Opp. at 19-20). In *Abu Dhabi*, a decision that dismissed 10 of the 11
     claims asserted against the RAs, the court sustained a claim for fraud where, on the basis of the

23   specific allegations before it, it determined that "plaintiffs [had] sufficiently pled that the Rating
     Agencies did not genuinely or reasonably believe that the ratings they assigned to the Rated

24   Notes were accurate and had a basis in fact." 651 F. Supp. 2d at 176. Again, Plaintiffs here have
     expressly disclaimed any allegation of fraud or knowing misconduct by any Defendant. (AC ¶

25   2). Moreover, Plaintiffs cannot have it both ways. If they are asserting claims of knowing
     misstatements, their claims sound in fraud and must meet the heightened pleading requirements

26   of Rule 9(b), with which they do not even attempt to comply. If, however, Plaintiffs are to be
     taken at their word, then Plaintiffs cannot simultaneously allege that the RAs did not subjectively

27   believe their rating opinions when issued.

28

11

further factual enhancement," *id.* at 1949; it is contrary to countless decisions in this and other Districts. *See, e.g.*, *McCasland* v. *Formfactor Inc.*, 2008 WL 2951275, at *11 n.27 (N.D. Cal. July 25, 2008) and cases cited in RAs Br. at 22-24; *Owens* v. *Gaffken & Barriger Fund, LLC*, 2009 WL 3073338, at *12 (S.D.N.Y. Sept. 21, 2009) ("conclusory allegation[s]" of control are "bare legal conclusion[s], and pursuant to *Iqbal*, [are] not entitled to the presumption of truth") (citation omitted); *In re Downey Sec. Litig.*, 2009 WL 736802, at *15 (C.D. Cal. Mar. 18, 2009) (pleading inadequate absent "particularized allegations" of actual control over primary violator); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 97927, at *95-*97 (S.D. Cal. Aug. 1, 2006) (control claims against majority shareholders and executives dismissed where complaint lacked sufficient facts to show actual power over general corporate policies); *In re Splash Technology Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (circumstances of control must be pled with particularity).

Moreover, it is *only* in the context of allegations *directed at a CEO* or other person traditionally in an obvious position of control that some pre-*Iqbal* courts have held that relatively sparse factual allegations are sufficient. *Cf. In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) ("by virtue of their positions (e.g., CEO, CFO) and Plaintiffs' specific allegations, these Individual Defendants very likely exercised actual control over the Issuers"). Indeed, Plaintiffs' own cited cases confirm that "control person" allegations have survived motions to dismiss *only* when directed at the officers, directors, employers or affiliates that allegedly controlled a primary violator. *See, e.g.*, *Howard* v. *Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (CEO of company); *Durham* v. *Kelly*, 810 F.2d 1500, 1503-04 (9th Cir. 1987) (director and corporate secretary); *In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 504 (W. D. Wash. 2009) (outside directors); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 352 & n. 85 (CEO & CFO).

Here, the RAs are not alleged to have a role in any way akin to those previously characterized as potential "control persons": the AC alleges no ownership interest, board positions, signing power, or contractual power – or any other power to control – with respect to the Depositor. *Cf. Paracor Finance, Inc.* v. *General Electric Capital Corp.*, 96 F.3d 1151, 1161

12

(9th Cir. 1996) (noting that the traditional indicia of control include a "prior lending relationship," owning stock in the allegedly controlled entity or having a seat on its board). On the contrary, Plaintiffs are engaged in an unprecedented attempt to expand the scope of the statute by implausibly categorizing the RAs – independent entities engaged to perform a service – as control persons. Thus, the requirement that control claims be supported by particular factual allegations plainly applies here *a fortiori*.

As previously demonstrated, and not refuted by Plaintiffs, the allegations of the AC do not come remotely close to complying with this pleading requirement. In an effort to evade this deficiency, Plaintiffs are reduced to grossly exaggerating and mischaracterizing their own implausible and/or conclusory allegations, contending that "[t]he Rating Agencies controlled every stage of the Certificates' existence from structuring through servicing," and that the RAs "controlled the Depositor's sole corporate purpose – the sale of mortgage pass-through securities." (Pls. Opp. at 13). In fact, the AC itself *contradicts* these unsupported assertions by counsel, making clear that the RAs did *not* control either the Depositor, *see* AC ¶ 16 (Wells Fargo Bank, N.A. was "at all times the controlling entity of the Depositor."), or the transactions themselves, *see* AC ¶ 118 (quoting SEC findings that "*the arranger is often the primary designer of the deal . . . [and] had substantial influence over the choice of rating agencies hired to rate the deal*") (emphasis added).[12]

Equally unavailing is Plaintiffs' argument, recycled from their § 11 argument, that the RAs are "control persons" because their ratings were necessary to the issuance of the Certificates. (Pls. Opp. at 13). This strained "but for" logic would, of course, convert any entity whose participation is allegedly "necessary" to the issuance of a security into a "control person" of the issuer – a complete subversion of the 1933 Act's rigorous limitation on those persons and entities subject to the statute's strict liability scheme. *See In re Stratosphere Corp. Sec. Litig.*, 1

---

[12] Indeed, in describing the mechanics of the creation and sale of the Certificates to investors, Plaintiffs' own diagram identifies the role of the essential players: the "Sponsor," "Depositor", "Issuing Entity/Trust," "Underwriter", and "Investors." (AC ¶ 43.) Tellingly, the RAs are entirely absent from Plaintiffs' chart.

