MARC T.G. DWORSKY (SBN 157413)
Marc.Dworsky@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 25th floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

DAVID H. FRY (SBN 189276)
David.Fry@mto.com
JENNY H. HONG (SBN 251751)
Jenny.Hong@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendants
WELLS FARGO DEFENDANTS AND THE INDIVIDUAL DEFENDANTS

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION

Civil Action No. 09-01376 (SI)

**CONSOLIDATED CLASS ACTION ECF**

**REPLY IN SUPPORT OF WELLS FARGO DEFENDANTS' AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

DATE: January 29, 2010
TIME: 9:00 a.m.
CTRM: 10

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. Plaintiffs' Conclusory Allegations Cannot Survive a Motion to Dismiss ..... 3

1. Plaintiffs Fail to Allege Adequately Any False or Misleading Statement Regarding Underwriting Guidelines ..... 3

a. Plaintiffs' Allegations Do Not Relate to the Securities They Bought ..... 4

b. Plaintiffs' Argument Misstates Defendants' Contention ..... 5

c. Plaintiffs Do Not Offer Factual Allegations That Support Their Conclusory Claims of Falsity ..... 6

2. Plaintiffs Fail to Allege Any Facts Indicating That a Single Appraisal at Issue Here Was Inflated ..... 8

3. Plaintiffs Fail to Explain How Any Statement Concerning Ratings Was False or Misleading ..... 9

B. Plaintiffs Cannot Show Their Claims Are Timely ..... 10

1. Plaintiffs' Argument That They Were Placed on Notice by the May 2008 Rating Downgrade Cannot Be Correct ..... 11

2. Plaintiffs Fail to Argue That the Inflated Appraisal Claims Are Timely ..... 12

3. Plaintiffs' Contention That They Were Not On Notice Because Most of the Articles Did Not Mention Wells Fargo Fails ..... 12

4. Plaintiffs' Standing Theory Implicates the Statue of Repose ..... 14

C. Plaintiffs Fail to Address the Standing Issues Raised by Wells Fargo ..... 15

D. The Control Person Claims Fail if the Underlying Claims Fail ..... 15

III. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........ 2, 3

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 2, 3, 6

*Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863 (9th Cir. 2008) ........ 10

*DeBenedictis v. Merrill Lynch & Co. Inc.*, 492 F.3d 209 (3d Cir. 2007) ........ 11, 14

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999) ........ 14

*In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008) ........ 3, 9

*In re iAsia Works, Inc. Sec. Litig.*, 2002 WL 1034041 (N.D. Cal. May 15, 2002) ........ 5

*In re Infonet Serv. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106 (C.D. Cal. 2003) ........ 10

*In re PMI Group, Inc. Sec. Litig.*, 2009 WL 1916934 (N.D. Cal. Jul. 1, 2009) ........ 7

*In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996) ........ 3

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490 (W.D. Wash. 2009) ........ 6

*P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004) ........ 15

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, __ F. Supp. 2d __, 2009 WL 3149775 (D. Mass. Sept. 30, 2009) ........ 8, 9

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ........ 9

*Toombs v. Leone*, 777 F.2d 465 (9th Cir. 1985) ........ 10

*United States ex rel. Chunie v. Ringrose*, 788 F.2d 638 (9th Cir. 1986) ........ 3

## FEDERAL STATUTES

15 U.S.C. § 77k ........ 14

15 U.S.C. § 77*l*(a)(2) ........ 15

15 U.S.C. § 77m ........ 10, 14

## TABLE OF AUTHORITIES
### (continued)

Page(s)

15 U.S.C. § 77*o* ..... 15
15 U.S.C. § 78j(b) ..... 10

FEDERAL REGULATIONS

17 C.F.R. § 229.512(a)(2) ..... 14
17 C.F.R. § 229.1111 ..... 6
17 C.F.R. § 230.436(g) ..... 9

## I. INTRODUCTION

Plaintiffs' Opposition to Wells Fargo's Motion to Dismiss ("Opposition" or "Opp.") confirms that Plaintiffs have failed adequately to investigate their claims and are seeking simply to tar Wells Fargo with the same brush their counsel have wielded against other issuers of mortgage-backed securities ("MBS"). Although Plaintiffs contend that Defendants' motion "ignores the facts," (Opp. at 3), it is the Opposition that suffers from that flaw. Most tellingly, on no fewer than five occasions, Plaintiffs tout Wells Fargo's "admission" in its 2007 Annual Report that it took on too much risk in the home equity loans it bought from other originators. Opp. at 2, 11, 12 n.9, 14, 16. Indeed, no allegation of the Complaint is featured as prominently in the Opposition. But this "admission" that Plaintiffs deem so important is, in fact, irrelevant to this case. The pools of mortgages at issue here comprised only first mortgages, not home equity loans. *See, e.g.*, RJN Ex. 1 at S-42. The fact is that Plaintiffs simply did not do their homework: they filed this case because they and others had filed ones like it. With tens of billions of dollars in securitizations at issue in each case, they need succeed only once to justify the exercise.

