UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION,                                           09 MD 2017 (LAK)

This document applies to:

*In re Lehman Brothers Mortgage-Backed
Securities Litigation*, No. 08 Civ. 6762.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

>   Joel P. Laitman
>   Christopher Lometti
>   Daniel B. Rehns
>   Kenneth B. Rehns
>   COHEN MILSTEIN SELLERS & TOLL, PLLC
>   *Attorneys for Plaintiffs*.

>   Michael J. Chepiga
>   Mary Elizabeth McGarry
>   Michael C. Ledley
>   SIMPSON THACHER & BARTLETT LLP
>   *Attorneys for Defendants Lana Franks, Edward Grieb, Richard McKinney, Kristine Smith, James J. Sullivan, Samir Tabet and Mark L Zusy*.

LEWIS A. KAPLAN, *District Judge*.

As the Court has noted previously,[1] the complaint in this putative class action seeks

---

[1] *In re Lehman Brothers Sec. & ERISA Litig.,* No. 09 MD 2017 (LAK), 2010 WL 337997 (S.D.N.Y. Feb. 1, 2010).

damages for alleged violations of the Securities Act of 1933 in the issuance, distribution and sale of over ninety separate offerings of mortgage pass-through certificates (the "Certificates") by affiliates and subsidiaries of Lehman Brothers Holdings, Inc. (collectively, "Lehman") between September 2005 and July 2007. The Certificates are a form of mortgage-backed security ("MBS"). The matter is before the Court on the motion of the Individual Defendants, officers or directors of the company responsible for creating the trusts that issued the Certificates, to dismiss the complaint against them for failure to state a claim upon which relief may be granted.

*Facts*

*The Securities*

The MBS at issue in this litigation were offered pursuant to two shelf registration statements with base prospectuses filed by a Lehman affiliate in August 2005, amended in September 2005, and August 2006. For each offering, Lehman filed also a prospectus supplement to the relevant base prospectus which amended or updated the original shelf registration statement to which it was traceable and provided additional information about the particular pools of mortgages underlying the Certificates offered pursuant to that supplement, including the types of loans and the descriptions of underwriting guidelines for those loans that were provided by the originators. The registration statements, base prospectuses and prospectus supplements are henceforth referred to as the "Offering Documents." The complaint alleges that named plaintiffs have purchased Certificates issued only in six of the ninety-four offerings alleged in the complaint.[2]

---

[2] The Private Securities Litigation Reform Act requires "[e]ach plaintiff seeking to serve as a representative party" to file a "sworn certification, which shall be personally signed by such plaintiff" with the complaint. 15 U.S.C. § 77z-1(a)(2)(A). The certification must "set[] forth all of the transactions of the plaintiff in the security that is the subject of the

*The Individual Defendants*

The Individual Defendants were officers or directors of the Structured Asset Securities Corporation ("SASCO") during the relevant time period. SASCO, which filed a chapter 11 petition last year, issued the registration statements and acted as depositor in the securitization process.[3] Only defendants Zusy, Tabat, and Sullivan signed the 2005 registration statement.[4] Each Individual Defendant except Tabat signed the 2006 registration statement.[5]

*Allegations against the Individual Defendants*

The complaint alleges that the Individual Defendants signed registration statements that failed to disclose the following allegedly material facts and thus were misleading:

---

complaint." *Id.*

Plaintiffs have attached four of the required certifications to the complaint. Three allege that named plaintiffs purchased Certificates in the following offerings: Structured Adjustable Rate Mortgage Loan Series 2006-1 and Lehman XS Trust, Mortgage Pass-Through Certificates Series 2006-14N, Series 2005-7N, Series 2005-5N, Series 2005-6, and Series 2006-2N. *See* Beauchamp Certification (Feb. 18, 2009) at Schedule A; Laufenberg, Jr. Certifiaction (Dec. 9, 2008) at Schedule A; Auble & Dickson Certification (Dec. 22, 2008) at Schedule A.