F. Supp. 2d 1096, 1122 (D. Nev. 1998) (holding that allegation that underwriters has "constant access" and "close association" with issuer insufficient, and explaining "[p]laintiffs have merely alleged that 'but for' the Underwriters' participation, the Stock Offering could not have been accomplished. This type of proximate causation is not a sufficient basis for 'control person' liability . . . .").

All that is actually alleged in the AC is that the RAs participated in the structuring of the Certificates, that they decided what mortgage loans would and would not be securitized and what credit enhancements would be required. (AC ¶¶ 61-66). These allegations (even if accepted as true, which they are not) conveniently ignore the central role of both the originators and actual underwriters and thus do not even amount to plausible allegations of control over the entire securitization *transaction*. They certainly do not in any way relate to "actual control" over the alleged primary violator.[13]  Allegations which, at most, relate to specified transactions, not to actual control over the day-to-day general policies and management of the *wrongdoer entity,* fall far short of what is required for § 15 liability. *Paracor*, 96 F.3d at 1162 (holding that the control person inquiry "revolve[s] around the 'management and policies' of the corporation, not around discrete transactions"). Similarly, factual allegations like those here which, at most, suggest some ability to "influence" the transactions at issue (AC ¶ 158) are insufficient as a matter of law. Plaintiffs do not even attempt to refute the law in this regard. *See* RAs Br. at 24 and cases cited therein.  Nor do Plaintiffs cite a single case where a court has sustained a "control" pleading against a party even arguably analogous or similar to the RAs.

The § 15 claims asserted against the RAs should therefore be dismissed.

---

[13] Moreover, the very nature of the basic relationship between the Depositor and the RAs, as alleged in the AC and the documents it cites, is irreconcilable with the absurd notion of either RA as a "control" person, as are, as noted above, Plaintiffs' plausible allegations of control against the essential players who appear in the AC's diagram of how, and by whom, these securities came to market.  (AC ¶ 43).

1

## CONCLUSION

2    For the foregoing reasons, each of the claims asserted in the AC against the RAs should

3    be dismissed with prejudice.

4    Dated:    January 15, 2010

5                                                                By:    /s/ David T. Biderman

6    Floyd Abrams (admitted *pro hac vice*)              David T. Biderman, SBN 101577
     Adam Zurofsky (admitted *pro hac vice*)             Judith B. Gitterman, SBN 115661
7    Tammy L. Roy (admitted *pro hac vice*)              Farschad Farzan, Bar No. 215194
     CAHILL GORDON & REINDEL LLP                         PERKINS COIE LLP
8    80 Pine Street                                      1620 26th Street, Sixth Floor, South Tower
     New York, New York  10005                           Santa Monica, California 90404
9    Telephone:  (212) 701-3000                          Telephone:  (310) 788-9900
     Facsimile:  (212) 269-5420                          Facsimile:  (310) 788-3399
10

11   *Attorneys for Defendant*
     *The McGraw-Hill Companies, Inc.*
12

13                                                               By:    /s/ Keith E. Eggleton

14   James J. Coster (admitted *pro hac vice*)           Keith E. Eggleton, SBN 159842
     Joshua M. Rubins (admitted *pro hac vice*)          KEggleton@wgsr.com
15   SATTERLEE STEPHENS BURKE &                           David A. McCarthy, SBN 226415
     BURKE LLP                                            DMcCarthy@wsgr.com
16   230 Park Avenue                                      WILSON SONSINI GOODRICH & ROSATI
     New York, New York  10169                            Professional Corporation
17   Telephone:  (212) 818-9200                           650 Page Mill Road
     Facsimile:  (212) 818-9606                           Palo Alto, California 94304
18                                                        Telephone:  (650) 493-9300
19   *Attorneys for Defendant Moody's*                    Facsimile:  (650) 565-5100
     *Investors Service, Inc.*
20

21                                                               By:    /s/ Stephen E. Taylor

22   Martin Flumenbaum (admitted *pro hac vice*)         Stephen E. Taylor, SBN 58452
     Andrew J. Ehrlich (admitted *pro hac vice*)         Jayesh Hines-Shah, SBN 214256
23   Tobias J. Stern (admitted *pro hac vice*)           Jonathan A. Patchen, Bar No. 237346
     PAUL, WEISS, RIFKIND, WHARTON &                      TAYLOR & COMPANY LAW OFFICES,
24   GARRISON LLP                                         LLP
     1285 Avenue of the Americas                          One Ferry Building, Suite 355
25   New York, New York  10019                            San Francisco, California 94111
     Telephone:  (212) 373-3000                           Telephone:  (415) 788-8200
26   Facsimile:  (212) 757-3990                           Facsimile:  (415) 788-8208

27   *Attorneys for Defendant Fitch Ratings, Inc.*
28

15