While the repeated reference to Wells Fargo's Annual Report is a particularly egregious error, it is only symptomatic of the Opposition's many other defects. *First*, Plaintiffs now assert, in effect, that Wells Fargo did not evaluate borrower creditworthiness *at all*, but point to no factual allegations that support such a far-reaching (and facially absurd) claim. Unable to draw any connection whatsoever between their generic complaint's allegations and the actual pools of mortgages underlying the Certificates in fact at issue here, Plaintiffs also disingenuously argue that they need not provide details about individual loans. At this stage of the proceeding, the question is not which individual loans involve underwriting breaches or inflated appraisals, but whether Plaintiffs have alleged facts showing that a material number of the loans underlying *these Certificates* have those issues. Absent such links between their allegations and the loans in these pools (as opposed to the other 90% of mortgages originated by Wells Fargo), no inference can be drawn that the offering materials were misleading.

*Second*, Plaintiffs simply mischaracterize Defendants' argument concerning the incredibly detailed information that is disclosed in the Prospectus Supplements about each pool of

mortgages. They fail to explain how, in view of those disclosures, an investor could have come away with an inaccurate impression of the credit quality of the borrowers. Particularly given that the numerical underwriting guidelines were not disclosed, it is inconceivable that alleged deviations from those guidelines could have rendered the offering materials misleading when the actual credit characteristics of the resulting pools of loans were disclosed.

*Third*, Plaintiffs' statute of limitations argument affirmatively demonstrates that their claims are time-barred. They contend that investors were not on notice of their claims until May 20, 2008, the first time an investment grade Certificate was downgraded below investment grade. Opp. at 3. But there were downgrades of Certificates at issue in this case, including investment grade Certificates, in December 2007 and January 2008. Plaintiffs assert that only a downgrade of an investment grade security to a below investment grade rating would trigger an investor's duty to inquire, but they provide no reasoned explanation for that conveniently self-serving standard. Their only response to the myriad other information in the public domain—including congressional hearings and loads of news articles—is to assert that these sources say very little about Wells Fargo specifically. But that is equally true of Plaintiffs' allegations, particularly with respect to the ratings. Plaintiffs allege nothing about how these Wells Fargo MBS (packaging *prime* loans) were rated, but rather rely on an SEC report concerning the *subprime* industry. The same is largely true of Plaintiffs' claims concerning inflated appraisals, which focus on congressional testimony and an industry study (both of which date to 2007).

*Fourth*, while Plaintiffs address some standing issues (albeit ineffectively) in their Opposition to the Underwriters' Motion to Dismiss, they fail to respond in any way to the standing arguments of the Wells Fargo and Individual Defendants.

*Finally*, and more broadly, Plaintiffs repeatedly ask the Court simply to accept their conclusory allegations, in contravention of *Twombly* and *Iqbal*, and to ignore reality when determining what inferences can reasonably be drawn from the factual allegations in the Complaint. Among other things, Plaintiffs urge the Court to pretend the economic crisis of the last two years did not occur, going so far as to put the phrase "economic downturn" in quotation marks, as if the dramatic drop in housing prices and increase in unemployment were figments of

Defendants' imaginations. Opp. at 3. Contrary to Plaintiffs' contentions, Defendants are not suggesting that the Court resolve disputed issues of fact, but rather that it evaluate the allegations of the Complaint with care—ignoring conclusory assertions and crediting factual allegations, but only for what they actually say and the inferences that can *reasonably* be drawn from them.

## II. ARGUMENT

### A. Plaintiffs' Conclusory Allegations Cannot Survive a Motion to Dismiss.

#### 1. Plaintiffs Fail to Allege Adequately Any False or Misleading Statement Regarding Underwriting Guidelines.

Plaintiffs cite, and even quote, the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), but fail to acknowledge or address the aspects of those decisions that bear most directly on this case. First, Plaintiffs cannot rely on conclusory allegations—even if they are framed as statements of fact, rather than a mere recitation of elements. *Iqbal*, 129 S. Ct. 1937, 1949-50; *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). It is not enough, therefore, to assert that "Defendant said 'X' and the truth was 'Not X';" a plaintiff must provide sufficient facts to render that bare allegation of falsehood plausible. Moreover, allegations that are merely "consistent with" liability do not suffice. *Twombly*, 550 U.S. at 557. Plaintiffs would like the Court to ignore the most devastating economic crisis of the past seven decades because, had it not occurred, downgrades of "virtually all" of the Certificates (Opp. at 6) might at least tend to suggest that the offering materials were deficient. In the real world, however, there is an obvious, compelling alternative explanation of the downgrades that renders them, at most, "consistent with" Plaintiffs' theory, but not more.