The fourth certification is unsigned and undated. *See* Auble & Ferullo Certification (undated and unsigned) at Schedule A. It alleges purchases in the following additional offerings: Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-GP2, GreenPoint Mortgage Funding Trust Pass-Through Certificates, Series 2006-AR4, and Series 2006-AR5. Without a signed certification, however, the claims regarding those offerings are not properly before the Court.

[3] A depositor acquires mortgage assets and transfers them to the trusts, which, in turn, issue the certificates.

[4] Cpt. ¶¶ 37-43.

[5] *Id.*

4

- "[T]he Originators of the underlying Certificate loans failed to comply with the general loan underwriting guidelines in the Registration Statements, including an examination of borrower creditworthiness and performance and review of standardized appraisals of the mortgage properties."[6]

- "[T]he Rating Agencies – and not [Lehman] as stated in the Offering Documents – largely determined the composition of the securitized pool of loans, the amount and form of the Certificates' levels of credit enhancement before the Certificates were created and the Ratings Agencies were 'engaged' to rate the securities."[7]

- "[T]here were material undisclosed conflicts of interest between Lehman and the Rating Agencies, including as reflected in the undisclosed rating shopping practices, which incentivized the Ratings Agencies to understate the appropriate Certificate credit enhancement and inflate the Certificate ratings."[8]

- "[T]he amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by the Ratings Agencies' models which

---

[6] Cpt. ¶ 18; *see also id.* ¶ 69-150, 185-266.

[7] *Id.*; *see also id.* ¶¶ 172-78, 272-73.

[8] *Id.*; *see also id.* ¶¶ 17, 168-71, 272-73.

had not been updated in a timely manner."[9]

The complaint seeks damages from the Individual Defendants for these alleged misstatements and omissions under Section 11 and 15 of the Securities Act of 1933,[10] the former on the theory that they signed the registration statements and the latter on the theory that they controlled SASCO, Lehman Brothers, Inc., and the trusts that issued the Certificates.

*Discussion*

A.  The Legal Standard

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[11] In order to survive such a motion, however, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[12] Although such motions are addressed to the face of the pleadings, the court may consider also documents attached to or incorporated by reference in the complaint as well as legally required public disclosure documents and documents possessed by or known to the plaintiff upon which it relied in bringing

---

[9] *Id.* ¶ 18; *see also id.* ¶¶ 16, 53, 58, 159-67, 268-71.

[10] 15 U.S.C. § 77k, *o*.

[11] *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[12] *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

the suit.[13]

To state a claim under Section 11 of the Securities Act of 1933, the plaintiff must allege that (1) it purchased a registered security, (2) the defendant adequately participated in the offering in a manner giving rise to liability under Section 11, and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[14]  Section 15 creates liability for individuals or entities that "control[led] any person liable" under Section 11.[15]

B.  *Standing*

The complaint alleges that plaintiffs purchased Certificates in six of the ninety-four separate offerings.  The Individual Defendants move to dismiss for lack of standing plaintiffs' claims with respect to the eighty-eight offerings in which they did not purchase.

Article III of the Constitution requires a plaintiff to have standing before the plaintiff may maintain a lawsuit.  The standing inquiry has three elements: a "plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to

---

[13] *ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[14] *In re Morgan Stanley Info. Fund Sec. Litig.*, slip op., No. 09-0837-cv, at *769 (2d Cir. Jan 25, 2010) (quoting 15 U.S.C. § 77k(a)).

[15] *Id.* (quoting 15 U.S.C. § 77*o*).

7

be redressed by the requested relief."[16]

One or more plaintiffs has alleged standing adequately with respect to the six offerings in which one or more bought Certificates. As no named plaintiff has alleged that he or she purchased Certificates in any of the other eighty-eight offerings, none can have been injured with respect to those offerings.[17] None, therefore, has standing to bring claims with respect to these offerings.