Plaintiffs contend Defendants are improperly seeking to rely on disputed facts introduced by means of judicial notice.[1] Opp. at 8. Plaintiffs have not, however, filed an opposition to Defendants' Request for Judicial Notice and, despite their bluster, they identify only one of the 86 documents submitted with that Request to which they actually object—Exhibit 31. Opp. at 8 n.7.

---

[1] Courts frequently consider matters subject to judicial notice in ruling on motions to dismiss, particularly in securities cases. *See, e.g.*, *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1002 (N.D. Cal. 2008).

Exhibit 31 is the S&P report showing that Wells Fargo's pools of prime mortgages (*i.e.*, the type of pools at issue in this case) have delinquency and foreclosure rates *far lower than the industry average*. Plaintiffs do not contest the facts there recited (or explain how they could), but contend that the document should not be considered for the truth of its contents. Defendants do not suggest that the Court should accept the facts stated in that document as true—those facts are immaterial to any basis for dismissal asserted in the Motion—but simply as casting into starker relief a critical thing missing from Plaintiffs' Complaint, namely, allegations of poor performance that might support Plaintiffs' contention that the mortgages in these pools were somehow tainted by fraudulent appraisals and indifference to underwriting standards.[2]

**a. Plaintiffs' Allegations Do Not Relate to the Securities They Bought.**

Plaintiffs do not seriously defend their allegations concerning underwriting guidelines. The Complaint ties *none* of its allegations to the pools of mortgages at issue. Plaintiffs' only rejoinder is to mischaracterize Defendants' argument. They contend that they are not required to tie their claims to "specific, individual loans." Opp. at 15. But because the Certificates they purchased are investments in *specific* pools of *specific* types of mortgages (as opposed to investments in Wells Fargo as a company), Plaintiffs must—for pleading purposes—at least link their allegations to those pools of mortgages or the allegations can have no bearing on the truth or falsity of the representations made in the offering materials. This is not a question of how detailed the Complaint's allegations are—but whether the allegations even relate in the first place to the securities at issue in the case.[3]

Plaintiffs inadvertently highlight this problem by repeatedly citing their favorite snippet from Wells Fargo's public disclosures, namely, what they characterize as Wells Fargo's "admission that it made mistakes and 'took on too much risk.'" Opp. at 16. The passage from

---

[2] In essence, Plaintiffs try to use the rating downgrades as a substitute indicator of poor quality loans. As noted, in the context of a crisis in the economy (and the housing market, in particular), the downgrades simply do not give rise to that inference. For that reason, Plaintiffs would like the Court to ignore both the economic downturn and the performance data.

[3] To be sure, Plaintiffs *will* ultimately be required to prove their claims by reference to specific loans: how else can they demonstrate that *any* of the mortgages underlying their securities are tainted in the way Plaintiffs allege, much less that the pools at issue are "*pervasive[ly]*" tainted, as Plaintiffs hypothesize? *See* Cplt. ¶ 76. But their failing here is even more fundamental.

Wells Fargo's 2007 Annual Report to which they refer, however, says that the company "took on too much risk . . . in the *home equity loans* we purchased through indirect channels such as mortgage brokers, bankers and other mortgage companies." Opp. at 11. *The pools at issue here, however, did not include home equity loans.* The Prospectus Supplements for all of them say that the loans included are first mortgages—not home equity loans. *See, e.g.*, RJN Ex. 1 at S-42 ("The mortgage loans to be included in the Trust Estate will be . . . residential first mortgage loans."). Saying that Wells Fargo took excessive risk in one part of its business is meaningless unless Plaintiffs can connect that part of the business to the Certificates, which they cannot.

**b. Plaintiffs' Argument Misstates Defendants' Contention.**

Plaintiffs devote three pages to arguing that Defendants cannot prevail on a materiality argument based on the detailed disclosures of the Prospectus Supplement. Opp. at 13-15. Defendants did not make a materiality argument (though several exist).[4] Rather, they argued that Plaintiffs have not adequately alleged that the disclosures, read as a whole, were misleading. The Court can, of course, consider the allegedly misleading statements in context in assessing whether they mislead. *In re iAsia Works, Inc. Sec. Litig.*, 2002 WL 1034041, at *7 (N.D. Cal. May 15, 2002).

Here, the offering materials describe only the procedural aspects of Wells Fargo's underwriting guidelines—they do not provide the numerical metrics used in that process (*e.g.*, FICO scores, DTI ratios, etc.). RJN Ex. 1 at 34. Appendix A to the Prospectus Supplement is where an investor can obtain information concerning the creditworthiness of the borrowers. Plaintiffs make the illogical assertion that disclosing information like "DTI ratios, LTV ratios, FICO scores and principal amounts says nothing about the failure to properly value . . . the creditworthiness of the borrower."[5] Opp. at 14. This is *precisely* the kind of information that is

---

[4] The Motion did make one narrow materiality point in a footnote (Mot. at 13 n.7)—the simple and inarguable point that deviations from a statement that loans included in the pools "generally" would not have an LTV of greater than 95% did not affect the "total mix" of information when the Prospectus Supplement disclosed *exactly* how many loans, if any, had an LTV over 95%.