Plaintiffs nonetheless argue that determining whether they properly may bring claims in respect of the eighty-eight offerings in which they did not purchase would be "premature at this point and more appropriately addressed at the class certification stage of the litigation."[18] They contend that the misstatements and omissions in the Offering Documents for the Certificates that they purchased are common to those in the Offering Documents for the Certificates that they did not buy. Plaintiffs suggest, therefore, that they are entitled to sue on behalf of a class of all who purchased Certificates offered under documents containing the same disclosure defects that allegedly affected their purchases or, at least, that this question goes only to their ability to serve as a class representative and not to standing. I disagree.

Standing is a threshold constitutional requirement that mandates an allegation of

---

[16] *Allen v. Wright*, 4658 U.S. 737, 751 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[17] Plaintiffs here are seeking damages based on the misstatements and omissions in the Offering Documents. They do not purport to seek a determination on the issue of whether the statements that were in the common registration statements violated the Securities Act at the time they were filed.

[18] Pl. Br. at 11. *See also In re Dreyfus Aggressive Grown Mutual Fund Litigation*, No. 98 Civ. 4318(HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000).

8

injury traceable to the conduct of which plaintiffs complain. It can not be dispensed with by styling the complaint as a class action.[19] In a class action, as in any other lawsuit, the named plaintiffs must "show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class . . . they purport to represent."[20]

Plaintiffs have not alleged that they have suffered any injury stemming from the offerings in which they did not purchase and thus have no standing. Judge Crotty's decision in *In re Salomon Smith Barney Mutual Fund Fees Litigation*,[21] is instructive on this point. In that case, the named plaintiffs, who owned shares in twenty of eighty-eight mutual funds offered by Salomon Smith Barney ("SSB"), sued for violations of the Securities Act, the Securities Exchange Act of 1934, and the Investment Company Act of 1940 on behalf of owners of shares in all the funds.[22] They alleged that the materials provided to fund investors, including the fund prospectuses, were

---

[19] *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"); *see*, *e.g.*, *Hoffman v. UGBS-AG*, 591 F. Supp.2d 522, 530-32 (S.D.N.Y. 2006); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp.2d at 607 ("[T]he Article III standing determination should precede that of class certification. With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims . . . .").

To the extent Rule 23 otherwise might purport to allow plaintiffs to bring a claim for which they do not have standing it would violate the Rules Enabling Act. 28 U.S.C. § 2072(b) (Federal Rules of Civil Procedure may not "abridge, enlarge or modify any substantive right.").

[20] *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) (internal quotation marks omitted).

[21] 441 F. Supp. 2d 579 (S.D.N.Y. 2006).

[22] *Id.* at 582.


9

materially misleading in that they failed to disclose a common scheme that allegedly violated the securities laws.[23] Judge Crotty dismissed for lack of standing the claims arising out of the sixty-eight funds in which no named plaintiff had an interest because they had not alleged any personal injury.[24] In doing so, he rejected cases that had determined the issues surrounding class certification before determining standing and held that "the Article III standing determination should precede that of class certification."[25]

So too here. Named plaintiffs have purchased in six of the ninety-four offerings. They have not alleged any personal injury stemming from the other eighty-eight. They therefore have no standing to assert those claims.

Plaintiffs' argue also that they have standing to bring claims based on the eighty-eight offerings because they were conducted pursuant to the same shelf registration statements that governed the six offerings in which plaintiffs did purchase. The fact remains, however, that plaintiffs have not alleged any injury traceable to the Certificates issued in those offerings.[26] In consequence, all claims arising from the eighty-eight offerings in which none of the plaintiffs purchased any securities are dismissed.

---

[23] *Id.* at 583-84.

[24] *Id.* at 604, 606.

[25] *Id.* at 607.

[26] *See* Tr., Jan. 28, 2010, at 40-41, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08 Civ. 10783 (MGC) (S.D.N.Y. Jan. 28, 2010) (granting motion to dismiss claims arising out of MBS certificates named plaintiffs did not purchase for lack of standing); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08 Civ. 10446 (RGS), 2009 WL 3149775 (D. Mass. Sept. 30, 2009) (dismissing section 11 claims for lack of standing where MBS certificates were issued pursuant to common registration statements but different prospectus supplements).