[5] Plaintiffs also state that this information does not disclose the supposed failure to value the property correctly—the inflated appraisal issue, which will be addressed below.

used to assess the creditworthiness of borrowers.[6] In short, investors could not have formed a *false* impression regarding the creditworthiness of the borrowers based on references to undisclosed guidelines when the *actual* information regarding the creditworthiness of the borrowers was set forth in detail in the same document.

Plaintiffs also mischaracterize Defendants' argument as one that underwriting standards *are* procedural. Opp. at 12. The point, however, is not that the guidelines lack substance but that the *disclosures* concerned their procedural aspects. Of course underwriting standards have substance, but investors could not have been misled about that substance when the numerical standards were not disclosed, but key creditworthiness data concerning the resulting loans was.[7]

**c. Plaintiffs Do Not Offer Factual Allegations That Support Their Conclusory Claims of Falsity.**

Apparently recognizing that allegations that Wells Fargo made exceptions to its underwriting guidelines fail to state a claim in light of the express disclosure of that very fact (*see* Cplt. ¶ 75), Plaintiffs now recast the claim as one that Wells Fargo abandoned *all* efforts to evaluate the creditworthiness of its borrowers. They argue that the false statement concerning the guidelines was that Wells Fargo "***evaluate[d] the applicant's credit standing and ability to repay the loan.***"[8] Opp. at 10 (emphasis in orig.); *see also id.* ("Far from evaluating 'the applicant's credit standing and ability to repay the loan' . . . ."). In making that claim, Plaintiffs bring to the fore *Twombly*'s distinction between "possibility" and "plausibility." *See Twombly*, 550 U.S. at 557. On its face, the claim that Wells Fargo stopped considering the credit risk posed by

---

[6] See Securities and Exchange Comm'n, *et al.*, Staff Report: Enhancing Disclosure in the Mortgage Backed Securities Market (Jan. 2003), *available at* http://www.sec.gov/news/studies/mortgagebacked.htm. The Report discusses at length the information that investors find useful in assessing risk, including default risk, in connection with purchases of MBS, and specifically mentioning DTI ratios, LTV ratios, and FICO scores. *See also* 17 C.F.R. § 229.1111.

[7] The cases Plaintiffs cite in support of the proposition that underwriting standards matter to investors (Opp. at 12) are inapposite for two related reasons. First, none provides support for the contention that the disclosures here were misleading—they do not address disclosures of this type at all. Second, those cases involve claims by purchasers of mortgage lenders' *equity or debt* securities, not MBS. Accordingly, those purchasers were buying securities with very different economics and risk, and doing so without the kind of disclosures made in Appendix A.

[8] This illustrates one of the shortcomings of the "puzzle-pleading" approach taken by Plaintiffs. *See In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 501-02 (W.D. Wash. 2009). There is no way to judge from the Complaint that this particular statement is the focus of Plaintiffs' claims, as it now is portrayed in the Opposition.

mortgage loan applicants is absurd, and meaningful factual allegations would be required to push that assertion from the realm of theoretical possibility into the realm of plausibility. The Complaint contains no such allegations.

*None* of the confidential witnesses ("CW") purportedly quoted in the Complaint stated that Wells Fargo stopped evaluating the creditworthiness of its borrowers. Plaintiffs cite to one CW who supposedly said that "high producers" caused "a lot of bad loans" to go through. Opp. at 10. Setting aside Plaintiffs' threshold—and dispositive—failure to tie these alleged comments to the loans at issue here, whatever "a lot" of "bad loans" may mean, the statement does not say or even suggest that Wells Fargo stopped evaluating the creditworthiness of borrowers. The same witness reportedly claims that there was "coercion between loan officers and underwriters" and that "loan officers were stretching the truth," (*id.*), but neither statement supports the contention that Wells Fargo had stopped analyzing whether prospective borrowers could repay their loans. The only CW who provided any information regarding the rate at which exceptions were supposedly made suggested that 25%-30% of the loans involved exceptions. *Id.* As with all of their CW allegations, Plaintiffs offer no foundation for this CW to speak to anything done outside his own office.[9] Moreover, the statement affirmatively contradicts the claim that Wells Fargo had stopped evaluating loan applicants because, if the CW's statement were true, then 70%-75% of the loans did not involve exceptions (*i.e.*, Wells Fargo applied its standards for assessing creditworthiness to those borrowers).[10] Similarly, the allegation that a "senior underwriter" says that Wells Fargo loosened its underwriting standards at the end of the year (Opp. at 11), affirmatively rebuts the contention that Wells Fargo stopped applying its guidelines—the bank could not have "loosened" its guidelines at year-end unless it was applying them during the rest

[9] Plaintiffs do not even address the problem that the Complaint offers no basis for concluding that any of the CWs can speak to a company-wide practice (much less to loans included in the pools at issue). *In re PMI Group, Inc. Sec. Litig.*, 2009 WL 1916934, at *9 (N.D. Cal. Jul. 1, 2009).