10

C.  *Alleged Misstatements or Omissions*

   1.  *Ratings agencies' relationships with Lehman*

Two of the alleged misstatements or omissions concern the ratings agencies' relationships with Lehman and their allegedly corresponding lack of independence. The complaint first alleges that the Offering Documents failed to disclose "conflicts of interest between Lehman and the Rating Agencies"[27] in that Lehman allegedly engaged in "ratings shopping" and paid the ratings agencies for their ratings.[28] It alleges also that the Ratings Agencies, and not Lehman, structured the pools of mortgage loans underlying the Certificates.[29] These omissions are said to have rendered the Offering Documents misleading because they created the false impression that the Ratings Agencies were independent evaluators of the Certificates.[30] These allegations are insufficient to state a claim for two reasons.

First, there was no obligation for the Offering Documents to disclose the potential for a conflict of interest arising from the fact that Lehman paid the ratings agencies for their ratings. The Securities Act does not require disclosure of that which is publicly known,[31] and the risk that

---

[27] Cpt. ¶ 18.

[28] *Id.* ¶ 179.

[29] *Id.* ¶ 18.

[30] *Id.* ¶¶ 173, 273.

[31] *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it.") (internal citations and quotation marks omitted).

11

the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years. For example, a January 2003 SEC report noted that "[c]oncerns have been expressed for a number of years about the potential conflict of interest that arises from the fact that the largest credit rating agencies rely on issuer fees for the vast majority of their revenues."[32] It went on to note several additional ways in which issuers could influence the ratings agencies.

Second, the rating agencies' role in structuring the Certificates is not material as a matter of law.[33] A reasonable investor would have known that the ratings agencies were paid by the issuers. If the fee arrangement undermined an investor's confidence in the ratings agencies' independence, a disclosure that a rating agency was involved in structuring the Certificates prior to rating them would have added nothing important to the "total mix" of information available. If, on the other hand, an investor trusted the ratings agencies to give an honest opinion notwithstanding the fact that they were paid by the issuer, the fact that they were involved in structuring the Certificates, assuming that they were, likewise would have been unimportant. In consequence, these claims are insufficient.

---

[32] McGarry Decl. Ex. 17 at 41. *See also* Testimony Concerning Rating the Rating Agencies: The State of Transparency and Competition, by Annette L. Nazareth, Director, Division of Market Regulation, SEC, Before the House Subcommittee on Captial Markets, Insurance, and Government Sponsored Enterprises, Committee on Financial Services, April 2, 2003 ("The practice of issuers paying for their own ratings creates at least the potential for a conflict of interest. Arguably, the dependence of rating agencies on revenues from the companies they rate could induce them to rate issuers more liberally, and temper their diligence in probing for negative information."), McGarry Decl. Ex. 18.

[33] *See DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (noting that information is material when there is "a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (citing *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976)) (alterations in original).

2.      *Departure from underwriting guidelines*

The complaint alleges that the Offering Documents were misleading because they failed to disclose that the loan originators did not comply with the disclosed underwriting guidelines that were designed to ensure a borrower's ability to repay.[34] The essence of this claim is that the loan originators systematically disregarded the stated underwriting guidelines, including the procedures for originating loans pursuant to the guideline exceptions, and ignored the borrowers' ability to repay in order to originate as many mortgage loans as possible. Plaintiffs allege that the delinquency and foreclosure rates of loans in the pools underlying the Certificates increased after the Certificates were issued.[35] They allege also that the ratings agencies downgraded the Certificates between 2007 and 2009 in part because of "aggressive underwriting practices" used in originating the loans in the pools,[36] and point to several news articles, private litigation filings, and government investigations concerning the loan origination industry and its loosened underwriting practices.[37] The Individual Defendants make three arguments in response.

First, they claim that the Offering Documents disclosed that the loan originators had discretion to issue loans pursuant to exceptions to the guidelines.[38] The complaint, however, does not allege that the loan originators simply made loans pursuant to the disclosed exceptions. Rather,

---

[34] Cpt. ¶¶ 18, 69-150, 185-266.