[10] This analysis necessarily accepts as true Plaintiffs' theory that an exception to the underwriting guidelines means that a borrower is uncreditworthy or that his or her creditworthiness was not analyzed. Plaintiffs have provided no support for this contention in their Complaint, for it is not only false but demonstrably illogical. Assume, as Plaintiffs claim, that one such guideline is that LTV should not exceed 95%. If Bill Gates asked for a mortgage with a 100% LTV ratio, granting that loan would deviate from the guideline, but might be justified because, given his income and other assets, he would be considered a good credit risk.

of the year. In sum, Plaintiffs' allegations amount to a conclusory assertion of falsity adorned with a desultory assortment of derogatory comments irrelevant to Plaintiffs' claims.

Plaintiffs also contend their allegations are "corroborat[ed]" by the statement in the 2007 Annual Report which, as noted, concerns home equity loans, not first mortgage loans. Opp. at 11. Moreover, the statement discusses the risks associated with loans purchased from other origination channels (*i.e.*, "mortgage brokers, bankers and other mortgage companies"). The only thing it "corroborates" is Plaintiffs' abject lack of factual support for their purported claims.

Plaintiffs further contend their allegations concerning American Home Mortgage suffice because that company greatly reduced or eliminated its guidelines and no disclosure said just that. Opp. at 11. The disclosure told investors, however, that loans purchased from others "may have been originated by the seller or another third party according to underwriting standards that may have *varied materially* from Wells Fargo Bank's underwriting standards" and that those underwriting standards would not be disclosed unless they accounted for more than 20% of the pool. RJN Ex. 1 at 32 (emphasis added). Plaintiffs do not, and cannot, explain how American Home's underwriting standards, no matter how deficient, could render that disclosure misleading.

With respect to all other lenders from whom Wells Fargo purchased loans, Plaintiffs relegate their response to a footnote and, for want of legal argument, simply deride Wells Fargo's position as "ironic." Opp. at 11 n.8. Plaintiffs effectively concede that they have no information tying the unnamed mortgage lenders described in the Complaint to the Certificates. Absent such a link, the allegation that other lenders did bad things cannot sustain a claim against Wells Fargo.

### 2. Plaintiffs Fail to Allege Any Facts Indicating That a Single Appraisal at Issue Here Was Inflated.

Plaintiffs mount a three-pronged argument that their allegations concerning inflated appraisals are sufficient. First, they note that the Complaint alleges there was congressional testimony to the effect that appraisals were inflated and a study indicating that 90% of appraisers felt pressure to inflate appraisals. Opp. at 16. These allegations, of course, are not tied to Wells Fargo or to the loans in these pools. *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, __ F. Supp. 2d __, 2009 WL 3149775, at *6 (D. Mass. Sept. 30, 2009)

("*Plumbers' Union*"). Second, they cite to CW allegations from two people (Opp. at 16-17) as to whom Plaintiffs offer no explanation whatsoever of how they would know if appraisals were inflated. Neither is an appraiser and neither indicates how he or she came to the epiphany that appraisers had inflated their appraisals. Moreover, Plaintiffs once again fail to provide any basis to think these CW allegations, even if true, concern company-wide conduct or pertain to the loans at issue here. Third, Plaintiffs say that Wells Fargo has been sued in another case concerning appraisals. Opp. at 17. An allegation that a defendant has been sued simply does not amount to an allegation of wrongdoing. *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d at 1005.

**3. Plaintiffs Fail to Explain How Any Statement Concerning Ratings Was False or Misleading.**

The Prospectus Supplements indicated what ratings the various classes of securities would need to receive for the offering to go forward. That was a true statement which Plaintiffs do not contest. Plaintiffs argue that the rating agencies, in granting those ratings, were not doing their jobs as well as they might have been. Opp. at 18. Assuming that were true, it would not mean that *Wells Fargo* made any false statement by saying what ratings would need to be assigned in order for the offering to go forward. *Plumbers' Union*, 2009 WL 3149775, at *8. Moreover, claiming that the rating agencies could have done their job better is simply fraud by hindsight.[11] *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001).[12]

Plaintiffs contend the Rating Agencies' alleged conflict of interest rendered the ratings misleading. If that is the basis for their claim, it is plainly time-barred because, as early as September 2007, Congress was holding hearings regarding whether the rating agencies had conflicts of interest "that might have contributed to the mortgage market turmoil that has upset investors worldwide." Supp. RJN Exs. 87-88. The *Economist* reported on this in May 2007,

[11] The potential consequences of Plaintiffs' theory are extraordinary. If the rating agencies used "out-dated" economic models to forecast economic growth, and therefore tax revenue, could the State of California be forced to repurchase bonds it sold with particular ratings? What about the other 49 states and thousands of municipal issuers? If the agencies were insufficiently current on business trends, could thousands of corporate bond issuers be forced to repurchase their bonds?