[35] *See, e.g.*, *id.* ¶¶ 75, 83, 87, 90, 105, 119, 128, 139, 143, 146.

[36] *See, e.g.*, *id.* ¶¶ 75, 83, 90, 105, 119, 128, 139, 146.

[37] *See, e.g.*, *id.* ¶¶ 69, 88, 93, 95-97, 101, 109, 113, 115, 117, 122, 133, 135-36, 153, 156-158.

[38] Ind. Def. Br. at 17-18.

13

it alleges that the originators systematically failed to follow the underwriting guidelines, including the procedures for using underwriting guideline exceptions. It supports these contentions with factual allegations about widespread departures from underwriting standards across the origination industry, including the originators of the loans backing the Certificates, and the impact that these practices allegedly had on the Certificates. These allegations are sufficient at this stage to support a reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading.

Next, the Individual Defendants argue that they were obliged to disclose only what they knew and that the complaint fails to allege that they knew about the exceptions to the underwriting guidelines.[39] If the plaintiffs' claim were based on omissions only, this theory might have some merit.[40] The complaint, however, fairly can be read to allege that the Offering Documents' description of the underwriting guidelines used in originating the loans was an affirmative misstatement because the guidelines allegedly were disregarded on a systematic basis.[41] Regulation AB requires the truthful disclosure of the "underwriting criteria used to originate or

---

[39] Ind. Def. Br. at 20-22.

[40] The Individual Defendants rely on Section 1111 of Regulation AB in support of this defense, which requires disclosure of "the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden." 17 C.F.R. § 229.1111.

[41] *See*, *e.g.*, Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-7N Prospectus Supplement, McGarry Decl. Ex. 2 at S-70 (stating that loans were originated in compliance with the described guidelines); Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-2N Prospectus Supplement, McGarry Decl. Ex. 3 at S-66 (same).

14

purchase the pool assets,"[42] and the complaint alleges that the loans were originated using criteria different than those stated in the Offering Documents. As this claim relies on Section 11 of the Securities Act, and not Section 10(b) of the Securities Exchange Act or Rule 10b-5, the Individual Defendants' knowledge is immaterial. They are strictly liable for any misstatements in the Offering Documents that they signed unless they can establish the due diligence defense, an issue inappropriate for consideration on a motion to dismiss.

Finally, the Individual Defendants argue that the allegedly omitted information is not material because the complaint fails to allege the volume of loans that departed from the stated underwriting guidelines and that the Offering Documents contained an "ocean's worth" of specific data about the loan pools.[43] These arguments are insufficient at this stage to determine that the alleged misstatements and omissions are immaterial as a matter of law.

In consequence, the allegations with respect to underwriting standards are sufficient.

### 3. *Inadequacy of credit enhancements*

The complaint alleges that the Offering Documents contained misstatements and omissions in that the amount and form of credit enhancements disclosed was "insufficient and understated" since it was largely determined by ratings agency models that were out-of-date.[44] It alleges that, as a result, the Certificates had inadequate credit enhancement to support the ratings

---

[42] 17 C.F.R. § 229.1111.

[43] Ind. Def. Br. at 22-26.

[44] Cpt. ¶ 159.

15

assigned to them.[45]  The Individual Defendants argue that these claims are deficient because the question of whether the Certificates' credit enhancements were sufficient to support their ratings is an opinion, not a statement of fact.[46]

Plaintiffs must allege a misstatement or omission of fact in order to state a claim under Section 11.[47]  An opinion is actionable under that statute only if the complaint alleges that the speaker did not truly have the opinion at the time it was issued.[48]

The complaint alleges that "the amount of credit enhancement provided was insufficient for the Certificates to be assigned AAA and investment grade ratings."[49]  Whether the credit enhancements were adequate to support the Certificates' ratings, however, was not a statement of fact.  It was instead a statement of opinion by each ratings agency that it believed, based on the methods and models it used, that the amount and form of credit enhancement built into each Certificate, along with the Certificate's other characteristics, was sufficient to support the rating assigned to it.  For the statements to be actionable, therefore, the complaint must allege that the ratings agencies did not truly hold those opinions at the time they were made public.