[12] Plaintiffs note that SEC Rule 436(g) provides that ratings shall not be considered part of the registration statement "prepared or certified by a person within the meaning of sections 7 and 11 of the Act." Opp. at 19. On this issue, they have a point. Footnote 9 of the Motion incorrectly quoted the rule and drew a conclusion that reached further than was warranted.

saying the big agencies "have an incentive to give the issuer-client the rating it wants so as to win repeat business" and that "[t]he biggest concern is structured finance, where the agencies now depend on a few large investment banks for much of their revenue." RJN Ex. 24. Plainly, if the agencies' alleged conflicts of interest are the issue, Plaintiffs have no case.

Plaintiffs also argue that Defendants did not disclose "that the Rating Agencies' fees were based on the issuance of particular ratings, rather than objective and independent analysis" (Opp. at 18), but the Complaint makes no such allegation.[13]

**B. <u>Plaintiffs Cannot Show Their Claims Are Timely.</u>**

Plaintiffs assert that Defendants bear "a considerable burden" to show the claims are untimely, citing *Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863 (9th Cir. 2008). Opp. at 3. That is simply wrong. *Betz* concerned claims under Section 10(b) of the 1934 Act. *Id.* at 872. With respect to 1933 Act claims, plaintiffs bear the burden of affirmatively pleading facts showing compliance with the limitations period. *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir. 1985); *In re Infonet Serv. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1115 (C.D. Cal. 2003).

Plaintiffs also suggest there is an inconsistency between Defendants' argument that the Complaint fails to state a claim and their contention that the claims are time-barred. Opp. at 3 n.5. Plaintiffs are mistaken. The Complaint here *could not do less* in the way of alleging any false or misleading statements in the offering materials. With respect to the statute of limitations, the point is that Plaintiffs could have filed an equally generic (and equally defective) complaint more than a year earlier. Under Section 13, the one-year statute runs from discovery of the untrue statement. 15 U.S.C. § 77m. If a plaintiff knows enough to allege *falsity*, the statute is running.[14] Plaintiffs are in a box; either the Complaint fails to allege falsity and must be dismissed, or it is

[13] Plaintiffs cite three different paragraphs of the Complaint for this proposition. One of those, ¶ 169, does not exist. Of the two remaining paragraphs, one states that the issuer of the securities pays the rating agency's fee (¶ 118), but that does not mean the fee depends on the ratings. The third paragraph says that the securities would not be distributed if they did not receive specified ratings (¶ 112), but that does not suggest that the agency would not be paid in that circumstance..

[14] This contrasts with the 10(b) standard under *Betz*, which would require notice of information concerning the defendant's *state of mind*. 519 F.3d at 878. In addition to being inapposite, *Betz* may not long be the law. A petition for *certiorari* has been pending in the case since May 2009, presumably awaiting the Court's ruling in *Merck v. Reynolds*, which raises similar issues.

adequately pleaded but must be dismissed because Plaintiffs do not, and cannot, point to anything in the year prior to filing this action that informed them of any fact necessary to this Complaint.[15]

### 1. Plaintiffs' Argument That They Were Placed on Notice by the May 2008 Rating Downgrade Cannot Be Correct.

Plaintiffs have not met their burden of affirmatively pleading their compliance with the statute, and, even in their Opposition offer no coherent argument that their claims are timely. The only event they can point to as putting them on notice is a downgrade of some, but not all, of the securities at issue in May 2008. Opp. at 22, 24. This argument makes no sense.

To begin with, some, but not all, of the Certificates were downgraded in December 2007 and January 2008. RJN Exs. 10-12. Plaintiffs assert that those downgrades did not put them on notice because those securities were not investment grade. Opp. at 22. That argument fails first because an A-rated tranche *was* downgraded in January 2008.[16] Supp. RJN Ex. 89. Thus, *if* the key is whether the downgraded securities were investment grade, the claims are time-barred.

That said, Plaintiffs offer no explanation of why the distinction between investment grade and non-investment grade is meaningful in this context. Plaintiffs assert that investment grade ratings are "important" because many institutional investors cannot purchase lower graded securities. Opp. at 22. But the importance of investment grade ratings to pension funds has no bearing on the adequacy or alleged inadequacy of the rating process. If the downgrade of a security indicates that the original rating was "wrong" based on certain assumptions about the performance of the entire pool (which is not true, but is what Plaintiffs appear to contend), that information should be equally relevant for a security with a B rating as one with an A rating.