---

[45] *Id.*

[46] Ind. Def. Br. at 30-33.

[47] *See In re Morgan Stanley Info. Fund Sec. Litig.*, slip op., No. 09-0837-cv, at*769 (2d Cir. Jan 25, 2010) (quoting 15 U.S.C. § 77k(a)).

[48] *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1131 (2d Cir. 1994) ("A statement of reasons, opinion or belief by such a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false.") (citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1094-96); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003).

[49] Cpt. ¶ 16; *see also id.* ¶¶ 18, 53, 57, 159.

16

To this end, the complaint alleges that Moody's and S&P used out-of-date models based on assumptions that did not reflect the realities of the mortgage market.[50] Relying on a newspaper article and Congressional testimony from 2008, it alleges that Moody's and S&P had not updated the models used to rate the Certificates since 2002 and 1999, respectively,[51] and did not implement updated models that they had developed.[52] It alleges further that one S&P employee admitted that "previous loss data proved to be much less of a guide to future performance"[53] and another testified that he believed that the new models would have provided an "earlier warning about the performance" of MBS.[54]

These allegations are insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued. At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions. Consequently, the claims based on these statements fail.

D.     Section 15

The complaint alleges that the Individual Defendants were officers or directors of

---

[50] *Id.* ¶¶ 161-167.

[51] *Id.* ¶ 159.

[52] *Id.* ¶ 166.

[53] *Id.* ¶ 161.

[54] *Id.* ¶¶ 162-167.

17

SASCO during the relevant time period and signed the relevant registration statements that SASCO filed.[55] Plaintiffs contend also that the Individual Defendants were control persons "within the meaning of Section 15 of the Securities Act" and "were responsible for overseeing the formation and operation of the Issuing Trusts."[56] Finally, plaintiffs allege that McKinney and Franks were managing directors at Lehman Brothers Holdings, Inc., and had responsibility for securitizing Prime/Alt-A and subprime loans, respectively.[57]

These allegations sufficiently allege that the Individual Defendants were control persons of SASCO because they were the company's officers or directors and signed the registration statements.[58] The complaint, however, is completely devoid of factual allegations suggesting the that the Individual Defendants controlled LBI, or the issuing trusts. In consequence, the Section 15 claims with respect to those entities are insufficient.

*Conclusion*

For the foregoing reasons, the Individual Defendants' motion to dismiss the complaint [09 MD 2017, docket item 102, 08 Civ. 6762, docket item 58] is granted to the extent that the complaint is dismissed in all respects except that it is denied with respect to the (1) Section 11

---

[55] *Id.* ¶¶ 37-45.

[56] *Id.* ¶¶ 306, 308-310.

[57] *Id.* ¶ 54.

[58] *See, e.g., In re Refco, Inc. Sec. Litig.*, 503 F. Supp.2d 611, 638 (S.D.N.Y. 2007) (finding that defendant's "signature on an SEC filing containing the misrepresentations that are the subject of a claim is suggestive of control").

18

claims based on the alleged disclosure flaws with respect to the alleged departures from underwriting standards as they relate to the offerings listed on Schedule A and (2) Section 15 claims based on the Individual Defendants' alleged control of SASCO.

SO ORDERED.

Dated: February 17, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

19

## SCHEDULE A

1. Structured Adjustable Rate Mortgage Loan Series 2006-1

2. Lehman XS Trust, Mortgage Pass-Through Certificates Series 2005-5N

3. Lehman XS Trust, Mortgage Pass-Through Certificates Series 2005-6

4. Lehman XS Trust, Mortgage Pass-Through Certificates Series 2005-7N

5. Lehman XS Trust, Mortgage Pass-Through Certificates Series 2006-2N

6. Lehman XS Trust, Mortgage Pass-Through Certificates Series 2006-14N

.