In any event, this case is not limited to institutional investors or purchasers of investment

---

[15] Plaintiffs also imply that Defendants must choose which day, among the dozens on which relevant information was published, Plaintiffs were on placed notice of their claims. Opp. at 22. Indeed, they put the word "unspecified" in bold and italics (twice) to ensure that point is not missed. *Id.* at 22, 24. Yet, Plaintiffs offer no authority for the proposition that the Defendants must determine such a date—it is enough that the information available one year prior to filing would have put a reasonable investor on notice. *See, e.g.*, *DeBenedictis v. Merrill Lynch & Co. Inc.*, 492 F.3d 209, 217 (3d Cir. 2007). Moreover, the inquiry notice date may differ for Plaintiffs' various alleged misrepresentations or omissions.

[16] It is true this rating remained investment grade. But Plaintiffs offer no explanation why the only kind of downgrade that would put them on notice is one to below investment grade.

grade bonds—the purported class definition includes the purchasers of any of the Certificates, including the non-investment grade tranches.[17] Cplt. ¶ 129. Plaintiffs cannot argue that May 2008 is the key date because that is when the securities that they (as opposed to absent members of the putative class) held were downgraded; the named plaintiffs in this case purchased only AAA-rated securities (*id.* at ¶ 128), which they allege were not downgraded until December 2008 (*id.* at ¶ 114). In short, there is no meaningful distinction between the May 2008 downgrades that Plaintiffs concede put them on notice and the December 2007 and January 2008 downgrades.[18]

**2. Plaintiffs Fail to Argue That the Inflated Appraisal Claims Are Timely.**

The Opposition does not even try to respond to Defendants' demonstration that the inflation of mortgage appraisals was widely-publicized years before this action was filed. Plaintiffs offer not one sentence arguing that the inflated appraisal claims are timely. That Plaintiffs would raise the white flag on this claim makes sense given that the Complaint itself premises its allegations of such conduct on a study that was widely reported in 2007 and congressional testimony occurring in that year. Cplt. ¶¶ 104-105.

**3. Plaintiffs' Contention That They Were Not On Notice Because Most of the Articles Did Not Mention Wells Fargo Fails.**

Plaintiffs contend that the news reports submitted to the Court regarding alleged flaws in the rating agencies' processes and diminution in underwriting standards did not put them on notice because, with one exception, those articles did not specifically mention Wells Fargo. Opp. at 23-24. This argument fails as well.

As applied to their allegations concerning rating agency practices, Plaintiffs' argument is entirely inapposite. Plaintiffs' allegations regarding the rating agencies are in no way specific to Wells Fargo. Indeed, they are copied verbatim from complaints Plaintiffs' counsel has filed against other companies. *See, e.g.*, RJN Ex. 8 at ¶¶ 161, 163, 164, 165, 167-168. These

[17] Nor would it matter if they had restricted the class to purchasers of investment grade securities because they still could not explain why, given their theory of the case, the downgrade of some Certificates would not have put them on notice as to issues with the ratings of all the Certificates.

[18] Plaintiffs also contend that the December 2007 and January 2008 downgrades did not put them on notice because the ratings on some of the securities were reaffirmed at the same time. Opp. at 22 n.18. That argument also fails to distinguish the May 2008 downgrades, which were similarly accompanied by reaffirmation of some classes of securities. Supp. RJN Ex. 90.

allegations concern the purported practices of the agencies with respect to MBS generally. The news reports submitted by Defendants show that the press was reporting on the same purported flaws in the rating agencies' practices that Plaintiffs allege in the Complaint—out-dated models and conflicts of interest exacerbated in the context of structured finance. *See*, *e.g.*, RJN Exs. 24, 27-28; Supp. RJN Exs. 87-88. The articles did not in any way suggest these issues were limited to particular issuers. It is absurd to suggest that, without a specific reference to Wells Fargo in the articles, a reasonable investor would not have been put on notice that those same purported flaws might apply to the ratings those very agencies issued in connection with these securities.

With respect to the alleged exceptions to the underwriting guidelines, Plaintiffs' point that the articles do not reference Wells Fargo might make more sense but for two problems. First, Plaintiffs ignore the connection between the news articles and the disclosures in the offering materials. An article saying that "stated income" mortgages raise red flags because borrowers can "cheat" (RJN Ex. 18), might not put investors on notice that such mortgages are being issued at Wells Fargo, but Appendix A to each Prospectus Supplement did (*see*, *e.g.*, RJN Ex. 1 at A-3). Taken together, the news reports and the disclosure materials certainly put Plaintiffs on notice of at least some of their claims, such as those concerning low-doc and no-doc loans.

Second, there was an article referencing Wells Fargo and there were disclosures in the offering materials themselves. Plaintiffs note that the article dealt with only a limited category of loans and suggested that there had not been a nationwide modification in Wells Fargo's lending practices. Opp. at 23 n.19. Plaintiffs are correct that the changes discussed in the article were limited in scope, and perhaps that should limit the significance of the article for statute of limitations purposes. But the same care should be applied in evaluating Plaintiffs' CW allegations and claims concerning matters such as the supposed "admission" in Wells Fargo's Annual Report, which concerned only home equity loans, not the loans packaged in these MBS.[19] If public reports that are not specific to the type of loans included in these Certificates are

[19] As noted, this statement had nothing to do with the mortgages at issue, and so is irrelevant to the limitations analysis. It is ironic that Plaintiffs assert over and over again that a report issued more than a year before this action was filed shows there were misstatements in the offering materials. *See* Opp. at 11 (quoting Annual Report and noting it was filed in February 2008).

insufficient to trigger inquiry notice, statements that are not directed at those loans are similarly insufficient to support Plaintiffs' claims of falsity. Plaintiffs cannot have it both ways.

Finally, all of this is trumped by the inarguable reality that the offering materials, of course, are specific to Wells Fargo and to the loans included in these MBS. They disclosed, *inter alia*, that: Wells Fargo made exceptions to its underwriting guidelines; other originators had materially less demanding guidelines that were not being disclosed; and low-doc and no-doc loans were included. Trying to distinguish *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209 (3d Cir. 2007), Plaintiffs contend that the offering materials here did not disclose "the true credit risk" of the securities. Appendix A did, however, disclose an immense amount of information of exactly the sort that lenders would use to determine the credit risk: credit scores, LTV ratios, DTI ratios, documentation levels, occupancy types, interest rates, etc. What Appendix A failed to do was to forecast the dramatic decline in home prices and increase in unemployment that were to come later, but that does not provide the basis for a claim.

**4. Plaintiffs' Standing Theory Implicates the Statue of Repose.**

In arguing that they have standing to assert claims on behalf of persons who bought securities that they did not buy, Plaintiffs contend that the Certificates were offered under only three Registration Statements. Opp. to the Underwriter Defts' Mot. to Dismiss, Dkt. # 170 at 8-10. If that contention is correct,[20] then the statute of repose imposed by Section 13 bars the Section 11 claims on all securities issued under the first two of those three registration statements.

Section 11 provides that, where a registration statement contains an untrue statement of material fact or omits a material fact required to be stated or necessary to make the statements therein not misleading, "any person acquiring *such security*" may bring claims against certain persons. 15 U.S.C. § 77k (emphasis added). Section 13, in turn, provides that "[i]n no event shall any such action be brought to enforce a liability created under section 11 . . . more than three years after *the security* was bona fide offered to the public." 15 U.S.C. § 77m (emphasis added).

[20] It is not correct. The SEC has stated that, where multiple sales occur pursuant to a shelf registration and different prospectus supplements (as here), the shelf plus the prospectus supplement constitute a "new registration statement" for 1933 Act purposes. 17 C.F.R. § 229.512(a)(2). That rule means Plaintiffs lack Section 11 standing for any offering in which they did not purchase. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999).

"The security" in Section 13 plainly refers to the same generic "security" referenced in Section 11 and, as "the *vast* majority of courts" have concluded, the repose period begins to run from the date of the registration statement, even if the plaintiff purchased later. *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 100 (2d Cir. 2004) (emphasis in original); *see also id.* at 104. Here, Plaintiffs allege that the first two registration statements were dated July 2005 and October 2005, respectively—both more than three years before this action was filed. Cplt. ¶ 1.

**C. Plaintiffs Fail to Address the Standing Issues Raised by Wells Fargo.**

The Opposition fails even to mention that the Wells Fargo Defendants have moved to dismiss for lack of standing. Plaintiffs discuss standing in their Opposition to the Underwriter Defendants' Motion to Dismiss (Dkt. #170). The Wells Fargo Defendants and Individual Defendants adopt the arguments the Underwriter Defendants' make in their Reply.

**D. The Control Person Claims Fail if the Underlying Claims Fail.**

Plaintiffs devote a page of their Opposition to arguing that they have adequately alleged that certain parties are "control persons" for purposes of Section 15. While the Wells Fargo Defendants and Individual Defendants do not concede that Plaintiffs' control person claims are correct, they have not argued that Plaintiffs have inadequately alleged the element of control. Rather, the Motion asserts that the Section 15 claims fail because the underlying Section 11 and 12(a)(2) claims are inadequately alleged—an argument that Plaintiffs do not contest.

## III. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

DATED: January 15, 2010

MUNGER, TOLLES & OLSON LLP

By: /s/ David H. Fry
DAVID H. FRY

Attorneys for Defendants
WELLS FARGO DEFENDANTS AND THE INDIVIDUAL DEFENDANTS

DATED: January 15, 2010

WELLS FARGO & CO.
Office of General Counsel
MAC A0194-266
45 Fremont Street, 26th floor
San Francisco, CA 94105
Telephone: (415) 396-4425
Facsimile: (415) 975-7864
tojacob@wellsfargo.com

By: */s/ Thomas O. Jacob*
THOMAS O. JACOB

Attorney for Defendants
WELLS FARGO DEFENDANTS